**EXECUTIVE SUMMARY**

A.    Overview

We find that the New York Racing Association, Inc. ("NYRA") has complied with the

Deferred Prosecution Agreement ("DPA") entered into with the United States Attorney's Office

for the Eastern District of New York ("USAO").

Beyond NYRA's compliance with the DPA and the law, this Monitorship focused on

helping NYRA reform itself.  The approach emphasized that good conduct is good business.

The hope was that in the process New York thoroughbred racing would emerge stronger,

increasing the value of the franchise to run racing in New York.  That would be of most benefit

to New York State and its citizenry, no matter who is granted that franchise in the future.  And

that is what we believe has been accomplished.

B.    Background

When NYRA entered into its DPA with the USAO in 2003, many described NYRA as a

broken organization.  The DPA arose out of an indictment of NYRA for engaging in accounting

and reporting practices enabling the systematic tax evasion activity of its pari-mutuel tellers.

But, in addition to that underlying activity, a more complete picture of NYRA's organizational

dysfunction was revealed by two official reports published earlier that year, one by the New

York State Comptroller's Office ("State Comptroller") in September, and the other by the New

York State Attorney General's Office ("State Attorney General") in June.

The State Comptroller's report made out "The Case for Reform," which was the title of

that Office's report.  In doing so, the State Comptroller recommended "that NYRA voluntarily

accept the imposition of an Independent Private Sector Inspector General (IPSIG) to reform its

operating practices, policies and procedures."

Subsequently, the USAO published a "Request For Expressions of Interest and Statements of Qualification for Federal Monitor" aimed at applicants able to function as a monitor and furnish court appointed monitoring services with respect to the operations of NYRA.  Following a vetting process conducted by the USAO and the State Comptroller's and an interview process by Federal District Court Judge Arthur D. Spatt, our law firm was appointed pursuant to the Order of Judge Spatt as the Monitor of NYRA ("Appointing Order").

Under the Appointing Order, we were given the authority to: (1) monitor NYRA's compliance with the terms of its DPA with the USAO; (2) monitor NYRA's business and operations for compliance with federal, state and local laws; and (3) suggest structural reforms helping ensure such compliance by NYRA after the expiration of our term.  We began our work in March 2004 and ended our day-to-day monitoring at the end of this year's Belmont meet on July 24, 2005.  Since then we have been engaged in closing out open items with NYRA and writing our final report.

C.      Monitor's Independent Private Sector Inspector General ("IPSIG") Approach

In understanding the role of an IPSIG-style monitor it is helpful to go the primary definition of an Independent Private Sector Inspector General which is the following:

[1]     An IPSIG is an independent, private sector firm with legal, auditing, investigative, and loss prevention skills, employed by an organization (voluntarily or by compulsory process) to ensure compliance with relevant law and regulations and to deter, prevent, uncover, and report unethical and illegal conduct by, within and against the organization.

[2]     Where the culture of the organization is primarily legitimate or amenable to reform, the IPSIG may, in addition to the prevention and control of illegal and unethical conduct, be a major participant with management in enhancing the economy, efficiency and effectiveness of the organization.  Where the culture is primarily illegitimate and hostile to change, the IPSIG's role may be essentially adversarial, limited to instituting internal controls and monitoring organizational activities.

When Getnick & Getnick undertakes an IPSIG style monitorship, the firm utilizes a multi-disciplinary team combining legal, investigative, auditing, and industry skills.  In this Monitorship, the firm's team included Hawthorne Investigations and Security, Inc., under the direction of Joseph A. Pepe, providing the investigative component, and P. Scutero & Associates, under the direction of Patrick Scutero, providing the forensic auditing component.

Consistent with the State Comptroller's call for the institution of a monitorship to reform NYRA's operating practices, policies and procedures, and the authority vested in the Monitor pursuant to the Appointing Order to suggest structural reforms helping ensure NYRA's continuing compliance with federal, state and local laws, we have always looked in the first instance to work with NYRA in reforming itself.  As said, when NYRA entered into the DPA in December 2003, many described it as a broken organization.  But more importantly, when NYRA entered into that agreement, it committed to repair itself.  Our measures for that repair are what we have called the Four Pillars of Good Corporate Conduct: Integrity; Transparency; Good Governance; and Social Responsibility.  And consistent with our approach that good conduct is good business, we have also been focused on helping NYRA achieve business profitability, productivity, effectiveness, and efficiency.

At the outset of the Monitorship, we read and analyzed reports from the State Comptroller, the State Attorney General, Racing & Wagering Board, SafirRosetti (NYRA's outside consultant hired in 2003), and the New York State Capital Investment Fund ("CIF").  We developed our initial performance benchmarks based on the issues and recommendations for change that had been reported at the time our monitorship began.  We undertook that approach to insure that NYRA, while undertaking fundamental structural reform, also addressed its specifically identified problems on an item by item basis.

D.    Compliance with the DPA

Pursuant to the terms of the DPA, the USAO agrees that if NYRA is in full compliance with all of its obligations under the DPA at the end of its term, then the USAO will seek dismissal with prejudice of the indictment against NYRA.   We conclude that NYRA has so complied.    Our report provides a detailed paragraph by paragraph analysis of NYRA's compliance with the DPA, leading us to reach that conclusion.

E.    Major Accomplishments

Beyond formal compliance with the DPA, NYRA has accomplished much more during the term of the DPA and the length of our Monitorship.

1.    *Free Pass Legislation*

As discussed above, when NYRA entered into the DPA, it committed to repair itself. First and foremost, it went about the task of fixing broken relationships, including the New York Thoroughbred Horsemen's Association ("NYTHA"), the State Comptroller, the State Attorney General, CIF, and the Racing & Wagering Board.

In particular that was true of the horsemen, i.e., the owners and trainers, individually and as collectively represented by NYTHA.   A particular case in point was the early task of addressing the issuance of admittance passes for the spouses and children of horsemen.  In some ways because that issue was so limited in nature, it proved to be a great starting point.  The issue was simple: while it may have made good sense to provide such passes, and that had been the practice for some time, the existing law did not permit their issuance.   The solution: simple, change the law.  And that's what NYRA went about doing.  Along the way it mended fences with and built bridges to NYTHA.   Together the two groups approached the State Attorney General which supported a sensible change in the law that would improve New York racing.

The result was that mid-way through last year's Saratoga meet, both houses of the state legislature passed such a bill and the Governor signed it into law.  And no one concluded that the world had changed fundamentally, but everyone recognized that this was a small example of what we had hoped for all along.  Namely, that by NYRA committing itself to obey the law, and by NYRA and its constituencies respecting one another, and by their working together along with government, New York racing could change for the better.

2.    *The TVG Deal and Restoring and Protecting the Horsemen's Funds*

Next came a far more challenging issue: the funding of the Horsemen's Account.  NYRA had long been entrusted with maintaining what is known as the Horsemen's Account (the funds of owners and trainers coming from their individual deposits or purse winnings).  But NYRA fell into the practice of spending down those funds, so that by 2003 they were gone -- approximately $13 million of horsemen's money gone.  It was of fundamental importance that NYRA rectify this situation.  NYRA committed to do so even before the start of the monitorship, by setting up a segregated account and beginning to fund it.  But that was not enough.  It needed to come up with the funds to fully make up the deficit.

NYRA began to reexamine its existing operations, coming to focus on its contract with the Television Games Network ("TVG"), and recognized that by being able to position its simulcast signal as a strategic asset, it could develop an immediate cash influx as well as an enhanced revenue stream.  Building off its renewed relationship of trust with NYTHA and by jointly approaching the Racing & Wagering Board, NYRA succeeded in putting together a highly successful business deal.  The deal provided for TVG to have limited exclusive broadcasting and wagering rights for NYRA races.  Among other things, that deal provided NYRA with the ability to fund the Horsemen's Account.

The observations and conclusions of the Monitor regarding the role of the Racing & Wagering Board in the review and approval process of the TVG deal, including the details of the face to face meeting and follow-up face to face discussion between Chairman Hoblock and Monitor Neil Getnick on the subject, are reserved for our Sealed Report.

In 2005, NYRA took additional steps to further secure the horsemen's funds.  NYRA changed its method of funding the Horsemen's Account to insure that it stayed funded on a day by day basis.  And, in August 2005, NYRA signed a Declaration of Trust and created a trust account, supplanting the former NYRA segregated account, to further secure the funds for the sole benefit of the horsemen.

3.      *Leadership Change and Corporate Governance Reform*

All of the above was accomplished before the end of the Saratoga meet in 2004 (excepting the additional steps in 2005 to further secure the horsemen's funds).  Then, building upon this record, NYRA set about the task of further structural changes within its own ranks. Charles Hayward was hired as NYRA's President and CEO.  Steven Duncker and Peter Karches were elected as Co-Chairmen of NYRA's Board of Trustees.  The Monitor came to know each of these people quite well during the course of this Monitorship.  Each has acted with integrity. Each has a distinguished record of business accomplishment.  And each has shown the day to day dedication of bringing those values and skills to the betterment of NYRA specifically and to New York racing more generally.

In addition, Robert F. Flynn, the Executive Director of NYTHA, was elected to the NYRA Board of Trustees.  Although Flynn was named to the Board of Trustees in an individual capacity, his presence is a further statement of NYRA's commitment to horsemen's interests. His background and skill were immediately felt as continues to be the case.

As agreed in the DPA, NYRA completed the restructuring of its Senior Management, as well as its pari-mutuel, legal, security, internal audit, accounting and human resources departments by the end of the first quarter of 2004.  In the time since, NYRA has initiated further organizational changes, particularly in its highest echelons, in order to revitalize the association.

The Board of Trustees has recently reorganized its committee structure and leadership. In 2005, the Board of Trustees rotated all of the committee chairpersons with the exception of the chair of the Special Oversight Committee who began serving in that capacity upon the creation of the Committee in 2003.

An important caveat is that much of this progress is the result of a shift within the Board of Trustees' structure, while the composition of the Board of Trustees has remained essentially the same.  In the same spirit of the Board of Trustees' decision to rotate committee chairpersons, the Monitor recommends that NYRA implement a suitable policy of rotation amongst its Board of Trustees to ensure diversity and a wide range of skill and expertise that will evolve with the changing composition of the Board of Trustees.

4.    *NYRA's Anti-Drugging Efforts and Cut Off of Rebate Shops*

In 2005, NYRA has gone beyond its specific problems.  NYRA has addressed industry-wide issues and in the process has emerged as an industry leader.  Specifically, NYRA has taken on the twin issues of horse drugging and rebate shops.  Rebate shops refer to the unregulated offshore and Indian reservation-based enterprises, reportedly providing customers with rebates of up to ten percent of every dollar wagered, and which are associated with extensive legal problems.  In a dramatic series of specific steps, NYRA has moved out of the talking phase and into the action stage.  Following the revelation of two indictments related to rebate shops, NYRA cut off its signal and terminated its contracts with offshore and Indian reservation based rebate

shops.   Furthermore, NYRA has implemented a state of the art drug testing program, uncompromising drug sanctions, and vigilant drug prevention in the form of race day monitoring barns.  Simply put, NYRA has unequivocally said yes to racing integrity and just as resoundingly said no to horse drugging, computer batch betting, tax evasion, and money laundering.   NYRA has an unmatched record of achievement in taking on these issues.

And that goes beyond the theoretical.  That goes directly to the practical experience of the retail bettor.  For today the retail bettor in the United States can look to New York racing not only to deliver the best racing product, but also to provide a level playing field designed to make sure that bettors get full value for every dollar wagered.  That's what we mean when we say good conduct is good business.

It is important to distinguish between rebate shops and rebates (sometimes referred to as Player Rewards programs).  NYRA understood that its decision to cut off the rebate shops would likely have a negative short term financial impact (the terminated rebate shops accounted for approximately $300 million in annual handle on NYRA races).  As a countervailing measure, NYRA, together with Capital OTB and Nassau OTB, submitted to the Racing & Wagering Board on May 6, 2005, a detailed player rewards program proposal.  The proposal set forth the structure of the program and provided a financial analysis of the positive impact of the program on NYRA income, purses, contributions to the breeding fund, and revenue to the State of New York.

5.    *Backstretch*

One of the most important and meaningful experiences that we have had in this monitorship is what we have learned and absorbed on the backstretch.  Comprised largely of Latino immigrant workers, the backstretch community bears the responsibility of caring for the

8

horses.  Working as grooms, stable hands, exercise riders and hot walkers (employees that walk the thoroughbreds for a post-race cool down), backstretch workers literally make racing in New York possible.  The Monitor, through a regular on-track presence and the operation of the Getnick & Getnick Integrity Hotline, built a strong rapport with the backstretch community.

As a result of its ability to penetrate the backstretch, the Monitor was able to identify the principal concerns of backstretch workers and to work with NYRA to address them.   First, recognizing the inadequacy of the current backstretch living conditions, NYRA has begun to repair and renovate dilapidated backstretch dormitories.  Second, NYRA has worked in conjunction with the Backstretch Employees Services Team ("BEST"), NYTHA, and the Jockey Club to develop an improved health benefits program for backstretch workers.  Third, NYRA has entered into a discourse with NYTHA, the Workplace Project and the backstretch workers.  Such a discourse, if continued, could strengthen the voice of backstretch workers in the larger racing community and improve NYRA's relations with and connection to the backstretch community.  Going forward, addressing and solving backstretch issues must remain a shared undertaking.

6.     *Guarding Against Unfair Competition*

In addition to focusing on conduct within the monitored entity, an IPSIG monitor serves to prevent unethical conduct directed against the monitored organization.   And where the organization is amenable to reform, the IPSIG may be a major participant with management in enhancing the economy, efficiency and effectiveness of the organization.  It  was  important  for NYRA to be able to undertake contractual negotiations without being hampered by the fact it was under indictment and operating under the supervision of a court appointed Monitor.  Ideally, the presence of the Monitor would encourage NYRA to perform at its best and discourage NYRA's competitors from trying to take unfair advantage of NYRA's legal status.  The Monitor

quite deliberately attempted to play that role and, as a result, we believe we succeeded in helping NYRA do its best in this regard.  And again, it should be understood that when NYRA did its best, the value of the NYRA asset was being maximized for the State, whoever might someday be granted the rights to the franchise.

7.    *Financial Statements*

On August 22, 2005, NYRA took the unprecedented step of publicly releasing its financial statements for the years ended December 31, 2004 and 2003 (Restated).  The current NYRA financial statements have been presented so that they are accurate as well as meaningful and useful to the reader.  In other words, the statements are far more transparent than anything from NYRA in the past.  In addition, NYRA has taken steps to clarify or expand other areas of its financial statements so that they accurately and fully represent NYRA's financial condition.

8.    *Money Services Business Registration and Reporting Requirements*

On February 17, 2005 acting on advice from its outside counsel, obtained in response to inquires from the Monitor and the Racing & Wagering Board, NYRA voluntarily registered as a Money Service Business ("MSB").  As a result of registering as an MSB, NYRA subjected itself to certain reporting and recordkeeping requirements.  In addition, NYRA adopted a formal Anti-Money Laundering ("AML") Policy and Program.

9.    *NYRA's Response to Criminal Activity at the Track*

In the past, NYRA has been fairly criticized for failing to prevent and report  criminal activity at the track, whether by patrons or its employees.  During the course of the Monitorship, and under its current leadership, NYRA has taken steps to rid the tracks of criminal activity and pledged its commitment to taking whatever action necessary to achieve this goal.  The report details specific examples of NYRA's actions in this regard.

_____
NYRA Monitorship

Furthermore, the NYRA Security Department under the direction of Kenneth Cook, former Deputy Superintendent and Full Colonel with the New York State Police, has undergone a major transformation and now has the capability to address significant security issues, and to coordinate efforts with law enforcement agencies, which it was not capable of doing in the past. NYRA's response to criminal activity at the tracks is far ahead of where it was prior to the Monitorship.

       10.    *Code of Ethics*

On August 10, 2005, the NYRA Board of Trustees approved a comprehensive Code of Ethics, applying to all NYRA trustees, officers, and employees.  The Code, developed with the guidance of the State Comptroller and the Monitor, provides a clear and coherent structure for reporting and resolving employee ethics issues.  It is being distributed to and acknowledged by all NYRA trustees and personnel (including officers, union employees, and administrative employees).

F.    <u>Current Financial Condition</u>

As stated above, in August 2005, NYRA released its financial statements for the year ended December 31, 2004.  While the statements showed NYRA to be in a weak financial position – auditor Deloitte & Touche provided a qualified opinion raising substantial doubt about NYRA's ability to continue as a going concern – they were representative of both a company in transition and NYRA's continued commitment to transparency.  In addition, NYRA currently is addressing two outstanding issues with its employee pension funds, as discussed in the Report.

On the positive side, as compared to the prior year, NYRA: (1) reduced its net loss; (2) increased its revenues; and (3) decreased its expenses.  That said, however, NYRA reported a net loss of $15.98 million for the year ended 2004.

G.     New York State Racing & Wagering Board

The Racing & Wagering Board is the state regulator of thoroughbred horse racing and pari-mutuel wagering.  The Racing & Wagering Board has "general jurisdiction over all horse racing activities and all pari-mutuel betting activities, both on-track and off-track, in the state and over the corporations, associations, and persons engaged therein."  The Racing & Wagering Board's stated purpose is "to ensure that New York State's legalized casinos, pari-mutuel, and charitable gambling activities operate with integrity and are in full compliance with New York State statutes and rules."

1.     *Pending Matters*

The Monitor recommends that prompt action be taken on four pending matters regarding the Racing & Wagering Board:

a.     NYRA's Simulcast License

During the course of the Monitorship, the Racing & Wagering Board has not approved NYRA's simulcast license.  As a result, NYRA has been proceeding, for both 2004 and 2005, under a continuing right basis premised on its prior license.  The Racing & Wagering Board is aware of this matter.  Given that NYRA continues to simulcast, and that its regulator knows and, at least implicitly approves of that simulcasting activity, it seems logical for the Racing & Wagering Board simply to approve NYRA's simulcast license for the current period.

According to some accounts, the Racing & Wagering Board has taken the position that it is disinclined to approve NYRA's simulcast license while there is an indictment pending against the entity.  Should the indictment against NYRA be dismissed, then the Monitor recommends that the Racing & Wagering Board act promptly to approve NYRA's simulcast license for the above-stated reasons.

NYRA Monitorship

b.      NYRA's Simulcast Agreements

Although NYRA cut off its contractual arrangements and simulcast signal from all identifiable rebate shops, NYRA continues to send its signal to and maintain contractual arrangements with out of state racing entities that have player rewards programs (e.g. the Meadowlands in New Jersey and Philadelphia Park in Pennsylvania). The Racing & Wagering Board has repeatedly delayed the approval of NYRA's proposed simulcast language to deal with this issue. If the Racing & Wagering Board insists on a strict "no rebate" policy, then NYRA will lose a significant amount of handle and that will have an adverse impact on NYRA's contributions to the State. The Monitor recommends that the Racing & Wagering Board act promptly on this matter. Doing so would help clarify another pending issue, i.e., NYRA's proposed player rewards program.

c.      Rewards Program

NYRA undertook its decision to cut off the offshore and Indian reservation shops knowing that it would likely have a negative financial impact (the terminated rebate shops accounted for approximately $300 million in annual handle on NYRA races). NYRA, as a countervailing measure, together with Capital OTB and Nassau OTB, submitted to the Racing & Wagering Board on May 6, 2005, a detailed player reward program proposal. The proposal set forth the structure of the program and provided a financial analysis of the positive impact of the program on NYRA income, purses, contributions to the breeding fund, and revenue to the State of New York. To date, NYRA has not received a response from the Racing & Wagering Board. Given the importance and urgency of the pending proposal request, the Monitor recommends that the Racing & Wagering Board act as soon as possible on this matter. As pointed out above,

in the current environment NYRA must go head to head in competition with other U.S. tracks that offer such player rewards to their customers.

      d.     <u>Remaining Appointee</u>

The legal structure of the Racing & Wagering Board is designed to prevent deadlock and stagnation.  Currently, unless the two members can reach unanimous agreement, nothing can go forward.  A third member, which is what is provided for under law, would alleviate this situation. The Monitor recommends that action be taken promptly to appoint the missing member of the Racing & Wagering Board.

H.     <u>The Franchise</u>

      1.     *Legislation Establishing the Oversight Board and Ad Hoc Committee*

On August 3, 2005 Governor Pataki signed into law Senate Bill No. 5923 which, among other things, created an Oversight Board for NYRA tasked with monitoring and reviewing all aspects of NYRA's business practices during the remainder of its franchise, which is due to expire at the end of 2007.  With respect to the franchise to run Aqueduct Race Track ("Aqueduct"), Belmont Park ("Belmont") and Saratoga Race Course ("Saratoga"), the new law accelerates from before July 2006 to before December 1, 2005, the establishment of an ad hoc committee that will solicit proposals for the purchase of the franchise.

      2.     *Qualifications to Include in the Requests for Proposals for the Awarding of the Franchise to Operate Aqueduct, Belmont and Saratoga in the Future*

We believe that the Oversight Board and the Committee on the Future of Racing (the name given to the ad hoc committee) should consider the positive changes and improvements that NYRA has made during the course of the monitorship and incorporate them as standards and requirements into the franchise request for proposals.

14

The following is a list of the most significant improvements implemented by NYRA during the term of the monitorship.  We recommend that the RFP for the New York racing franchise mandate that the following be included as conditions of the franchise:

1. A safe, healthy and humane environment in which to work and live for the backstretch employees and their families;

2. A refusal to send the simulcast signal to rebate shop betting locations that do not provide full and complete information to satisfy New York State that they are operating in a lawful manner;

3. A strict drug testing program with severe sanctions for violators to guarantee that all races at Aqueduct, Belmont and Saratoga are fairly run and to ensure that bettors are not disadvantaged;

4. Pre-race monitoring barns at each track;

5. A fully-funded and segregated trust account for the horsemen's funds, together with full access by the horsemen to account records for review and inspection;

6. A comprehensive Code of Ethics that applies to all track employees, officers and board members, and that is enforced in a meaningful and effective manner;

7. Audited financial statements filed on a yearly basis that: are transparent; accurately portray the financial condition of the company; are prepared according to generally accepted accounting principles; and, are made available to the appropriate State regulatory agencies for review and inspection; and

8. Registration as a Money Services Business, including all related reporting requirements, as well as implementation by NYRA of the anti-money laundering policies and other financial system protections to prevent the facilitation of criminal activity, e.g., money laundering, tax evasion, etc.

I. <u>Operational Issues and Observations</u>

Our report includes a detailed discussion of the following operational issues and observations:

- Mutuel Tellers

- o Since entering into the DPA, NYRA has complied with its remedial terms regarding mutual teller policies, procedures and rules.  NYRA has also taken additional steps to curtail improper or illegal behavior by mutual tellers and to foster a climate of transparency and integrity within the department.

- NYRA Security Department Improvements

  - o Since the inception of the Monitorship, the NYRA Security Department has made significant strides towards improvement by restructuring the organization of the department, instituting new written policies and procedures, enhancing record-keeping procedures, and cooperating with state and federal law enforcement.

- Travel and Entertainment Expense Policy

  - o In accordance with the recommendation of the State Comptroller's recent audit, NYRA developed a comprehensive Travel and Entertainment Expense Policy, with the input of both the Monitor and the Comptroller's office, in the Spring of 2005, which policy took effect on May 1, 2005.

- Procurement

  - o NYRA has repeatedly been the subject of criticism for its procurement practices.  During the course of the Monitorship, and particularly in response to the State Comptroller's recent audit, we have witnessed significant, fundamental improvements in this area.  NYRA's procurement procedures are steadily improving.

- Improved Relationships

  - o NYRA's current leadership has shown that it recognizes that NYRA must be accountable to its regulators and protect the interests of the horsemen, jockeys, and backstretch workers who are the lifeblood of racing.  This, in turn, has led to a fundamental change in NYRA's interactions with governmental and private entities.

- The Backstretch

  - o Nowhere on the track is the need for social responsibility more visible than on the backstretch.  As a whole, members of the backstretch community live and work in substandard conditions.  The Monitor strongly believes that the treatment of backstretch workers should reflect the significance of their contribution to racing.  Going forward, addressing and solving backstretch issues must remain a shared undertaking, including NYRA, the horsemen, and the backstretch workers and their representatives.

     o  In addition to the significant improvements made by NYRA discussed in The "Major Accomplishments" section, the report provides further details regarding:

- Knowledge of the backstretch

- Living conditions on the backstretch

- Working conditions of backstretch employees

- Backstretch dialogue with NYRA, NYTHA, and the Workplace Project

- Backstretch Reorganization: The Backstretch Employee Services Team (BEST)

- Health Care

- The Backstretch Pension Fund

J.    <u>Statutory Structure and New Business Model</u>

NYRA, by statute, is required to pay out its entire adjusted net income (less $2 million dollars to be paid for purses) in the form of a franchise fee to the State of New York.  Without retained earnings, NYRA is unable to directly reinvest in itself in the form of capital improvements or otherwise.

NYRA has communicated to the Monitor its position that future success in New York racing demands fundamental changes to the business and regulatory environment in which the franchisee operates.  In monitoring NYRA's operations, particularly over the past ten months, the Monitor has been witness to significant and varied efforts by  NYRA's new leadership to explore new business models addressing this challenge.

K.    <u>Conclusion</u>

NYRA has gone beyond mere compliance with the DPA and the law.   NYRA has implemented a program of self-reform.   We believe that government at every level should support NYRA's integrity-based actions.   We believe that law enforcement and regulators should protect NYRA by acting against market-driven misconduct.   Throughout our report we make recommendations.   Of those, we recommend most strongly that:

(1)    The Racing & Wagering Board act as soon as possible on the joint NYRA / Capital OTB and Nassau OTB Player Reward Program proposal (pending since May 6, 2005) as a countervailing measure to the cut-off of rebate shops (see Executive Summary at p. 13 and Report at pp. 60-66, 89-90 ); and

(2)    The forthcoming RFP for the franchise to run racing in New York State should include the specific criteria set forth in this report at    and not take us backwards to lesser practices and standards that continue to exist elsewhere (see Executive Summary at pp. 14-15 and Report at 92-94 ).

It has been our privilege to undertake this Monitorship.   We hope that the results achieved will be of substantial benefit to the New York thoroughbred horse racing industry, its constituencies, and all New Yorkers.

**DISCUSSION**

**I.      Introduction**

      A.      <u>The Importance of Horse Racing to New York State</u>

The horse racing industry is vital to the economy of New York State.[1]   It supports the breeding farms which are a significant part of the State's agri-business industry.  It also provides numerous jobs.  The 2004 Annual Report issued by the New York State Senate Committee on Racing, Gaming and Wagering, submitted on February 18, 2005 by Senator William J. Larkin, Jr., states that, "The horse racing industry in New York has estimated that approximately 33,000 jobs are linked to horse racing.  The industry supports jobs as diverse as grooms, trainers, farmers, tractor mechanics, veterinarians, stewards, publicists, riding apparel designers, restaurant workers and feed and hay producers."  It contributes significantly to tourism in the State.  Many thousands of people come to New York each year to see the Travers Stakes at Saratoga Race Course ("Saratoga"), the Wood Memorial at Aqueduct Race Track ("Aqueduct"), and the Belmont Stakes at Belmont Park ("Belmont"), the third-leg of the Triple Crown.  The horse racing industry also provides substantial revenue to the State through statutory taxes and fees, as well as income from video lottery terminals which are currently operating at Saratoga Gaming and Raceway, Buffalo Raceway, Monticello Raceway and Finger Lakes Racetrack, Batavia Downs and are authorized for Aqueduct, Yonkers Raceway, and Vernon Downs. Beyond the economics, New York-bred horses, and New York racing, set the standard in the industry and are second to none.   It is because the horse racing industry is critical to the State and so many of its residents that NYRA was allowed to enter into a Deferred Prosecution Agreement ("DPA").

---

[1] For an excellent discussion of the economic impact of thoroughbred racing in New York and the United States, <u>see</u>, Office of the New York State Comptroller, <u>The New York Racing Association, The Case for Reform</u> (State Comptroller Sept. 2003 Report"), Sept. 2003, attached hereto as Exhibit 1.

B.    The Deferred Prosecution Agreement and the Appointment of Getnick &
Getnick as the Independent Federal Monitor

Indictment CR 03 1295, filed on December 4, 2003 ("Indictment") in the District Court of the Eastern District of New York, charged NYRA with one count of Conspiracy to Defraud the United States in violation of Title 18, United States Code, Section 371, and three counts of Aiding and Abetting False Tax Filings in violation of Title 25, United States Code, Section 7206(2).   Various employees of NYRA who had worked in its Pari-Mutuel Department were also charged with crimes in that same Indictment.

NYRA entered into a DPA[2] and a Stipulation of Facts[3] with the United States Attorney's Office for the Eastern District of New York ("USAO") on December 10, 2003.   Through the DPA and the Stipulation of Facts, NYRA admitted to, and accepted responsibility for, the crimes charged against it in the Indictment.   As a result of entering into the DPA with the USAO, NYRA has been given the opportunity to avoid a criminal conviction if it complies with the conditions set forth therein. Paragraph 9 of the DPA provides for the appointment by the Court of an independent monitor to, among other things, monitor NYRA's compliance with the terms of the DPA.   Getnick & Getnick was appointed as Monitor of NYRA on March 1, 2004, by the Honorable Arthur D. Spatt, United States District Judge for the Eastern District of New York.[4] Judge Spatt's Order sets forth our duties and responsibilities as Monitor for NYRA.   Our authority to monitor the activities and operations of NYRA has been extensive and far-reaching. Specifically the Order states that the Monitor has the authority to:

1.    Monitor NYRA's compliance with all of the terms of the DPA;

---

[2] See, United States v. N.Y. Racing Ass'n, Inc., Deferred Prosecution Agreement ("DPA"), 03 Cr. 1295, Eastern District of New York, Dec. 10, 2003, at 2-3, attached hereto as Exhibit 2.
[3] See, United States v. N.Y. Racing Ass'n, Inc., Stipulation of Facts ("Stipulation of Facts"), 03 Cr. 1295, Eastern District of New York, Dec. 10, 2003, attached hereto as Exhibit 3.  The Stipulation of Facts also appears as Exhibit B to the DPA.
[4] See, United States v. N.Y. Racing Ass'n, Inc., Order Appointing Monitor ("Appointing Order"), 03 Cr. 1295, Eastern District of New York, Mar. 1, 2004, issued by Hon. Arthur D. Spatt, attached hereto as Exhibit 4.

2.      Monitor all aspects of NYRA's business and operations to ensure that NYRA complies fully with all federal, state and local laws and regulations; and

3.      If appropriate, suggest structural reforms that would help ensure NYRA's compliance with all federal, state and local laws and regulations after the expiration of the Monitor's term.  See, Exhibit 4 at 1-2.  The Order then lists specific examples of the Monitor's authority and power to monitor and review daily activities and operations of NYRA.[5]  This list is an illustrative but not an exhaustive inventory of the Monitor's power to carry out its mandate from the Court.

C.      Why NYRA Was Allowed to Enter into a Deferred Prosecution Agreement

DPAs are infrequently used to resolve criminal cases, and are executed only after careful consideration of what is in the best interests of the public, and when societal interests are best served by an outcome other than a criminal conviction.[6]  The best interests of New York State and the horseracing industry were critical factors in the decision to allow NYRA to enter into a DPA.  The indictment of NYRA, the mounting of a criminal defense, and the possibility of a criminal conviction, jeopardized the operation of the three premier thoroughbred racetracks in New York State, and consequently the welfare of the State and those who earn their livelihood from horse racing. The video lottery terminal ("VLT") project, expected to bring millions of dollars into the State educational system, was also jeopardized by the filing of criminal charges against NYRA.  These compelling factors were instrumental in the decision to allow NYRA to enter into the DPA and potentially avoid criminal prosecution.

---

[5] See, Exhibit 4 hereto, at 2-3.  ¶ 4(a)–( j) of the Order lists examples of the Monitor's power and authority to monitor and review the daily activities and operations of NYRA.
[6]  Recent examples of prosecutors offices allowing major corporate entities to resolve criminal charges by acknowledging wrongdoing and entering into deferred prosecution agreements are the following: (i) United States v. KPMG LLP, Cr. 00903-LAP (S.D.N.Y.),  and (ii) United States v. Computer Associates, Int'l Inc,, Cr. 04-83 (ILG), (E.D.N.Y.).

NYRA Monitorship

D.     The DPA as an Innovative Resolution

There are several aspects of this DPA which are creative and noteworthy.

- As discussed above, the DPA allows the three premier thoroughbred racetracks in New York to continue operating, and thus protects the livelihood of the many people who earn their living from the horse racing industry in New York State.

- The use of monitorships has become more common in resolving criminal charges brought against corporate defendants that the government decides should continue to operate.[7]  In fact, the New York State Comptroller, Alan Hevesi, called for NYRA to voluntarily accept the imposition of an Independent Private Sector Inspector General ("IPSIG"), which operates the same way that a monitor does outside a criminal setting, prior to NYRA's indictment by the USAO.[8]   The appointment of a Monitor pursuant to the DPA reflects a partnership between government and the private sector to reform a corporate defendant that has acknowledged past fraudulent criminal behavior and practices.  The Monitor, in the case of NYRA, has aided the government in determining whether the terms of the DPA have been met, has saved the government time and resources by functioning as its eyes and ears during its continual on-track presence, and has assisted in bringing about structural reform in an organization that is critical to an industry that, in turn, is of great value to the State.

- The Appointing Order provides that the New York State Comptroller's Office ("State Comptroller") has the power and authority, subject to the oversight and supervision of the USAO, to direct the Monitor regarding all aspects of the Monitorship.  It further states that the Monitor reports to the State Comptroller as the State Comptroller or the USAO

---

[7] Id.
[8] See, Exhibit 1 at ii and 38-39.

require, and responds, as directed by the State Comptroller or the USAO, to inquiries, recommendations, and directions from the State Comptroller regarding the Monitorship.[9] As we noted in our First Report to the Court ("First Report"):

> What is particularly noteworthy in the appointment of the Monitor over NYRA is the reporting obligation to both the USAO and the Comptroller, and the fact that the Monitor receives its direction from the Comptroller, subject to oversight and supervision by the USAO. This coordination and cooperation between the Federal and New York State governments to fashion a method for addressing the issues and concerns of each in connection with this particular case is significant and will serve as a model for future resolution of civil and criminal matters. This partnership between the State and Federal Governments will effectuate needed reform and change in this organization and industry.[10]

Under this arrangement it was the State Comptroller that was most directly involved in the day to day supervision of the Monitor.

- As noted above, the Appointing Order calls for the Monitor to not only ensure that NYRA complies with all terms of the DPA, and all federal, state and local laws and regulations, but also to " . . . (c) if appropriate, suggest structural reforms that would help ensure NYRA's compliance with all federal, state and local laws and regulations after the expiration of the Appointed Monitor's term."[11]  As will be discussed in this report, the Monitor, working alongside and with the guidance of the Comptroller, the oversight of the USAO, and the cooperation of NYRA, has in fact brought about structural reforms and changes that have resulted in significant improvements at NYRA, and that should be continued by any organization awarded the franchise to run Saratoga, Belmont and Aqueduct in the future.

---

[9] See, Exhibit 4 at 4.
[10] See, First Report at 5.
[11] See, Exhibit 4 at 2.

E.     The Monitor's IPSIG Approach and Methodology

In understanding the role of an IPSIG-style monitor it is helpful to go the primary definition of an Independent Private Sector Inspector General which is the following:

[1]     An IPSIG is an independent, private sector firm with legal, auditing, investigative, and loss prevention skills, employed by an organization (voluntarily or by compulsory process) to ensure compliance with relevant law and regulations and to deter, prevent, uncover, and report unethical and illegal conduct by, within and against the organization.

[2]     Where the culture of the organization is primarily legitimate or amenable to reform, the IPSIG may, in addition to the prevention and control of illegal and unethical conduct, be a major participant with management in enhancing the economy, efficiency and effectiveness of the organization.  Where the culture is primarily illegitimate and hostile to change, the IPSIG's role may be essentially adversarial, limited to instituting internal controls and monitoring organizational activities.[12]

When Getnick & Getnick undertakes an IPSIG style monitorship, the firm utilizes a multi-disciplinary team combining legal, investigative, auditing, and industry skills.  In this Monitorship, the firm's team included Hawthorne Investigations and Security, Inc., under the direction of Joseph A. Pepe, providing the investigative component, and P. Scutero & Associates, under the direction of Patrick Scutero, providing the forensic auditing component.

In our First Report, we described the manner in which we established our presence at each of the three tracks and reached out to relevant parties and organizations.  We have continued and expanded upon these activities.  Among other things:

1.     We sustained our on-site presence at all three tracks during racing days.

---

[12] Lesley Skillen et al., The Independent Private Sector Inspector General, Report of the Civil Prosecution Committee of the New York State Bar Association Commercial and Federal Litigation Section at 1-2 (1994), attached hereto as Exhibit 5.

2.      We continued throughout the monitorship to operate the 24-hour a day, 7-day a week, Integrity Hotline, which was staffed directly by our professional investigative team.[13] The Integrity Hotline, which received consistently heavy use during the course of the monitorship, proved to be an excellent source of information and investigative leads.  As described in our First Report, we posted notices with the Integrity Hotline number, in both English and Spanish, throughout the three racetracks, in the public areas and the backstretch, as well as on NYRA's official website.[14]  We also publicized the Integrity Hotline number in correspondence to NYRA employees and members of the New York Thoroughbred Horsemen's Association ("NYTHA").  As a result, we were able to reach a broad cross-section of patrons and employees of the racetracks, as well as horse owners and trainers.  Since the callers to the Integrity Hotline were not required to identify themselves and because the Monitor was totally independent from NYRA and only reported to the State Comptroller, to the USAO, and to the Court, people who otherwise would not have come forward with important information did call the Monitor's Integrity Hotline.

3.      We continued to have daily contact with NYRA, its key executive staff members, and employees, including those people who worked on the backstretch. We attended all Board of Trustees meetings and key Committee meetings.

4.      We continued throughout the course of the monitorship to have regular contact with and/or to make ourselves available to, those governmental and private organizations that regularly interact with NYRA.

---

[13] Sometimes investigative agencies outsource a hotline to an answering service which has no familiarity with the particular monitorship or investigative assignment.  We had our investigators, who were working at the tracks and who were thoroughly familiar with the issues, answer these hotline calls.  Our experience has shown that this results in a more productive hotline.

[14]  Attached as Exhibit 6 is a copy of the Integrity Hotline poster.

5.      Throughout the course of the monitorship we worked with our governmental partners, the State Comptroller and the USAO, on an almost daily basis.

6.      We have also made periodic and thorough reports to Judge Arthur D. Spatt, in addition to our ongoing reports to the State Comptroller and USAO.

F.      Monitor's Final Report to the Court

The Court's Appointing Order allows for portions of the Monitor's report to be submitted under seal:

> The Appointed Monitor shall, with the consent of the Comptroller and the approval of the Court, have the authority to file any portions of the report without notice to NYRA, and to request that the Court seal any such portion of such reports, to the extent the Monitor reasonably believes it necessary to the successful completion of any phase of the Monitorship.

See, Exhibit 4 at 4-5.

Accordingly, as we did with our First Report, we are submitting our Final Report in two parts, i.e., Part I which is public, and Part II which will be filed under seal with the Court.   It is important to note that all matters pertinent to NYRA's compliance with the terms of the DPA have been set forth in the public portion of our Final Report.

## II.    NYRA's Compliance With the Terms of the DPA

A.      DPA Standard: Full Compliance To Result in Dismissal of the Criminal

Indictment

The DPA, in paragraph 14, sets forth how the criminal charges in the Indictment will be resolved if NYRA complies with the terms of the DPA.  It reads, in relevant part, as follows.

> 14.   The USAO agrees that if NYRA is in full compliance with all of its obligations under this Agreement, the USAO, within 30 days of the expiration of 18 months from the date of this Agreement, will seek dismissal with prejudice as to NYRA of Counts One and Fourteen through Sixteen of the Indictment, and this

26

Agreement shall expire.  Except in the event of a breach of this Agreement, it is the intention of the parties to this Agreement that all investigations relating to the matters set forth in the Indictment and the Stipulation of Facts that have been, or could have been, conducted by the USAO prior to the date of this Agreement shall not be pursued further as to NYRA. . . .[15]

B.      NYRA's Compliance with the DPA Reported in our First Report

In our First Report we reported on NYRA's compliance with the terms of the DPA as of the end of the first sixty days of the monitorship.[16]  We will set forth in this Final Report the status of NYRA's compliance with the DPA as of the completion of the monitorship.

C.      NYRA's Compliance with the Specific Provisions of the DPA

NYRA's specific compliance obligations are set forth in paragraphs 3 through 12, inclusive, of the DPA.  Set forth below, is a paragraph-by-paragraph analysis of NYRA's compliance with those provisions.

1.      Paragraph 3 of the DPA.

This provision of the DPA requires that NYRA, through its attorneys, Board of Trustees, agents, officers or employees,[17] not make any public statement that contradicts the Stipulation of Facts wherein NYRA admitted to, and accepted responsibility for, the crimes charged against it in the Indictment.  NYRA has not made any public statements during the term of the monitorship that would contradict the Stipulation of Facts.  To the contrary, NYRA has acknowledged that its conduct that led to the criminal charges set forth in the Indictment was wrong and that steps should be taken to ensure that it would not recur in the future.

---

[15] See, Exhibit 2 at 9.
[16] See, First Report  supra, at 14 – 20.
[17] This provision does not apply to any statement made by a NYRA employee or former employee who was charged with criminal acts in the Indictment.

2.      Paragraphs 4 and 5 of the DPA

Paragraph 4 requires NYRA to continue cooperating fully with the USAO, and any other governmental agency designated by the USAO, regarding any matter about which NYRA has knowledge, including privileged information, pertaining to the charges set forth in the indictment.   Paragraph 5(a)-(f) describes the nature of that cooperation.   Paragraph 5(g) sets forth representations by NYRA concerning remedial steps NYRA has or will take to address the concerns of the USAO and other governmental agencies.

With respect to paragraph 4 and paragraph 5(a)-(f) in the DPA, NYRA has fully cooperated with the USAO, as well as any other governmental agency designated by the USAO, as required in these sections of the DPA.   The USAO has made specific requests for information during the term of the DPA, and NYRA has complied with these requests.

With respect to the specific representations made by NYRA in Paragraph 5(g) of the DPA, we make the following observations concerning those steps that we deem pertinent to our Final Report to the Court:

- **NYRA created a new Office of the Chairman which consists of two Co-Chief Operating Officers whose responsibilities include supervision of all business areas and departments of NYRA.**  The two Co-Chief Operating Officers, who were already in office when the monitorship began, were C. Steven Duncker and Peter F. Karches. They have since been elected Co-Chairmen of the NYRA Board of Trustees effective January 1, 2005.   Each brings extensive business acumen from their previous professional employment, Duncker as a Partner and Managing Director of Goldman Sachs, and Karches as the former President of Morgan Stanley & Co. They have worked tirelessly and without compensation to improve not only NYRA's operations, but also to raise

industry standards.   They have cooperated with the Monitor, and we applaud their commitment to improving NYRA and horse racing in New York State for the public benefit.

- **NYRA implemented new policies and procedures for employees in the Pari-Mutuel Department, including a daily count-out procedure.**   NYRA's current "Mutuel Department Rules and Regulations" are attached hereto as Exhibit 7.   Section XV of those Rules on page 16 describes procedures used to count funds collected by the pari-mutuel clerks on the next business day.   NYRA's failure in the past to count cash it received from pari-mutuel bets placed at the track on a daily basis was just one of many problems that had been identified in various reports by state agencies concerning NYRA's pari-mutuel department.[18]   During the course of our monitorship we observed the implementation of NYRA's daily count-out procedure, in addition to many other improvements which are discussed in detail later in this Final Report.   This daily accounting occurs for funds turned in by both pari-mutuel tellers and mini-dealers. It is performed the next morning by account balancers and is recorded on camera.   This procedure is clearly a vast improvement over the old approach which only accounted for funds at the end of each race meet, which only occurred three times during the year.

- **NYRA implemented a new work rule prohibiting any Mutuel Employee who had a history of excessive shortages prior to the new shortage policy that was put in effect in 2000 from working in the money room, at any fifty-dollar minimum window, at any IRS window, or at any check cashing or cash advance window.**   In the public portion of our First Report, we discussed the fact that this work rule was challenged at an

---

[18]   For an excellent summary of these problems, including those identified by the New York State Comptroller, the New York State Attorney General and the New York State Racing and Wagering Board, see, Exhibit 1.

arbitration proceeding by the International Brotherhood of Electrical Workers AFL-CIO, Local Union No. 3 ("Local 3"), of which NYRA's pari-mutuel tellers are members. The arbitrator determined that this rule violated the terms in the Collective Bargaining Agreement which was then in effect.[19]   In our First Report we stated that "[w]e will monitor this situation and continue to report on it as NYRA determines how it will address the Arbitrator's Award."[20]   NYRA disagrees with the arbitration ruling, and takes the position that it has the right to prohibit tellers with a history of excessive shortages, as it has defined that term, from working in the enumerated positions because these assignments are especially vulnerable to theft, fraud and abuse.[21]   NYRA has continued to enforce this policy and does not allow those pari-mutuel tellers who have had "excessive shortages" to fill these sensitive positions.   NYRA maintains that since it disagrees with the arbitration ruling on public policy grounds, Local 3 should move to confirm the arbitration award in the Supreme Court of the State of New York, pursuant to Section 7510 of New York's Civil Practice Law and Rules.   Without confirmation of the arbitration award, the ruling cannot be converted into an enforceable judgment. See, N.Y. Civ. Prac. L. & R. § 7514 (McKinney 2005).   Local 3 has not taken any steps to enforce the arbitration ruling and those tellers who fall into the category of having "excessive shortages" are still not allowed to fill these positions.[22]   Since this arbitration decision NYRA and Local 3 have entered into a new Collective Bargaining Agreement for the period of January 1, 2004 through December 31, 2007.   It appears that NYRA's rule

---

[19] See, Monitor's First Report at 17–19.
[20] Id., at 19.
[21] The term "excessive shortages" was defined as a shortage of $1500 or more during each of any four of the preceding five years prior to the year 2000.  NYRA's shortage rule and the imposition of progressive discipline for shortages was implemented by NYRA in January 2000.
[22] The number of tellers currently employed by NYRA who fall into this restricted category has been greatly reduced by attrition for various reasons since the rule first went into effect.

prohibiting mutuel employees who had a history of "excessive shortages" from working in the money room, at any fifty-dollar minimum window, at any IRS window, or at any check cashing or cash advance window will remain in effect without further challenge from Local 3.

### 3.  Paragraph 6 of the DPA

Paragraph 6 of the DPA requires NYRA to complete the restructuring of its senior management and six of its departments, and to eliminate the Trustee Emeritus positions from its Board of Trustees.  We reported on NYRA's compliance with this provision of the DPA in our First Report.[23]  As we indicated therein, NYRA was in compliance with these key provisions. NYRA has continued not to employ and not to rehire those individuals replaced pursuant to paragraph 6 in the DPA.  Since our First Report was issued, NYRA has reconstituted its Internal Audit Department and hired William Varvaro as the Director.  Varvaro, who has extensive audit experience in both the private and public sectors, has assembled a seasoned staff to work with him.  Pursuant to the DPA, the former Controller was allowed to stay on as an independent consultant to aid the transition of the new Controller.  The former Controller stopped working as a consultant earlier this year after his services were no longer needed.

### 4.  Paragraph 7 of the DPA

Paragraph 7 of the DPA requires NYRA to seek an advisory opinion, within 60 days from entering into the DPA, from the Internal Revenue Service ("IRS") concerning the proper accounting and tax treatment of funds that NYRA received from and paid to "the New York State Capital Investment Fund," i.e., the State Thoroughbred Racing Capital Investment Fund

---

[23] See, First Report at 4–15.

("CIF").[24]   As we reported in our First Report,[25] NYRA has requested a ruling with respect to this issue and its request is being reviewed by the New York City Office of the Large and Mid-Size Business Division of the Financial Services Industry at the IRS.   We further noted that we would " . . . continue to monitor NYRA's request for an opinion from the IRS with respect to this issue, and will contact the appropriate IRS Division to inform them of our involvement and provide whatever assistance they may request of us."[26]   We, along with auditors from the State Comptroller, have met with revenue agents and the team manager from the IRS unit reviewing this matter.  NYRA has also met with these individuals and provided them with information.  To our knowledge, this matter is still under review by the IRS and no final determination had been made as of the end of the Monitorship.

    5.    Paragraph 8 of the DPA

    In Paragraph 8 of the DPA, NYRA agrees to provide its audited financial statements to the New York State Racing and Wagering Board  ("Racing & Wagering Board") and to the State Comptroller, and not to oppose the release of its audited financial statements pursuant to the terms of the New York State Freedom of Information Law ("FOIL").[27]   Under the New York Racing, Pari-Mutuel Wagering and Breeding Law ("Racing Law"), NYRA is supposed to file audited financial statements with the Racing & Wagering Board on an annual basis no later than 90 days after the end of the fiscal year, i.e., by March 31st of the following year, since NYRA's fiscal year ends on December 31st.[28]   In 2004 and 2005, NYRA filed its audited financial statements with the Racing & Wagering Board after this deadline.  Specifically, NYRA filed its

---

[24] With the passage of Senate Bill No. 5923 in August 2005 CIF has been replaced by the Non-profit Racing Association Oversight Board. See, S. 5923, 228th Leg., Reg. Sess., 2005 N.Y. Laws 354 (N.Y. 2005).
[25] See, First Report at 16-17.
[26] Id. at 17.
[27] See, N.Y. Pub. Off. Law § 84, et seq. (McKinney 2005).
[28] See, N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 231(a) (McKinney 2005).

audited financial statements for the years ending 2003 / 2002 in September 2004 and for the years ending 2004 / 2003 in August 2005.  The audited financial statements filed for 2004 / 2003 contained a restatement of the figures for 2003.

In addition, NYRA is required in paragraph 8 of the DPA not to oppose the release of its audited financial statements pursuant to FOIL.   In the past it was NYRA's practice to automatically request that portions of its audited financial statements not be publicly released by invoking one of the enumerated exemptions set forth in FOIL, i.e., that the information contained in the audited financial statements was  proprietary and its release would cause substantial injury to NYRA's competitive position.  NYRA continued this practice until its most recent filing in August of 2005.  NYRA advised the Monitor that it believed that this paragraph in the DPA still allowed it to make applicable FOIL exemption requests and that is why it made such requests in connection with past filings.  In order to ensure compliance with this provision, however, NYRA withdrew all FOIL exemption requests pertaining to its audited financial statements that it had previously filed with the Racing & Wagering Board.

The Racing & Wagering Board has publicly pointed out that NYRA was out of compliance in 2005 by failing to timely file its 2004 audited financial statements with the Racing & Board by March 31st as required by the Racing Law.  One reason, among others, that NYRA was delayed in that filing is that in 2005 NYRA was engaged in the ultimately successful effort to present far more transparent and informative financials.  In doing so, NYRA underwent a painstaking process with its outside auditor in order to change the presentation of its financial figures, including a restatement of its 2003 financials.  That process did not come to a conclusion until August 2005, whereupon NYRA made its filing with the Racing & Wagering Board.

As required by the DPA, NYRA has also provided its audited financial statements to the State Comptroller's Office.

      6.      <u>Paragraph 9 of the DPA</u>

In Paragraph 9 of the DPA, NYRA agrees to the appointment of an independent Monitor that will, among other things, monitor NYRA's compliance with the terms of the DPA.  NYRA also agrees to give the Monitor access to all materials pertaining to NYRA's operations, subject to certain attorney-client privileges.

NYRA has fully cooperated with the Monitor and has provided us with access to all of its records and personnel throughout the course of the Monitorship.  In particular, NYRA's two former Co-Chief Operating Officers and now Co-Chairmen of the Board, Duncker and Karches, and NYRA's new President and CEO, Charles E. Hayward, have been instrumental in fostering a successful working relationship with the Monitor.

      7.      <u>Paragraph 10 of the DPA</u>

In Paragraph 10 of the DPA, NYRA agreed to make all commercially reasonable and legally permissible efforts to enter into contractual arrangements with other entities to enable the operation of VLTs at Aqueduct if the VLT project was not completed or substantially completed under the then current proposed plan in 2004. Paragraph 10 goes on to say that if by the seventeenth month after the date of the DPA, <u>i.e.</u>, May of 2005, the VLTs are not operational at Aqueduct, then the USAO shall evaluate whether NYRA has made all commercially reasonable and legally permissible efforts in accordance with this paragraph.

VLTs are currently not operational at Aqueduct.  There are a number of reasons that account for this.  Some of the most significant are the following:

- MGM Mirage ('MGM") is the company selected by NYRA to build and manage the VLTs at Aqueduct.  Preparatory site work took place at Aqueduct during the Summer of 2003.  This work ceased in light of the federal investigation of NYRA and the possibility that NYRA would soon be facing criminal charges that would be detrimental to the VLT project.  Another relevant factor is MGM's obligations to its own regulators in Nevada. MGM is licensed to operate as a gaming enterprise and regulated by the Nevada Gaming Commission ("Nevada Commission") and the Nevada State Gaming Control Board ("Nevada Board"), which reviews and makes recommendations to the Nevada Commission. The Nevada Commission and the Nevada Board comprise the two-tiered system charged with regulating the Nevada gaming industry.  The Nevada Commission acts on the recommendations of the Nevada Board in licensing and other matters.  The Nevada Commission is the final authority on licensing matters, and has the ability to approve, restrict, limit, condition, deny, revoke, or suspend any gaming license.  The Nevada Board will submit a report to the Nevada Commission with respect to MGM entering into a contractual business relationship with NYRA in connection with the VLT Project, because MGM is licensed as a gaming business in Nevada.  The Monitor, as well as the Comptroller, have met and spoken with a representative of the Nevada Board on several occasions in connection with NYRA.  The Nevada Board representative has advised the Monitor will not submit a final report and recommendation to the Nevada Commission concerning MGM's application to join with NYRA in the VLT project until the term of the monitorship has been completed and the outcome of the pending indictment has been determined.

- In January of 2002 the constitutionality of the legislation[29] authorizing the operation of video lottery terminals in New York State was challenged in a lawsuit filed in the Supreme Court of the State of New York[30] in Albany County by a group of taxpayers, two state legislators, nonprofit organizations and an association opposed to the spread of gambling.  The Supreme Court found the legislation to be constitutional and dismissed the lawsuit in July 2003.    The case was appealed to the Appellate Division of the Supreme Court of New York, Third Department.  On July 7, 2004 the Appellate Division reversed the portion of the lower court's ruling which found that the VLTs were constitutional, on the grounds that the net proceeds from the VLTs did not go exclusively to education, since a portion of the vendor fee went to breeding funds and purses, i.e., non-vendors, which the court found to be in violation of the New York State Constitution, Article I, § 9(1) setting forth that lottery revenues are to be used to support education.[31]    The Appellate Division's ruling with respect to the constitutionality of VLTs was reversed by the New York State Court of Appeals on May 3, 2005.[32]   The Court of Appeals determined that, with respect to the VLT vendor fees, the New York Constitution required only that net proceeds go to education and that the legislature can determine what portion of the total lottery revenue constitutes necessary expenses (which in this case include money for breeding programs and purses) and what constitutes net proceeds.  It also noted that the vendor fee calculation for the VLTs in the statute before it was only 2.9% of sales which is less than the general vendor fee of 6% for the

---

[29] 2001 N.Y. Laws 383 (N.Y. 2001).
[30] In New York, the Supreme Court is a court of general jurisdiction.  The appellate court above the Supreme Court is the Appellate Division.  Finally, the State's appellate court of last resort is the New York Court of Appeals.
[31] See, Dalton v. Pataki, 11A.D.3d 62 (N.Y. App. Div. 3d. Dep't 2004), attached hereto as Exhibit 8.
[32] See, Dalton V. Pataki, 2005 N.Y. LEXIS 1059 (N.Y. May 3, 2005), attached hereto as Exhibit 9.

traditional lottery, as well as significantly lower than vendor fees paid to VLT operators in other states.

- Before the Court of Appeals reached a decision in <u>Dalton v. Pataki</u>, the legislature acted to ensure that the operation of VLTs in New York State would not be jeopardized.  A special VLT provision was inserted into a larger tax bill included as part of the State budget, approved on April 12, 2005.  It extends the VLT law until the end of 2017 and provides a larger vendor fee to the racetracks.  It eliminated the section that the Appellate Division in <u>Dalton v. Pataki</u> determined was unconstitutional, <u>i.e.</u>, allotting a percentage of the vendor fees to breeding funds and purses.  Significantly for MGM, it guarantees that any successor organization to NYRA will be bound by any contractual and loan agreements NYRA entered into with respect to the construction, operation and management of the VLTs.  So even if NYRA lost its franchise at the end of 2007, MGM's role in operating the VLTs at Aqueduct is secure.

- MGM and NYRA entered into a VLT management agreement in June of 2005.  On August 3, 2005, Governor Pataki signed into law Senate Bill No. 5923 which is an act to amend the Racing Law.  Included are several provisions which pertain to VLTs.  In particular, the law adds a new § 911 which directly impacts on the agreement between MGM and NYRA.  It reads in pertinent part:

> [A]ny contract  entered into prior to the effective date of this section by the New York Racing     Association, Inc., or amendments thereto, which is directly related to the operation, management, or distribution of revenues or design of a video lottery gaming facility at Aqueduct racetrack which contract of amendment either involves a loan or is substantially completed shall be exclusively subject to approval by the lottery division in all respects including the procedures for procurement based upon the division's determination that such contract or amendment optimizes quality, cost and efficiency.[33]

---

[33] S. 5923, 2005 N.Y. Laws 354.

By letter dated August 8, 2005, The New York Lottery, through its Director Nancy A. Palumbo, requested that NYRA provide any and all agreements and relevant documents between NYRA and MGM in connection with the video lottery gaming facility at Aqueduct.[34]

In light of the factors discussed above, in particular the uncertainty about the constitutionality of the VLT law during a significant portion of the DPA, it appears that NYRA made all commercially reasonable and legally permissible efforts to promote the implementation of VLTs at Aqueduct, and therefore has complied with paragraph 10 of the DPA.

8.      Paragraph 11 of the DPA

In Paragraph 11 of the DPA, NYRA agrees to pay $3,000,000 to the United States according to the payment schedule set forth in this paragraph.  This payment schedule was amended in an agreement entered into between NYRA and the USAO on August 10, 2005.[35] The amended agreement does not change the amount of money NYRA owes to the Government, i.e., $3,000,000.  Rather, it accelerates the due date of the 4th payment of $500,000 from 24 months from the date of execution of the DPA which was December 10, 2003, to on or before August 23, 2005.  Further, the amended agreement calls for NYRA, on or before August 23, 2005, to file one or more Confessions of Judgment in favor of the United States equal to $1,000,000.   The final $1,000,000 payment is to be made in one lump sum no later than 36 months from the date of the execution of the DPA, i.e., from December 10, 2003.[36]

---

[34] See, letter from the New York Lottery to Charles Hayward, CEO and President of NYRA, of 8/8/05, attached hereto as Exhibit 10.
[35] See, Second Amendment to Deferred Prosecution Agreement, attached hereto as Exhibit 11.
[36] The original payment terms called for NYRA to pay the final $1,000,000 in two payments:  $500,000 30 months from the date of the DPA and $500,000 36 months from the date of the DPA.

NYRA Monitorship

NYRA has provided proof to the Monitor that it has made all payments which have come due under the terms of the DPA to date in a timely manner, and that it has entered into a Confession of Judgment in favor of the United States equal to $1,000,000.

        9.      <u>Paragraph 12 of the DPA</u>

Under paragraph 12, NYRA agrees to comply with all federal, state and local laws, including tax laws.  The key question regarding this provision is one of timing.  Is NYRA required to be in such compliance from the start of the DPA or is NYRA required to come into such compliance as soon as it can during the life of the DPA?  Practically speaking, the question answers itself.  If the answer is "immediately," then the Monitorship would have been over before the end of the first day.  And along with it, the DPA and its attendant benefits to the State and its citizenry of reforming this quasi-public entity.

For example, at the start of the Monitorship, the Horsemen's Account money was mostly gone due to the fact that NYRA had misappropriated it.  It didn't take any great insight or effort to figure that out, given that it was already commonly known.  From the Monitor's standpoint, the goal was to help NYRA find a way to get back on side with the horsemen and get those monies repaid before the DPA expired.  And that's exactly what happened.

By way of another example, at the outset of the Monitorship, NYRA took the position that the procurement contract competitive bidding provisions of the Racing Law didn't apply to professional services contracts.  And, as a result, NYRA for years had not followed those procedures when professional services were involved.  The only problem was that the law provided for no such exception.  The Monitor saw what was going on within the first sixty days of the Monitorship.  We sat down with NYRA pointing to the needed change.  And NYRA changed.  NYRA changed its position and its practice to conform with the law.

In sum, during the course of the DPA, particularly given the emphasis of its current leadership, NYRA sought to identify areas of non-compliance, and upon doing do so, it brought itself into conformity with the law.

Under paragraph 12, NYRA also agrees to materially comply with all generally accepted accounting principles in maintaining its books and records.  NYRA has done so.  And, as described above, in publishing its financial statements, going beyond the baseline requirements of GAAP standards, NYRA strove and succeeded in achieving an even higher level of transparency.

## III.    Overview of Statutory Structure

NYRA, in the form of its predecessor, the Greater New York Association, Inc., was established in 1955 to acquire the assets of four private racing associations under a single organization for the purpose of consolidating and improving thoroughbred racing in New York State.  Initially, NYRA was granted a twenty-five year pari-mutuel wagering franchise.  This franchise has since been extended and currently runs through December 31, 2007.[37]

### A.    Support of State Government

NYRA is a non-profit racing association with an exclusive franchise from New York State to conduct thoroughbred racing and pari-mutuel betting at Aqueduct, Belmont, and Saratoga.  NYRA has a quasi-public nature in that it is a private corporation that, as franchisee of the State, is required to operate in a sound, economical, efficient and effective manner so as to produce a reasonable revenue for the support of State government.[38] Although NYRA is exempt from New York State income tax, it does remit three types of payments to the State in

---

[37] For an interesting discussion of the history of thoroughbred horse racing in New York generally, and of NYRA specifically, see, Exhibit 1 at 1-4.

[38] See, N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 208(10) (McKinney 2005).

conjunction with its racing activities: (i) a pari-mutuel tax levied on on-track wagering, (ii) a regulatory fee to the Racing & Wagering Board, also based on on-track wagering, and (iii) a franchise fee payable to CIF.[39]   The franchise fee is defined as an amount equal to the entire adjusted net income of NYRA, less two million dollars which is to be used "exclusively for the purpose of increasing purses, including stakes, premiums and prizes, awarded to horses in races conducted by such association."[40]   If the full amount of NYRA's entire adjusted net income is less than two million dollars, then that full amount shall be used for the purpose of increasing purses.[41]   Over the past three years, the amounts paid by NYRA were as follows:

| Year | Pari-Mutuel Tax | RWB Fee | Franchise Fee |
| --- | --- | --- | --- |
| 2002 | $10,138,000 | N/A[42] | $1,599,000 |
| 2003 | $9,348,000 | $1,393,000 | $0 |
| 2004 | $8,754,000 | $1,795,000 | $0 |

B.   Purse Funding and Support for New York Horse Breeding

In addition, the Racing Law provides that money for purses and money for the support of New York horse breeding will come from a portion of the monies wagered on NYRA races.[43]

---

[39] At the end of each year, CIF is required to pay all moneys of the fund in excess of seven million dollars to the Commissioner of Taxation and Finance for deposit in the General Fund of the State of New York.  See, N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 257(2) (McKinney 2005).  As set forth above at Note 24, as of August 2005, CIF has been replaced by the Non-Profit Racing Association Oversight Board.

[40] See, N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 208(1) (McKinney 2005). NYRA's "entire adjusted income" is computed by adding to taxable income the amount by which NYRA's operating expenses for a given year exceed 106% of the operating expenses for the year prior.  There are certain statutory exclusions from operating expenses, such as charges for stakes and purses, real estate taxes, and costs for advertising.  Id.

[41] Id.

[42] For year 2002, no fee for Racing & Wagering Board was required from NYRA by statute.

[43] See, e.g., N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 229(1)(B) (addressing simulcast-related funding) and § 229(2)(c) (addressing funding from on-track wagers); For the year 2004, for example, the racing law provided that 5.94 % of every dollar wagered was to go to fund purses and 0.70% of every dollar wagered was to go to the New York State Thoroughbred Breeding and Development Fund.  See, N.Y. Rac. Pari-Mut. Wag & Breed. Law § 229(1)-(2) (McKinney 2005).

---

For the year 2004, for example, $120,863,000 was generated for stakes and purses and $3,175,000 for the New York State Thoroughbred Breeding and Development Fund.[44]

  C. <u>Statutory Inability to Retain Earnings</u>

  As set forth above, NYRA, by statute, is required to pay out its entire adjusted net income (less $2 million dollars to be paid for purses) in the form of a franchise fee to the State of New York.  NYRA management has advised the Monitor that the franchise fee structure, under the current statutory framework, presents a significant operational problem that harms NYRA's competitive position in the industry.  The practical implication of paying a franchise fee equal to the organization's entire adjusted net income is that NYRA is unable to retain any of its earnings.[45]  Without retained earnings, NYRA is unable to directly reinvest in itself in the form of capital improvements or otherwise.  This competitive disadvantage is a matter that should be addressed and resolved as the State prepares to determine who will receive the franchise to operate Aqueduct, Belmont, and Saratoga after December 2007.

## IV. Major Accomplishments

  A. <u>Free Pass Legislation</u>

  At the start of this Monitorship, NYRA was confronted with a string of broken relationships.  The relationship between NYRA and NYTHA was particularly low.  NYTHA was reeling from the possibility that its Horsemen's Account money was mostly gone without any foreseeable source of repayment other than VLTs which were not going to be up and running overnight.  And NYTHA couldn't get access to NYRA's bookkeeping records to audit the account.  Distrust ran high.  NYRA's relationship with the State Attorney General was seen as

---

[44] <u>See,</u> The New York Racing Association Inc. Statements of Operations and Accumulated Deficit for the Years Ended December 31, 2004 and 2003, Exhibit 34 at 4.

[45] Of course, this problem does not become an issue unless the organization produces significant revenue to pay a franchise fee and/or has the potential to retain earnings.

being defined by the State Attorney General's report which concluded that "crime was part of the culture at NYRA" and characterized NYRA as "an insular, opaque, and unaccountable organization."[46]  The legislature, which in the past had been highly supportive of NYRA, had become increasingly cold.

It was against this background that the "free pass" issue presented itself.  For years, horse owners' and trainers' and jockeys' family members were allowed for free onto the track. With admission free in the winter at Aqueduct and costing all of $2.00 per person at Belmont and Saratoga, the free passes weren't viewed by the horsemen and the jockeys so much as a financial benefit as a professional courtesy.  But, the applicable state law made no such provision.  And NYRA's DPA demanded compliance with all laws.

In some ways because the free pass issue was so limited in nature, it proved to be a great starting point.  The issue was simple: while it may have made good sense to provide such passes, and that had been the practice for some time, the existing law did not permit their issuance.  The solution: simple, change the law.  And that's what NYRA went about doing.  After NYRA provided NYTHA's auditor with access to the Horsemen's Account records, NYRA continued to mend fences with and build bridges to NYTHA.  Together the two groups approached the State Attorney General which supported a sensible change in the law that would improve New York racing.  The result was that mid-way through last year's Saratoga meet, both houses of the state legislature passed such a bill, and the Governor signed it into law.  And no one concluded that the world had changed fundamentally, but everyone recognized that this was a small example of what had been hoped for all along.  Namely, that by NYRA committing itself to obey the law,

---

[46] See, New York State Attorney General, "An Examination of Employee Misconduct at the New York Racing Association, Inc., and Management's Response," June 2003 ("NYSAG June 2003 Report"), attached hereto as Exhibit 12.

and by NYRA and its constituencies respecting one another, and by their working together along with government, New York racing could change for the better.

    B.    <u>TVG Deal</u>

    The TVG deal provided for the Television Games Network to have limited exclusive television broadcasting and wagering rights for NYRA races.   While addressing the 2005 Saratoga Institute, Neil Getnick drew the connection between NYRA repairing its relationship with the horsemen, the funding of the depleted Horsemen's Account, and the TVG deal, saying the following:

> [At the outset of the Monitorship, NYRA faced a fundamental and highly] challenging issue: the funding of the horsemen's account.  NYRA had long been entrusted with maintaining what is known as the horsemen's account (the funds of owners and trainers coming from their individual deposits or purse winnings). But NYRA fell into the practice of spending down those funds, so that by 2003 they were gone -- approximately $13 million of horsemen's money gone.  It was of fundamental importance that NYRA rectify this situation.  NYRA committed to do so even before the start of the monitorship, by setting up a segregated account and beginning to fund it.  But that was not enough.  It needed to come up with the funds to fully make up the deficit.

> And that introduced the flip side of what we have called the four pillars of good conduct.  Because the fact of the matter is that good conduct is good business.  And applied well, good conduct translates into effectiveness, efficiency, productivity, and profitability.   So NYRA began to reexamine its existing operations, coming to focus on its contract with TVG, and recognized that by being able to position its simulcast signal as a strategic asset, it could develop an immediate cash influx as well as an enhanced revenue stream.  Building off its renewed relationship of trust with NYTHA and by jointly approaching the Racing & Wagering Board, NYRA succeeded in putting together a highly successful business deal.  Among other things, that deal provided NYRA with the ability to fund the horsemen's account.

> Interestingly I've seen the TVG deal criticized for a lack of transparency. Such critics should remember that transparency does not mean that the proprietary and confidential aspects of a business transaction must be revealed publicly thereby potentially undoing the deal itself.  In this case, NYRA was fully transparent to its regulator, the Racing & Wagering Board, and to the Federal

monitor, thereby assuring the public of appropriate oversight and regulatory compliance.[47]

The observations and conclusions of the Monitor regarding the role of the Racing & Wagering Board in the review and approval process of the TVG deal, including the details of the face to face meeting and follow-up face to face discussion between Chairman Hoblock and Monitor Neil Getnick on the subject, are reserved for our Sealed Report.

      C.      <u>Restoring and Protecting the Horsemen's Funds</u>

From the start, the Monitor concluded that the Horsemen's Account issue was of fundamental importance. How NYRA got into that mess was symbolic of what was wrong with NYRA. How NYRA addressed the Horsemen's Account could be the start of NYRA's turnaround.

To understand the issue one first has to understand the nature of the Horsemen's Account. NYRA requires horsemen[48] to maintain money in individually named accounts to pay for necessary racing expenses such as entry fees, the purchase of horses through claiming races, a jockey's percentage of the purse, fees payable to the Jockey Injury Compensation Fund, in addition to other fees. NYRA also deposits into these individual accounts purses from winning races. These accounts are handled similarly to an individual's commercial bank account, where withdrawals, debits and deposits take place. The Horsemen's Bookkeeper Department, a division of NYRA, administers these accounts. In addition to deposits by NYRA from purses, horsemen can also transfer funds into their individual accounts by wire transfer or by depositing cash or checks.

---

[47] Neil V. Getnick, Panel Session on "The State of the NYRA Franchise," remarks at Saratoga Institute on Racing & Gaming Law, August 2, 2005.
[48] For purposes of this discussion, horsemen include owners, trainers and jockeys, since those are the groups of individuals whose funds are held in the Horsemen's Account.

Those funds were collectively referred to as the Horsemen's Account.  But, actually there was no such specific account except on paper.  NYRA commingled the money which belonged to the horsemen, and which it held for them, with other NYRA controlled funds in its general operating account.  And then NYRA spent the money.

James M. Odato, a reporter with the <u>Albany Times Union</u>, broke the story of NYRA's misappropriation of the Horsemen's Account funds before the Monitorship started.[49]  As reported in that and other articles, the horsemen, through NYTHA and its legal counsel, were attempting to address this issue with NYRA to protect the interests of the horsemen without jeopardizing the running of races at NYRA tracks.

One of the Monitor's primary goals, in keeping with our court-ordered mandate to suggest structural reforms that would help ensure that NYRA acted in a lawful manner after the expiration of the Monitorship, was to see that the horsemen's funds were repaid and to make certain there was a system in place to ensure that those funds would be protected in the future.  To that end, early on in the Monitorship we met with representatives of NYTHA, i.e., Richard Bomze (President), Robert Flynn (Executive Director), Alan Foreman (NYTHA's counsel), and Craig Gegorek (NYTHA's accountant), and have continued to meet with them as well as the NYTHA Board of Directors, throughout the Monitorship.

Even before entering into the DPA, NYRA began to address this issue.  First, it acknowledged the situation.  Then, in late 2003, NYRA set up a segregated account for the horsemen's funds.  By the end of the year, NYRA had funded the account to the extent of $550,000.  At the outset of the Monitorship, NYRA informed the Monitor that it was committed to paying back the horsemen's funds, although it had no immediate capability of doing so.

---

[49] <u>See</u>, James M. Odato, <u>Horse Owners Pressure NYRA; They're Moving to Get About $14M the Association Owes Them</u>, The Times Union, September 20, 2003, attached hereto as Exhibit 13.

So the Monitor, meeting with NYTHA on the one hand, and NYRA on the other, encouraged a process of coming together to solve what everyone recognized as a fundamental problem.  In the end, the process of achieving that solution proved as valuable as the substance.  For today, NYRA and NYTHA have a far better working relationship than they did going back to March 2004.  And in large part, that's a result of what they did together.  And here is what they did:

- In Spring 2004, NYRA opened up its books and records to NYTHA's accountant so that the horsemen could see for themselves where things stood and continue to monitor the situation going forward;

- In Summer 2004, NYRA explained to NYTHA the proposed TVG deal and its potential for creating a sufficiently large up-front payment to fund the Horsemen's Account, following which NYTHA joined NYRA in meeting with the Racing & Wagering Board, which ultimately approved the deal;

- In August 2004, NYRA used the funds from the TVG deal to fund the Horsemen's Account;

- During 2005, NYRA changed its method of funding the Horsemen's Account to ensure that it stayed fully funded on a day by day basis;[50]

- In August 2005, NYRA signed a Declaration of Trust and created a trust account, supplanting the former NYRA segregated account, to further secure the funds for the sole benefit of the horsemen.

---

[50] "The procedure now in place calls for monies equal to the sum of the day's purses to be deposited into the account that morning.  The funds are distributed at the close of the racing day.  For Saturday and Sunday races, funds are deposited on Monday morning and distributed that same day.  Funds for races held on a Monday holiday are deposited and distributed on Tuesday."  See, NYRA Press Release, NYRA, NYTHA Create Trust Account for Horsemen's Purse Money, Aug. 22, 2005, available at http://nyra.com/saratoga/news.asp?track=S&id=1696 (last visited Sept. 10, 2005), attached hereto as Exhibit 14.

Upon the creation of the trust account, NYRA issued a news release marking the significance of the event, saying:

> New York Racing Association President and CEO Charles E. Hayward and New York Thoroughbred Horsemen's Association President Richard M. Bomze announced today that a trust account has been established to protect horsemen's purse money….  The new trust account, totaling approximately $20 million, is fully funded and has been deposited.
>
> "I would like to acknowledge the role of the federal monitor in this process and the collaborative efforts of NYTHA to establish this new account," said Hayward.  "In the unlikely event of an insolvency or bankruptcy of NYRA, these monies are segregated through the trust fund and further secured."
>
> Bomze applauded the creation of the trust account.
>
> "I am so pleased that NYRA, under Charlie Hayward, has worked with us to further secure the horsemen's funds," said Bomze.  "Now the horsemen can feel secure that all winnings and purse accounts will be further protected."[51]

Solving the Horsemen's Account issue took mutual respect, cooperation, patience, creativity, and perseverance.  The Monitor cannot speak to what initially motivated NYRA to address this issue.  We can, however, say this.  NYRA did not simply tolerate having to make restitution to the horsemen.  NYRA came to embrace the process and the result.  Finding the funds and securing them for the horsemen became a top priority and point of pride for NYRA.  By the end, what started out as such an awful negative, became a symbol of NYRA's commitment and capability to achieve positive reform

D.  Leadership Change

1.  CEO Charles Hayward

Charles Hayward was the former President and CEO of the Daily Racing Form, the horse racing industry's leading publication.  He served in that position from 2001 through June 2004, having served as its Chief Operating Officer from 2000 through 2001.  Before becoming

---

[51] Id.

affiliated with the Daily Racing Form, Hayward served in key executive positions in a succession of publishing companies, including President of the General Books Division of Simon & Schuster (1986 – 1991), President and CEO of Little Brown & Company (1991 – 1996) and President of Hayward Publishing Company, whose clients included Disney, Rodale Press and the Daily Racing Form (1997 – 1999).

NYRA's hiring consultant firm undertook an interview of Alan Marzelli, the highly respected President and Chief Operating Officer of The Jockey Club, on Hayward.  Among other things, Marzelli said of Hayward:

> Charlie Hayward is a great person for President and Chief Executive for the New York Racing Association (NYRA).  He understands the industry of racing, the business of racing, the racing part of racing, what's wrong with racing, and he also understands what it's going to take to fix it.
>
> …Charlie roots for everybody in the industry and he has the ability to see both sides and he can also see what's in the best interest of NYRA.  He can connect the dots.
>
> …There are going to be some really tough decisions down the road and I can't think of a person who would do it better than Hayward.  He has proven that he can cut costs, tighten up operations, make bold decisions, and not only bold decisions but ones that are right as well.  He can do all of that and from an operational standpoint keeping the morale high internally which he did at the Daily Racing Form.
>
> I think he is an absolutely perfect person for NYRA at this time.[52]

On September 27, 2004, the Monitor conducted an extended and detailed interview of Hayward.  He displayed a broad knowledge of the thoroughbred racing industry in general and a specific understanding of NYRA and New York racing's various constituencies.  He presented a

---

[52] Russell Reynolds Associates, Interview of Alan Marzelli, President and Chief Operating Officer, The Jockey Club (Sept. 21, 2004), interview taken by Joseph A. Bailey III.

consensus building approach and a solid understanding of the financial challenges ahead for NYRA.  Hayward was hired as President and CEO, effective November 4, 2004.[53]

        2.     <u>C. Steven Duncker and Peter F. Karches</u>

In 2003, NYRA took numerous remedial steps to address concerns raised by the USAO and other law enforcement and regulatory bodies.  These steps included the creation of the Office of the Chairman, incorporating two new Co-Chief Operating Officers, whose responsibilities included supervision of all business areas and departments of NYRA.[54]  Two members of NYRA's Board of Trustees, C. Steven Duncker and Peter F. Karches, were elected as the Co-COOs.  Subsequently, they were elected Co-Chairmen of the Board, effective January 1, 2005, replacing Barry K. Schwartz, who stepped down as NYRA Chairman at the end of 2004, after serving in that capacity for over four years.

Duncker is a thoroughbred owner and breeder.  He is a retired Goldman Sachs Partner and Managing Director.  He currently serves as a trustee of the Thoroughbred Owners and Breeders Association and as Chairman of its Graded Stakes Committee.  He is a graduate of Duke University with a B.A. in Economics and has a Masters degree in Finance from Northwestern University's J.L. Kellogg Graduate School of Management.[55]

Karches is also a Thoroughbred owner and breeder.  He retired from Morgan Stanley after a 25-year career where he served on the Management Committee of Morgan Stanley and was President and Chief Operating Officer of its Institutional Securities and Investment Banking Group.  Prior to the merger with Dean Witter Securities, Karches was President of Morgan

---

[53] <u>See</u>, NYRA Press Release, <u>Hayward Named NYRA President</u>, Nov. 4, 2004, available at http://wireless.nyra.com/Aqueduct/news.asp?id=1471&track=A (last visited Aug. 28, 2005), attached hereto as Exhibit 15.

[54] <u>See</u>, Exhibit 2 at ¶ 5(g).

[55] <u>See</u>, NYRA Press Release, <u>Duncker, Karches Named NYRA Co-Chairman</u>, Dec. 9, 2004, available at http://nyracing.com/aqueduct/news.asp?id=1495&track=A (last visited Aug. 28, 2005), attached hereto as Exhibit 16.

Stanley, & Co., Inc.  He is a graduate of Georgetown University and the Columbia Graduate School of Business.  Karches is a trustee of the Thoroughbred Owners and Breeders Association and a trustee of Georgetown University and New York Presbyterian Hospital.[56]

Both Duncker and Karches have served without compensation in these positions.  In speaking of them, along with NYRA President and CEO Charles Hayward, at the 2005 Saratoga Institute, Neil Getnick said the following:

> I have come to know each of these people quite well during the course of this Monitorship.  Each has acted with integrity.  Each has a distinguished record of business accomplishment.  And each has shown the day to day dedication of bringing those values and skills to the betterment of NYRA specifically and to New York racing more generally.[57]

Of particular note is the role that Karches played in moving NYRA to self disclose information to the State Attorney General bearing on racing integrity.  That disclosure led the State Attorney General's Organized Crime Task Force (OCTF) to begin an investigation into certain suspicious activity, culminating with State Police and OCTF investigators executing search warrants at NYRA's three racetracks.  As Karches said at the time:

> The New York Racing Association is 100 percent committed to ensuring that nothing is permitted to interfere with the integrity of the races we conduct.  The NYRA Trustees and NYRA's senior management want it to be perfectly clear, both to the general public and to the people who are involved in NYRA's racing operations, that we have zero tolerance for anyone who fails to abide completely by the rules of racing.  If we see something suspicious occurring at one of our racetracks, the appropriate law enforcement agencies will be immediately notified.  If actual wrongdoing is uncovered, the perpetrators will be prosecuted to the fullest extent of the law.[58]

Likewise, Karches took an early lead in encouraging NYRA to marshal its forces to combat horse drugging.

---

[56] Id.

[57] Neil V. Getnick, Panel Session on  "The State of the NYRA Franchise," remarks at Saratoga Institute on Racing & Gaming Law, August 2, 2005.

[58] See, NYRA Press Release, NYRA Information Sharing Leads to Investigation, Dec. 18, 2004, available at http://nyra.com/Aqueduct/feature.asp?track=A&id=1246 (last visited Sept. 9, 2005), attached hereto as Exhibit 17.

Duncker consistently has found innovative ways to monetize NYRA's heretofore hidden assets.  As the chief architect of the TVG deal, Duncker succeeded in valuing the strategic asset of television and account wagering rights for races at NYRA's tracks.  As a further example, by first initiating a study of the relative economics of NYRA's former Triple Crown Production agreement, Duncker spearheaded the signing of a far more lucrative contract for NYRA with ABC-ESPN for the broadcast rights for the Belmont Stakes starting in 2006.  The TVG deal alone marked a turning point for NYRA, especially by generating an immediate cash influx to fund the Horsemen's Account, a fundamental step on NYRA's road to reputational and fiscal recovery.

Once assuming the Co-Chairmanship of the Board, Duncker and Karches, together with Hayward, led NYRA in launching an unprecedented campaign against horse drugging and rebate shops.  Again, speaking at the 2005 Saratoga Institute, Neil Getnick said the following about the results of those efforts:

> In 2005, NYRA has gone beyond its specific problems.  NYRA has addressed industry-wide issues and in the process has emerged as an industry leader.  Specifically, NYRA has taken on the twin issues of horse drugging and rebate shops.  In a dramatic series of specific steps NYRA has taken us out of the talking phase and into the action stage.  Following the revelation of the RSI-related indictments, NYRA cut off its signal and terminated its contracts with offshore and Indian reservation rebate shops.  Furthermore, NYRA has implemented a state of the art drug testing program, uncompromising drug sanctions, and vigilant drug prevention in the form of race day monitoring barns.  Simply put, NYRA has unequivocally said yes to racing integrity and just as resoundingly said no to horse drugging, computer batch betting, tax evasion, and money laundering.  NYRA has an unmatched record of achievement in taking on these issues.[59]

The most difficult task of creating lasting structural reform is changing corporate culture.  Doing so is a daunting task.  And that is where Duncker and Karches have done best.  They have

---

[59] Neil V. Getnick, Panel Session on  "The State of the NYRA Franchise," remarks at Saratoga Institute on Racing & Gaming Law, August 2, 2005.

embraced what the Monitor has termed "the Four Pillars of Good Corporate Conduct" (integrity, transparency, good governance, and social responsibility) while continuing to focus on business results (profitability, productivity, effectiveness, and efficiency).

      E.      NYRA's Anti-Drugging Efforts

There is a growing concern about the use of performance enhancing drugs in the horse racing industry.  During the span of the monitorship, NYRA instituted several new policies in an effort to combat illegal drug use.  Two of the most notable policies are (1) the requirement that all competing horses report to a pre-race monitoring barn; and (2) the requirement that selected horses undergo state-of-the-art pre-race testing for evidence of unauthorized medications or authorized medications administered in an unauthorized amount or manner.  NYRA's innovative anti-drugging efforts are not only designed to maintain and improve the public's confidence in the integrity of horse racing in New York but also to level the playing field for bettors and horsemen, alike.  While these efforts have only recently gotten underway, they position NYRA as an industry leader.

      1.      Monitoring Barns

The most aggressive anti-drugging measure taken by NYRA to protect the sport's integrity and improve the public's trust in racing is the establishment of monitoring barns, where competing horses are stabled under the supervision of NYRA security on race days.   The rules governing the operation of the monitoring barns are stringent.  All horses entered to run in a NYRA race must appear at the monitoring barns at least six hours prior to the post time of the scheduled race.[60]  Fines will be issued for horses that arrive past the designated time and, if a

---

[60] See, NYRA Press Release, Belmont Race Day Security Barn, June 17, 2005, available at http://nyra.com/Saratoga/news.asp?id=1625&track=S (last visited Aug. 29, 2005), attached hereto as Exhibit 18; see also, the New York Racing Association, Inc., Saratoga 2005 Racecourse Condition Book -2- ("Condition Book"), at 45 (2005) (pages of the Condition Book referenced in this report are attached hereto as Exhibit 19).

horse is more than thirty minutes late, it will not only be fined but also scratched from the race.[61] Once admitted to the monitoring barns, horses will not be permitted to leave for any reason unless NYRA security is informed and approves of the move.   Only trainers, licensed stable employees and two owners per horse are allowed to accompany horses into the monitoring barns; no private veterinarians will be admitted.   Lasix is administered by NYRA veterinarians.    No vitamins, supplements or dose syringes are allowed in the monitoring barns.   All feed will be thoroughly checked and NYRA security may take samples of the feed and water for analysis at its discretion.[62]   All persons in the monitoring barn area must have a valid Racing & Wagering Board license and current NYRA badge, which should be unobstructed and worn on the outside of the licensee's clothing.[63]   The strict enforcement of these rules guarantees a secure pre-race environment upon which competitors and bettors can rely.

The new NYRA monitoring barn policy was first employed at Belmont, beginning on May 4, 2005, where two barns, consisting of a total of 93 stalls, were fenced off and set aside to serve as monitoring barns.   Although there were attendant increases in workload and cost to the trainers, the barns operated successfully during the Belmont meet and the Monitor received few complaints.

Monitoring barns were also operational during the 2005 Saratoga meet.   At Saratoga, however, the barns were met with more resistance.   The monitoring barn area at Saratoga

---

[61] The first time a horse is late to the Monitoring Barn, the trainer will be fined $250.  For each subsequent offense, the fine will increase by $250 (i.e. second offense = $500, third offense = $750, etc.).  If a horse is late more than thirty minutes, then it will be scratched from the race and the trainer will be fined.  The fines for exceeding the thirty minute mark are substantially higher and increase incrementally in the same manner that the regular late fines do. Therefore, a trainer will be fined $1,000 for the first offense, $2,000 for the second offense, $3,000 for the third and so forth.  See, Exhibit 19.  According to a NYRA representative, if a trainer fails to pay multiple fines, he or she may be prevented from entering any of the horses under his or her training in NYRA races until the balance is cleared.
[62] Id.
[63] The only exception to this rule is for out-of-town trainers, who will be allowed into the monitoring barn area with their out-of-town licenses but who should secure NYRA credentials as soon as their horse is securely stalled.  Id.

consisted of 30 stalls located in permanent barns and approximately 80 stalls located in two temporary tents.[64]   The stalls in the temporary tents gave rise to a number of complaints by trainers.   The primary complaints were that the stalls were too small, the plywood floors were potentially hazardous to the horses, and there were not enough electrical outlets for the fans needed to cool the horses stabled in the tents.[65]   The temporary stalls were 9-by-9 feet in comparison to an average barn stall size of 9-by-13 feet.[66]   Trainers complained that their horses were too cramped in the temporary stalls. The plywood floors were potentially hazardous because, when wet, the horses could slip and injure themselves or their caretakers.   Lastly, given the shortage of outlets, trainers claimed that, without an ample number of fans, it was difficult to keep the horses cool when summer temperatures surged.   According to a number of trainers, these conditions, collectively and in isolation, could upset a horse and potentially have a negative impact upon its performance.[67]   For those reasons, many trainers initially voiced their opposition to the monitoring barns in Saratoga.

After the first indication of potential conflict, the Monitor tried to facilitate communication by and between NYRA and the horsemen.   The Monitor observed that NYRA listened attentively to the horsemen's complaints and took immediate and decisive action in response.   Insofar as the limited space issue was concerned, NYRA reconfigured the temporary tents to eliminate six stalls in each barn, twelve stalls in total, in order to create an additional 500 square feet per barn.[68]   This immediately alleviated space concerns.   In regard to concerns about the safety of the plywood flooring, NYRA placed rubber floor mats in each of the temporary

---

[64] See, Tim Wilkin, Trainers criticize security barns; Track's portable stalls called too small, too hot, The Times Union, July 29, 2005, at C1, attached hereto as Exhibit 20.
[65] Id.
[66] Id.
[67] Id.
[68] See, NYRA Press Release, NYRA Responds to Raceday Security Barn Concerns, July 29, 2005, available at http://nyra.com/Saratoga/news.asp?id=1668&track=S (last visited Aug. 30, 2005), attached hereto as Exhibit 21.

stalls to prevent the horses from slipping.  Lastly, in response to the fan shortage, NYRA upgraded the barns to accommodate an electric fan for every stall.  All of these changes were completed by July 29, 2005, a mere two days after the start of the meet.[69]

Clearly, there were deficiencies in the planning and execution of the monitoring barns' construction at Saratoga.  That said, the Monitor considered NYRA's response indicative of a new willingness to cooperate with the horsemen.  Several trainers who were interviewed acknowledged that NYRA listened to, and subsequently addressed, the horsemen's concerns to the best of its ability.[70]

It is critical that the lines of communication between NYRA and the horsemen remain open on a going forward basis.  As NYRA continues to lead the industry in its anti-drugging efforts, it will benefit from constructive input from the horsemen as it searches for innovative solutions to current and future problems.

### 2.   Equine Drug Testing Programs

Equine drug tests on the three NYRA-operated tracks are performed by NYRA and the Racing & Wagering Board, both of which are assisted by the New York State College of Veterinary Medicine at Cornell University.  Tests are conducted to determine the use of unauthorized medications or authorized medications administered in an unauthorized amount or manner.

### a.   Pre-Race Testing Procedures

Pre-race tests currently administered on NYRA-operated tracks are designed to combat the practice of "milkshaking."  Milkshaking refers to the illegal practice of administering alkalizing agents, most commonly baking soda (sodium bicarbonate), combined with other

---

[69] Id.
[70] See, Exhibit 20 and Exhibit 21.

substances such as sugar or other substances, to a horse for the purpose of neutralizing lactic acid build-up, slowing the onset of fatigue and ultimately improving the horse's performance.  The tell-tale sign that a milkshake has been administered to a horse is that the horse will have excessively high levels of carbon dioxide, a byproduct of milkshaking, in its blood.  Therefore, the milkshake testing programs seek to measure the total carbon dioxide, or TCO2, in the thoroughbred's blood as an indicator of illegal milkshaking activity.  The Racing & Wagering Board has established 37 millimoles per liter as the threshold TCO2 level; anything equaling or exceeding that number will yield a positive result.[71]

TCO2 testing, or "blood gas" testing, can be done both pre- and post-race.  Furthermore, the pre-race TCO2 testing can be done prior to or after Lasix[72] is administered to eligible horses. As noted by NYRA Co-Chairman Duncker, "[t]here has been a vigorous debate within the industry over which testing practice employs the best methodology[.]"[73]  Believing pre-race testing to be more effective, NYRA has designed and instituted a state-of-the-art pre-race TCO2 testing program that measures TCO2 levels prior to *and* after the administration of Lasix. Employing this dual method of pre-race testing will allow NYRA to build up a database for future analysis.  Although the NYRA TCO2 testing program is in its early stages and subject to future modification, it is currently the most progressive form of TCO2 testing employed to combat the use of milkshakes.

---

[71] See, Racing & Wagering Board Recent Rule Changes and Proposals, available at http://www.racing.state.ny.us/about/rls.home.htm (last visited Aug. 27, 2005), attached hereto as Exhibit 22.  The February 4, 2004 emergency rules set the threshold TCO2 level at 37 millimoles per liter.

[72] Lasix, also known as Salix, is the common name for the anti-bleeding medication furosemide.  Furosemide is the only medication that may be administered to horses on the race day (horses must be eligible and enrolled to receive furosemide).

[73] See, NYRA Press Release, NYRA to Implement Pre- and Post-Race Testing, Feb. 9, 2005, at http://www.nyracing.com/Aqueduct/feature.asp?track=A&id=1254 (last visited Aug. 29, 2005), attached hereto as Exhibit 23.

The pre-Lasix blood samples are taken at the Monitoring Barns roughly 5 to 5 ½ hours before the horses' scheduled post times.  Post-Lasix blood samples are taken at some point after Lasix has been administered to the eligible horses in the field, which normally occurs 4 to 4 ½ hours prior to the horses' scheduled post time.   All pre-race blood samples are taken by a NYRA veterinarian.   The blood is then refrigerated and sent to the New York State College of Veterinary Medicine at Cornell University where it is tested and analyzed within 4 days.

NYRA pronounced that the penalties for trainers whose horses test positive in the pre-race test will be severe.  This stance and NYRA's adherence to it have and will continue to underscore NYRA's commitment to a strong anti-drugging program and brand NYRA as an industry leader.  Currently, a pre-Lasix, pre-race TCO2 level of 37 millimoles per liter or above will yield a positive result, thereby indicating the illegal administration of a milkshake.   A positive test will count as an offense and the horse's trainer will be referred to the Barn Area Violation Panel, which will impose the following penalties.[74]  The first offense will result in a fine of $2,000 and, for the next thirty days, the offending trainer will have to place each of his or her horses in guarded quarantine at the NYRA Monitoring Barns from 5:00pm on the evening preceding a race through and including the following day leading up to the scheduled race.  The second offense will cause the trainer to be fined $5,000 and he or she will lose the privileges of entering NYRA grounds and training or entering to run any horse under his or her control in a race conducted by NYRA for a period of 30 days.  The third and final offense will cause a trainer to have all of his or her privileges revoked.  After three strikes, a trainer will neither be given stalls nor be allowed to enter a horse to compete in any races at NYRA-operated racetracks.  In instances where a horse tests positive, NYRA will refer the matter to the Racing & Wagering

---

[74] See, Exhibit 19.

Board and appropriate law enforcement officials.[75]  In no uncertain terms, NYRA's three strikes policy signals that the illegal administration of performance enhancing substances to thoroughbreds will not be tolerated.

b.    <u>Post-Race Tests</u>

At present, the Racing & Wagering Board is solely responsible for the post-race testing conducted at NYRA racetracks.  The Racing & Wagering Board operates an Equine Drug Testing Program that tests for a variety of illegal or illegally administered substances.[76] Responding to concerns about milkshaking in the industry, the NYSRWB recently instituted emergency rules which provide for post-race blood gas testing to be conducted by a State veterinarian a minimum of one hour after the conclusion of the race.[77]  These emergency rules were set to expire on August 3, 2005, although the NYSRWB expressed its intention to make the rules permanent.[78]

Insofar as penalties for positive results from a post-race blood gas test are concerned, the NYSRWB has determined that trainers are subject to a range of sanctions including but not limited to suspension, fines, quarantine of horses under the trainer's control and the denial all track privileges.[79]

3.    <u>Impact</u>

NYRA has implemented a state of the art pre-race TCO2 testing program, hard-hitting sanctions for violations, and vigilant drug prevention in the form of race day monitoring barns. Simply put, NYRA has said yes to racing integrity and no to horse drugging.  NYRA's anti-drug

---

[75] <u>Id.</u>
[76] <u>See</u>, N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 902 (McKinney 2005); and N.Y. Comp. Codes R. & Regs. Title 9, § 4012.3 (2005).
[77] <u>See</u> N.Y. Comp. Codes R. & Regs. Title 9, §§ 4043.8 and 4043.9 (2005).
[78] <u>Id.</u> ; <u>See also</u>, Exhibit 22.
[79] <u>See</u>, N.Y. Comp. Codes R. & Regs. Title 9, §§ 4043.8 and 4043.9.

---

program is designed to: (1) insure a level playing field favoring the honest bettor; (2) take the pressure off trainers to conform to the lowest common denominator of conduct; and (3) secure the future of New York breeding, by seeking to make sure that race results are a function of innate ability rather than unlawful performance enhancers.

      F.    <u>Rebates and Rebate Shops</u>

Rebates and rebate shops are two very different subjects.[80] Rebates refer to providing a percentage back to the bettor on each dollar wagered, based on the dollar amount wagered, win or lose. Sometimes these arrangements are referred to as player rewards programs and emulate volume discounts which are provided in a variety of industries and commercial enterprises -- for example, credit card rebates. Rebate shops, on the other hand, refer to the unregulated offshore and Indian reservation-based enterprises reportedly providing to customers rebates of up to ten percent of every dollar wagered.

The Monitor has closely studied the operations of rebate shops and the activities of individuals known to be associated with them. Throughout the length of the Monitorship, the Monitor has focused on the actual and potential legal implications of those operations and activities. Within the closed circle of the USAO, State Comptroller, and the Court, we have previously circulated a detailed and extensive report on the subject of illegal gambling, money laundering, and tax fraud associated with rebate shops.

While we do not believe it to be either prudent or appropriate to go into further detail in this report about those submissions, we point out that two federal criminal Indictments, one out

---

[80] <u>See</u>, Chris E. Wittstruck, <u>What's a Rebate? . . . and Why We All Need to Care</u>, US Trotting Association, September 6, 2005, available at www.ustrotting.com/absolutenm/anmviewer.asp?a=11530&print=yes (last visited 09/12/05), for an analytical discussion of the distinction between rebates and rebate shops, attached hereto as Exhibit 24.

of the District of North Dakota[81] and the other out of the Southern District of New York[82] begin to shed some light on the nature and extent of the legal problems associated with off-shore rebate outlets.

As a general proposition it should be understood that rebate shops have provided a mechanism to solve an age old problem of bookie operations. In the past, bookies shied away from horse betting because full pay-offs on the odds could prove devastating. But now these operations can lay off their action by directly accessing the pari-mutuel pools through the rebate shops. Simply put, high risk payoffs have gone to no risk payoffs. Thus, for example, the Uvari Indictment charges individuals allegedly affiliated with an organized crime syndicate of making book through the rebate shops, concealing the identities of the actual bettors, facilitating tax evasion, and committing tax fraud by aggregating tax losses to a single Social Security number. In addition, that Indictment reveals how such bettors allegedly trade on horse drugging information in placing their bets.

By January 2005, NYRA and the Monitor were engaged in moving forward in studying the twin problems of horse drugging and rebate shops with a view to taking remedial action. Indeed, by coincidence the Monitor and NYRA leadership were at a previously scheduled meeting about the problems associated with rebate shops when the Southern District Uvari Indictment came down. The Indictment unveiled activities involving horse drugging in a NYRA race by a trainer based at Belmont, and illegal betting activity at an illegal rebate shop, and the connection between the two. Based on its readiness to deal with these issues, NYRA sprung into action and quickly cut off its contractual arrangements and simulcast signal from all identifiable

---

[81] <u>United States v. Racing Services, Inc., et al.</u>, C3-03-112, District of North Dakota, attached hereto as Exhibit 25.
[82] <u>United States v. Uvari, et al.</u>, Indictment 05 Cr. 24, Southern District of New York, attached hereto as Exhibit 26.

rebate shops[83] and began the institution of what would prove to be the most aggressive anti-drugging program in the horse racing industry in the nation.

Thus, in 2005, NYRA emerged as an industry leader.  No other racing organization has responded as aggressively.  Responses from other racing organizations have varied from cutting off a limited number of rebate shops to cutting off none. Some in the media have been critical of NYRA's decision to voluntarily limit this source of additional handle, but the NYRA leadership has displayed a forward-thinking vision of the implications this issue holds for the industry.  As Charlie Hayward, CEO of NYRA, succinctly put it at last month's Jockey Club Round Table held in Saratoga Springs, New York,

> I feel very strongly, unequivocally, that off-shores are bad for this game.  They have a technological advantage to serial-port wagering, which makes them win often times more than the actual takeout, and there's no question that they are havens for money-laundering and tax evasion. And if anyone in this room thinks one bookmaker in New York is the only guy that's figured this gig out, I've got a bridge I'd love to sell you.[84]

Following NYRA's lead, the Racing & Wagering Board issued a letter on January 27, 2005 to all New York Racetrack Presidents and General Managers withdrawing its approval of any contracts between New York simulcast licensees and the ten rebate shops with which NYRA terminated its simulcast contracts.   "To maintain the integrity of all New York State thoroughbred and harness racing and pari-mutuel wagering, the Racing and Wagering Board is

---

[83] In January 2005, NYRA terminated its simulcast contracts with the following rebate shops: Euro Off-Track, located on the Isle of Man in the United Kingdom; International Racing Group, Inc., located on Curacao in the Netherlands Antilles; Elite Turf Club, also located on Curacao; Tonkawa Indian Reservation, located in Oklahoma; Racing & Gaming Services, Inc., located on St. Kitts, West Indies; Lakes Region Greyhound Park, located in New Hampshire; Capital Sports Limited, located in Australia; Darwin All Sports, Ltd., also located in Australia; Coeur d'Alene Casino, located in Idaho; and the Excelsior Casino, located on Aruba.  See, NYRA Press Release, NYRA Takes Decisive Action to Ensure Integrity and Transparency, Jan. 18, 2005, available at http://www1.nyra.com/aqueduct/news.asp?id=1515&track=A (last visited Sept. 5, 2005), attached hereto as Exhibit 27; see also, NYRA Press Release, NYRA Shuts Down Six Additional Simulcast Outlets, Jan. 25, 2005, available at http://www1.nyra.com/aqueduct/news.asp?id=1517&track=A  (last visited Sept. 5, 2005), attached hereto as Exhibit 28.
[84] NYRA CEO Charles Hayward, NYRA: The Present, The Future, Remarks at the Jockey Club Fifty-Third Annual Round Table Conference on Matters Pertaining to Racing (Aug. 21, 2005), transcript available at http://www.jockeyclub.com/roundtable_05.asp (last visited Sept. 5, 2005).

withdrawing approval for any contracts between New York simulcast licensees and any of the ten sites . . . ."[85]

Recognizing the downturn in handle that would naturally accompany the decision to cut off the rebate shops,[86] within days, NYRA submitted to the NYSRWB a detailed account of its twin-prong racing integrity program.[87]  NYRA noted the following steps that it had taken in the weeks following the Uvari Indictment:

- Terminated its simulcast agreements with the four simulcast outlets named in the Indictment;

- Suspended the privileges of trainer Greg Martin, a trainer named as a defendant in the Indictment;

- Continuing work with the Racing & Wagering Board and Cornell University developing testing standards for milk-shaking tests to be implemented in February 2005;

- Terminated its simulcast agreements with six additional simulcast outlets operating off-shore or in Indian territory, citing the need for further assurances of the integrity and transparency of those entities;

- Reached agreement with Cornell University whereby Cornell would utilize funding from both NYRA and NYTHA to begin freezing and storing urine samples from horses running at NYRA for future testing; and

---

[85] Letter from Joseph Lynch, Chief of Racing Operations, Racing & Wagering Board, to All New York State Racetrack Presidents and General Managers, of 01/27/05, attached hereto as Exhibit 29.
[86] At the time that it terminated its agreements with the rebate shops, NYRA estimated that the annualized loss in handle on its races from those sites could be as much as $300 million.  See, Exhibit 28.
[87] See, Letter from Charles E. Hayward, President and CEO of NYRA, to Hon. Michael Hoblock and Hon. Cheryl Buley, Racing & Wagering Board, of 02/4/05, attached hereto as Exhibit 30.

- Commit, with the Racing & Wagering Board, to implement pre- and post-race testing for milk-shaking.

NYRA further noted that it had been engaged in discussions with various industry participants – including NYTHA, several New York OTBs, the Thoroughbred Racing & Protective Bureau, and the National Thoroughbred Racing Association – to examine the potential effects of NYRA's actions on the racing industry.  Cognizant of the fact that NYRA's actions in the areas of rebate shops and drug testing would likely have a detrimental economic impact on NYRA, NYRA stated, "Still, it is NYRA's firm belief that where issues of integrity and legality are at stake, cost cannot be a determinative factor."[88]

NYRA did, however, have a plan to alleviate the initial economic impact of its decisions and to further shore up the integrity of racing in New York.  In February 2005, it raised this proposal with the Racing & Wagering Board.

> NYRA believes that the best way to ensure the integrity of our racing product and our pari-mutuel pools, while at the same time sustaining and eventually growing our bottom line, is by: 1) eliminating the opportunity for trainers and vets to cheat through the use of performance enhancing drugs; 2) eliminate the opportunity for criminal elements to engage in criminal activity involving our pari-mutuel pools (such as tax evasion and money laundering) by denying our product to non- and under-regulated pari-mutuel simulcast outlets, and 3) *provide the New York bettors with a comprehensive and competitive account wagering alternative to the offshore, internet and out-of-state account wagering operators.*[89]

The proposed comprehensive and competitive account wagering alternative referenced in the above-quoted letter was a player rewards program (or rebate program) that rewards account wagering-customers with a cash reward based on a percentage of the player's account wagering activity.  As proposed, the reward would be credited to the player's account.  NYRA raised this proposal with the Racing & Wagering Board and advised that it sought to team-up with certain

---

[88] Id.
[89] Id. at 2 (emphasis added).

NYRA Monitorship

regional OTBs on this project.  NYRA sought to grow its account wagering customer base "both through the recruitment of new players and through re-patronization of New York residents who have migrated their account wagering activities to out-of-state and off-shore account wagering providers."[90]

At the February meeting, the Racing & Wagering Board, while not committing to the project, gave NYRA a favorable reception and encouraged NYRA to speak with the OTBs.

NYRA's efforts with the OTBs ultimately proved fruitful.  On May 6, 2005, NYRA, together with Capital OTB and Nassau OTB, submitted to the Racing & Wagering Board a detailed player reward program proposal.[91]  The proposal set forth the structure of the program and provided a financial analysis of the positive impact of the program on NYRA income, purses, contributions to the Breeding fund, and revenue to the State of New York.  In addition, the proposal made clear the importance of the player rewards program in the context of NYRA's integrity efforts:

> The timing of this request for the New York pari-mutuel industry is crucial.  On January 18, 2005, NYRA terminated its simulcast agreements with 10 simulcast outlets that NYRA (and its federal monitor) felt were engaging in poor business practices.  These simulcast outlets accounted for approximately $300 million in handle on NYRA races.  According to the Thoroughbred Racing Protective Bureau, as much as 50% of this handle is attributable to New York State residents who were conducting their account wagering activities through these out-of-state and offshore simulcast outlets. . . .  We believe that the implementation of a competitive Player Rewards Program will enable NYRA and the OTBs to recapture an even larger segment of this handle, which formerly followed through these out-of-state and offshore entities.  This will allow NYRA to off-set some of the negative fiscal impact that has resulted from its good-business decision, and it will further aid NYRA and the OTBs to keep a larger portion of the handle wagered by New York residents on NYRA races in New York.  Moreover, the

---

[90] Id. at 3.

[91] See, Letter proposal from NYRA, Capital OTB, and Nassau OTB to Hon. Michael J. Hoblock, Jr. and Hon. Cheryl Buley, Racing & Wagering Board, of 05/6/05, attached hereto as Exhibit 31.  It should be noted that the mere fact of this joint submission is significant.  The joint proposal – a collaborative effort between NYRA and the OTBs for the betterment of New York racing -- represented a ground-breaking step forward made possible by NYRA's recent efforts to foster relationships for the good of the sport.

State of New York will benefit through the collection of pari-mutuel taxes on handle that was formerly beyond the State's taxing jurisdiction as out-of-state or foreign commerce.[92]

NYRA's joint proposal was submitted to the Racing & Wagering Board on May 6, 2005. To date, NYRA has not received a response from the Racing & Wagering Board.

G.    The Backstretch

The Monitor, through a regular on-track presence and the operation of the Getnick & Getnick Integrity Hotline, built a strong rapport with the backstretch community.  As a result of its ability to penetrate the backstretch, the Monitor was able to identify the principal concerns of backstretch workers and to work with NYRA to address them.  While the range of issues affecting the backstretch is significant, NYRA took meaningful steps during the span of the Monitorship to ameliorate backstretch living conditions, to improve backstretch healthcare benefits, and to engage in a dialogue with the backstretch community.  First, recognizing the inadequacy of the current backstretch living conditions, NYRA has begun to repair and renovate dilapidated backstretch dormitories.  Second, NYRA has worked in conjunction with the Backstretch Employees Services Team ("BEST"), NYTHA, and the Jockey Club to develop an improved health benefits program for backstretch workers.  According to NYRA representatives, the new MagnaCare program, which began on or about August 1, 2005, offers eligible employees lower co-payments and broader coverage than the previous Empire Blue Cross Blue Shield program.  Ancillary to the MagnaCare program is the new Saratoga backstretch medical clinic, which NYRA opened on July 27, 2005, in cooperation with BEST, NYTHA, and Schenectady Family Health Services.[93]  The Saratoga clinic offers bilingual medical assistance to backstretch workers every day of the Saratoga meet as well as two days per week during the

---

[92] Id. at 1.

[93] See, NYRA Press Release, New Clinic Means Progress in Improving Backstretch Life, July 26, 2005, available at http://nyra.com/saratoga/news.asp?id=1664&track=S (last visited Aug. 28, 2005), attached hereto as Exhibit 32.

spring and fall training seasons.   It is the first time such a service has been available to backstretch workers in Saratoga.[94]   Third, NYRA has entered into a discourse with NYTHA, the Workplace Project and the backstretch workers, themselves.   Such a discourse, if continued, could strengthen the voice of backstretch workers in the larger racing community and improve NYRA's relations with and connection to the backstretch community.   Going forward, addressing and solving backstretch issues must remain a shared undertaking.   These three accomplishments are primary examples of NYRA's renewed commitment to social responsibility, one of what the Monitor has termed the Four Pillars of Good Corporate Conduct.

H.      Guarding Against Unfair Competition

It is well understood that the role of an independent monitor includes uncovering and reporting unethical and illegal conduct within the monitored entity.   In addition to that role, however, an IPSIG monitor serves to prevent unethical conduct directed against the monitored organization.   And where the organization is amenable to reform, the IPSIG may be a major participant with management in enhancing the economy, efficiency and effectiveness of the organization.[95]   This is particularly true where the monitored entity, like NYRA, is a quasi-public entity, and therefore its economic viability is important to the State and its citizenry.

Take, for example, two of the successful efforts by NYRA to fully monetize its potential value: the TVG deal and the ABC-ESPN deal.   As discussed earlier, the TVG deal, by positioning NYRA's simulcast signal as a strategic asset, provided for an immediate cash influx as well as an enhanced ongoing revenue stream.   The ABC-ESPN deal followed a market study undertaken by NYRA to determine whether it could improve upon its economic return in marketing the broadcast rights to the Belmont Stakes.   The study examined whether NYRA

---

[94] Id.
[95] See, Exhibit 5 at 1-2.

would do better on a stand-alone basis rather than as part of the three-part consortium constituting Triple Crown Productions.[96]  And the ABC-ESPN deal proved it by providing for a far more lucrative contract for NYRA starting in 2006.

In each of these cases, in all cases for that matter, the important thing was for NYRA to be able to negotiate the best deal without being hampered by the fact it was under indictment and operating under the supervision of a court appointed Monitor.  Going even further, ideally, the presence of the Monitor would encourage NYRA to perform at its best and discourage NYRA's competitors from trying to take unfair advantage of NYRA's legal status.  The Monitor quite deliberately attempted to play that role and, as a result, we believe we succeeded in helping NYRA do its best in these and other efforts.  And again, it should be understood that when NYRA did its best, the value of the NYRA asset was being maximized for the State, whoever might someday be granted the rights to the franchise.

I.    Financial Statements

On August 22, 2005, NYRA took the unprecedented step of publicly releasing its financial statements for the years ended December 31, 2004 and 2003 (Restated).[97]  The current NYRA financial statements have been presented so that they are accurate as well as meaningful and useful to the reader.  In other words, the statements are far more transparent than anything issued by NYRA in the past.

In the course of the monitorship, the Monitor raised with NYRA the issue of the nature of certain categories of cash held by NYRA.  In particular, the Monitor was concerned that the

---

[96] Triple Crown Productions is a consortium of Magna Entertainment Corp., Churchill Downs, and NYRA developed in connection with the broadcasting of the Kentucky Derby, the Preakness Stakes, and the Belmont Stakes, the three legs of the Triple Crown.

[97]  See, NYRA Press Release, NYRA Publicly Releases 2004 Financial Statements, Aug. 22, 2005, available at http://www.nyra.com/sarratoga/news.asp?id=1697&track=S (last visited Sept. 5, 2005), attached hereto as Exhibit 33.

presentation of cash and its related liabilities on the Balance Sheet may be misleading to the reader.  A result of this discussion is a revised presentation of cash that accurately reflects this asset and its related liabilities.  Historically, NYRA's presentation of cash and related liabilities was problematic for a number of reasons, including:

- No identification of restricted cash;

- No identification of cash designated for specific purposes; and

- No separation of significant liabilities.

The net effect of these problems was that the reader of NYRA's Balance Sheet was unable to discern (i) the amount of cash NYRA had available for its use, (ii) the amount of cash NYRA held on behalf of horsemen and others,[98] (iii) the amount of the liability that NYRA owed to horsemen and others, or (iv) the amount of NYRA's liability associated with the payment of purses on future races.  For example, NYRA's 2003 financial statements indicated that NYRA had $9,530,000 in cash and cash equivalents.  That amount, however, included restricted cash that NYRA could not use (such as horsemen's funds and NYRA One account holder funds) as well as cash that NYRA internally segregated and designated for a specific purpose (such as money to pay purses for a New York race series and money for employee retirement plans).  Therefore, the amount of cash available for NYRA operations was significantly less than that represented by the cash and cash equivalents line item.  By the old method of presentation one would not, and could not, know this by reading the Balance Sheet.  That presentation, however, was revised and clarified in the 2004 financial statements.

---

[98] Categories of restricted cash and cash segregated by NYRA and designated for a specific purpose include: horsemen's accounts (restricted), NYRA One accounts (restricted), money held for use in the Stallion Stakes race series (internally segregated and designated), and supplemental employee retirement plans (internally segregated and designated).

The 2004 Balance Sheet specifically identifies categories of "restricted cash"[99] – namely, horsemen's accounts and NYRA One accounts.  Furthermore, the notes to the financial statements make clear that "cash equivalents" includes "funds that have been segregated and internally designated for specific purposes," and goes on to list the categories of such funds and their respective amounts.  Thus, in 2004, one can readily determine how much cash NYRA has on hand that is available for its operational use.

In addition, by separately identifying specific liabilities on the 2004 Balance Sheet, one can readily determine the extent to which NYRA is covering said liabilities.  For instance, by looking at current liabilities, one can see that NYRA had a liability to NYRA One account holders in the amount of $2,006,000.  By then comparing that to the current asset restricted cash line item for NYRA One accounts, one can determine that NYRA, as of December 31, 2004, was holding $2,006,000 for NYRA One account holders – i.e., that the NYRA One account holder obligation was fully funded.

In addition to the cash presentation issue identified above, NYRA has taken steps to clarify or expand other areas of its financial statements so that they accurately and fully represent NYRA's financial condition.  For example, the 2004 financial statements contain a detailed and extensive note addressing NYRA's commitments and contingencies.  Such detail places the reader in a much better position to evaluate NYRA's financial condition.

NYRA's effort to strive for transparency in its financial statements is laudable.  The industry would be well served if others sought to follow NYRA's lead in this regard.

J.      Money Services Business Registration and Reporting Requirements

---

[99]  The financial statements define restricted cash as "funds that have been placed in a segregated account that cannot be used for a purpose other than the purpose for which that account is designated without the consent of a third party."  See, The New York Racing Association, Inc. Financial Statements for the Years Ended December 31, 2004 and 2003 (Restated) and Independent Auditors' Report ("NYRA 2004 Financial Statements"), at 10, attached hereto as Exhibit 34.

On February 17, 2005 acting on advice from its outside counsel, obtained in response to inquires from the Monitor and the Racing & Wagering Board, NYRA voluntarily registered as a Money Services Business ("MSB") by filing FinCEN form 107.[100]  As a result of registering as an MSB, NYRA subjected itself to certain reporting and recordkeeping requirements.  Below are summaries of the reporting requirements set forth in a legal opinion memo from outside counsel to NYRA:

- Currency Transaction Reports ("CTRs") - As an MSB, NYRA is required to file a report for deposits, withdrawals, exchanges and other transactions in currency of more than $10,000.   In transactions where a CTR must be filed, NYRA must record specific personal information and verify this information with an individual's driver's license, passport, alien identification card or other official documentation with picture.  The CTR form is FinCEN form 104. A CTR must be filed at the address indicated on the form within 15 days of the date of the transaction.

- Form 8300s - Non-financial institutions are required to file Form 8300 when they receive currency in excess of $10,000.  According to NYRA's outside counsel, if NYRA files a CTR there is probably no need to also file Form 8300.   However, there might be situations where Form 8300 should be filed.  The key is the filing, not which form is used.  Form 8300 must be filed within 15 days of the date of the transaction.

- Suspicious Activity Reports ("SARs") – Some MSBs are required to file SARs when the MSB knows, suspects, or has reason to suspect that certain transaction involve funds derived from illegal activity, are designed to evade the law, or serve no apparent lawful

---

[100] See, FinCEN form 107, Registration of a Money Services Business (dated Feb. 22, 2005), attached hereto as Exhibit 35.

business purpose.[101]   In the opinion of NYRA's counsel, NYRA is not required to file SARs.  However, NYRA has undertaken to file SAR's because it will protect NYRA from liability to the same extent as if a report were required.  SARs are to be filed no later than 30 calendar days after the initial detection of the facts that constitute the basis for filing the SAR.

In addition to the reporting requirements, as an MSB, NYRA also has record retention requirements.  Below is a list of the records NYRA is required to maintain:

- <u>CTRs</u> - Copies of CTRs must be kept for five years.

- <u>SARs</u> - Copies of SARs with supporting documentation must be kept for five years.

- <u>Form 8300</u> - Copies of 8300s must be kept for five years.

- <u>FinCEN 107</u> - The MSB registration form must be kept for five years.

- <u>Extensions of Credit</u> - If NYRA extends credit, it must keep a record of any such extensions over $10,000.

- <u>Transfers to or from outside the United States</u> - Records of transfers for more than $10,000 must be kept for five years.

   1. <u>Anti-Money Laundering  Policy and Program</u>

As an MSB, NYRA is required to develop, implement and maintain an effective money laundering program.  On February 17, 2005 NYRA adopted a formal Anti-Money Laundering ("AML") Policy and Program. Below is a list of the relevant AML policies and procedures that NYRA has adopted and implemented:

- Appointing an anti-money laundering compliance officer;

- Distributing the anti-money laundering policy to all NYRA employees;

---

[101] <u>See</u>, 31 C.F.R. § 103.20(a)(2).

- Retaining professional trainers to conduct personnel training for relevant NYRA employees[102] regarding the new procedures, including CTR requirements, Know Your Customer and Due Diligence Procedures, and Reporting Suspicious Activity Procedures;

- Establishing an effective method of customer identification for all NYRA customer accounts;

- Filing appropriate reports such as CTRs for cash transactions greater than $10,000 and SARs;

- Instructing all employees to promptly report any suspicious activities to the compliance officer;

- Establishing a comprehensive record creation and retention program that includes all documentation relating to the identity of each NYRA customer and/or NYRA account holder and all reports and filings required by applicable law;

- Conducting an independent audit/test at least once during each twelve month period of NYRA's anti-money laundering procedures and program to ensure that they comply with all appropriate laws and regulations and operate effectively; and

- Complying fully with any and all properly authorized requests for information made by federal or state law enforcement agencies regarding the identity of any NYRA customer and/or account holder reasonably suspected of violating any AML law or regulation.

K.    Code of Ethics

On August 10, 2005, the NYRA Board of Trustees approved a comprehensive Code of Ethics that applies to all NYRA trustees, officers, and employees.  This Code of Ethics shall

---

[102] Relevant employees include personnel from the following departments: Pari-Mutuel, Customer Service, Security, Accounting and Horsemen's Bookkeeper.

serve as both a touchstone and a guide for NYRA personnel by which they may evaluate the propriety of their conduct.

1.  NYRA's Prior Code of Ethics

On December 10, 2003, the NYRA Board of Trustees passed its first Code of Ethics.[103] That one and one half page document was, in essence, nothing more that a conflicts of interest provision.[104]

In 2005, NYRA's Internal Audit Department conducted an audit of the 2003 Code of Ethics distribution and issue resolution process.  Internal Audit issued both a preliminary report and a final report in connection with this audit.[105]  Both reports found that the controls surrounding the Code of Ethics process required improvement.   The findings and recommendations of the reports were as follows:

- The Code of Ethics was distributed to full-time administrative NYRA employees only (i.e., not to part-time administrative employees or union employees).

- Evidence documenting distribution of the Code of Ethics was not present in all employee files.

- The Code of Ethics forms were not consistently dated when signed

- The Code of Ethics should be recertified on an annual basis.

- There was no formal procedure to escalate and resolve ethics related issues.

- Potential conflicts of interest were not explored and resolved in a timely manner.

Notably, these audits did not focus on the substance of the Code of Ethics, merely the process surrounding the distribution of the Code of Ethics and the resolution of related issues.

---

[103] December 10, 2003 is also the date that NYRA entered into its Deferred Prosecution Agreement with the United States Attorney's Office for the Eastern District of New York.
[104] See, 2003 Code of Ethics – The New York Racing Association Inc., attached hereto as Exhibit 36.
[105] See, Audit Report # 2005-1, dated Feb. 18, 2005, and Audit Report # 2005-3, dated Apr. 28, 2005, attached hereto as Exhibits 37 and 38, respectively.

With respect to the substance of the Code, on its face, it was both deficient in scope and usability.  The State Comptroller, in its Travel and Entertainment Expenses audit noted that the NYRA Code of Ethics was "vague about specific requirements" and that not all NYRA officials have dated and signed the Code of Ethics.[106]  Furthermore, the State Comptroller recommended that NYRA "[r]equire that all NYRA employees sign and date a NYRA Code of Ethics, and enforce compliance with the Code of Ethics."[107]  Finally, the State Comptroller directed the Monitor to work with NYRA officials to develop an enhanced Code of Ethics.

2.      NYRA's Current Code of Ethics – Comprehensive Scope

Over the course of 2005 NYRA, with the guidance of the Monitor and the State Comptroller, developed the comprehensive Code of Ethics that was passed by the Board of Trustees at the August 2005 Board Meeting.[108]  The current Code of Ethics is a document of substance that addresses a broad range of issues and situations, including:

- Compliance with laws, rules, and regulations

- Conflicts of interests (specifically addressing outside employment and activities, conflicting financial interests, gifts and business courtesies, travel and entertainment, and Trustees as horsemen)

- Accuracy of books and records

- Confidential information

- Bribery

- Patron wagering and anti-money laundering compliance

---

[106] See, State Comptroller, New York Racing Association Travel and Entertainment Expenses: 2004-S-40, Jan. 11, 2005 ("State Comptroller 2005 T&E Audit"), at 17, available at
http://www.osc.state.ny.us/audits/allaudits/093005/04s40.pdf (last visited Aug. 30, 2005), attached hereto as Exhibit 39.
[107] Id. at 20.
[108] See, The New York Racing Association, Inc. Code of Ethics, passed by the NYRA Board of Trustees on Aug. 10, 2005 ("NYRA 2005 Code of Ethics"), attached hereto as Exhibit 40.

- Employee wagering

- Tips and gratuities

- Competitive bidding

- Unlawful discrimination and harassment

- Workplace safety and health

- Government employees

- Political contributions

- Trustees

In expanding the breadth of coverage of the Code of Ethics, NYRA has sought to provide all NYRA personnel with a substantive, user-friendly document that can be used both for reference and guidance.

3.    <u>Reporting Structure</u>

In addition to significantly expanding its subject matter scope, the current Code of Ethics provides a clear and coherent structure for reporting and resolving employee ethics issues.

<u>*Ethics Compliance Officer*</u>

NYRA designated an Ethics Compliance Officer to be the point person for ethics issues. The Code of Ethics sets forth the following methods for an individual to raise an ethics issue:

- Contact the Ethics Compliance Officer directly in person, by telephone, or by email;

- Report the situation to a supervisor who then must report the matter to the Ethics Compliance Officer;

- Contact NYRA's confidential employee hotline (with the option of reporting anonymously); or

- Submit an Investigatory Report Form (with the option of reporting anonymously).

_____
NYRA Monitorship

As a general matter, the Ethics Compliance Officer will handle routine matters individually.  The Ethics Compliance Officer, however, may refer matters to the Ethics Committee (see below) and may appeal decisions of the Ethics Committee to the Audit Committee of the Board of Trustees (see below).   The Ethics Compliance Officer is also tasked with reporting to the Audit Committee of the Board of Trustees, at the regular meetings of the committee, the ethics issues handled by the Ethics Compliance Officer during the intervals of time between such meetings.

*Ethics Committee*

NYRA developed an Ethics Committee comprised of the President/Chief Executive Officer, the Senior Vice President/General Counsel, the Senior Vice President/Chief Financial Officer, and the Senior Vice President of Human Resources and Labor Relations.  In certain matters, the Ethics Compliance Officer may choose to simultaneously submit an ethics issue to the Ethics Committee for further review and decision.  Pursuant to the structure established by NYRA, the Director of Internal Audit will attend all Ethics Committee meetings.  The Director of Internal Audit is not an Ethics Committee member and will not participate in either the decision-making or the issue review process.   Concerning the resolution of a given issue, the Ethics Committee may choose to accept the decision of the Ethics Compliance Officer, reject it, or refer it to the Audit Committee of the Board of Trustees.

*Audit Committee of the Board of Trustees*

As noted, the Ethics Committee may refer to the Audit Committee of the Board of Trustees a decision of the Ethics Compliance Officer.  In addition, the Ethics Compliance Officer may appeal to the Audit Committee of the Board of Trustees a decision of the Ethics Committee. The decisions of the Audit Committee of the Board of Trustees are final and binding.

4.      Disclosure of Business Interests

A significant change brought about by the new Code of Ethics is a disclosure requirement for NYRA personnel in positions of influence.  Attached to the Code of Ethics is a mandatory Disclosure of Business Interests form for the disclosure of potential conflicts of interest by trustees, officers, vice presidents, directors, the Anti-Money Laundering Compliance Officer and the Ethics Compliance Officer.  In addition, all employees have an obligation to disclose relationships where they or their family members have interests in, or are employed by, entities that have actual or potential business contacts with NYRA.

     5.    <u>Universal Distribution</u>

The Code of Ethics is being distributed to all NYRA personnel, including trustees, officers, union employees, and administrative employees.  All personnel will be required to acknowledge acceptance of the Code of Ethics on an annual basis.

The recent passage of the comprehensive Code of Ethics by the NYRA Board of Trustees is a meaningful statement by NYRA about the state of the organization today and where it would like to be in the future.

    L.    <u>NYRA's Response to Criminal Activity at the Track</u>

    1.    <u>NYRA's Initiation of an Investigation by the State Attorney General</u>

In the past, NYRA has been fairly criticized for failing to prevent and report  criminal activity at the track, whether by patrons or its employees.[109]  During the course of the Monitorship, and under the leadership of the two Co-Chief Operating Officers and later Co-Chairmen C. Steven Duncker and Peter F. Karches, and President and CEO Charles Hayward upon his arrival at NYRA in November of 2004, NYRA has taken steps to rid the tracks of criminal activity and pledged its commitment to taking whatever action necessary to achieve this goal.

---

[109] <u>See</u>, Exhibits 1, 3, and  12.

In 2004, the NYRA Board of Trustees' Special Oversight Committee developed information that it provided to the State Attorney General.  Following that disclosure, the State Attorney General's Organized Crime Task Force (OCTF) began an investigation into certain suspicious activity.  In December of 2004, New York State Police Officers working with the Attorney General's Office in connection with that investigation, seized records pursuant to search warrants executed at Aqueduct, Belmont and Saratoga.[110]  NYRA has continued during the course of the Monitorship to cooperate with the State Attorney General in this investigation.

### 2.      Alleged Solicitation of Commercial Bribes at Saratoga Restaurant

A recent example of NYRA's desire to rid the track of criminal behavior is an undercover operation it conducted at Saratoga.  NYRA arranged for security personnel to pose as customers at The Porch restaurant.  The security officers reported that a long time maitre d' at the restaurant solicited money and then accepted $200 in exchange for a table.  Saratoga County District Attorney James Murphy is investigating the matter.[111]

This abusive practice of requiring patrons to pay money in order to be seated at the restaurant has reportedly been going on for years.  The Monitor had received complaints from patrons of the track concerning this abuse.  NYRA is to be commended for taking action to stop corrupt behavior.

### 3.      NYRA's Security Department

We discuss the work of the NYRA Security Department under the direction Kenneth Cook, former Deputy Superintendent and Full Colonel with the State Police, later in this report. This department has undergone a major transformation and now has the capability to address

---

[110] See, Exhibit 17; see also, Internal Unit Began Probe, The Times Union, Dec. 19, 2004, at D4, attached hereto as Exhibit 41.
[111] See, James M. Odato, Maitre d' facing inquiry from DA, The Times Union, Aug. 26, 2005, at A1, attached hereto as Exhibit 42.

significant security issues, and to coordinate efforts with law enforcement agencies, which it was not capable of doing in the past.

4.      Other Criminal Matters

There are additional matters which have been brought to the attention of the Monitor from various sources, including callers on our Integrity Hotline.  To the extent we have been able to discuss these matters with NYRA, they have been cooperative and responsive.

5.      Conclusion

NYRA's response to criminal activity at the tracks is far ahead of where it was prior to the Monitorship.  There will always be the potential for corruption in the horse racing industry. It is the job of government and the franchise holder to do all it can to thwart those who wish to criminally exploit horseracing in New York for their own selfish goals.   NYRA has demonstrated both of a record of success and a commitment to remain vigilant in combating criminal activity at the track.

M.      Corporate Governance

1.      Restructuring of Senior Management and Other Departments

As agreed in the DPA, NYRA completed the restructuring of its Senior Management, as well as its pari-mutuel, legal, security, internal audit, accounting and human resources departments by the end of the first quarter of 2004.[112]    In the time since, NYRA has initiated further organizational changes, particularly in its highest echelons, in order to revitalize the association.   The restructuring of management has demonstrated NYRA's commitment to meaningful change and good governance.

NYRA has divided the position of the Chairman of the Board of Trustees ("Chairman") and the Chief Executive Officer ("CEO").  Charles E. Hayward became President and CEO of

---

[112] See, Exhibit 2 at ¶ 6.

NYRA on November 4, 2004.  This paved the way for the next Chairman of NYRA to serve in a non-executive role.  Upon Hayward's appointment, Duncker and Karches, who served as Co-Chief Operating Officers relinquished those titles and continued to serve as Vice Chairmen of the Board of Trustees until they became the Co-Chairmen of the Board of Trustees effective January 1, 2005.  The Co-Chairmen serve in a non-executive fiduciary role.[113]

Hayward as CEO and President, together with Duncker and Karches as Co-Chairmen, have proven to be inspired choices maximizing the practical value of the improved corporate governance structure.

2.    New Board of Trustees Committees, Chairs, and Members

As the body governing NYRA, the NYRA Board of Trustees has been a longstanding epicenter of power within the racing community.

The Board of Trustees has recently reorganized its committee structure and leadership. Three committees were eliminated: Marketing Review; Customer Service; and Long Range Planning.   The remaining standing committees are: Executive; Nominating; Audit; Compensation; Facilities; Legislative Liaison; Pension; Special Oversight created in 2003; and a newly created Finance Committee.  In 2005, the Board of Trustees rotated all of the Committee chairpersons with the exception of the chair of the Special Oversight Committee who began serving in that capacity upon the creation of the committee in 2003.

The Board of Trustees should continue on this path of good governance by articulating and memorializing its policy of evaluating committees and rotating committee membership and chairpersons.  The Monitor further recommends that the policy should incorporate an annual review of committee assignments.  In considering the rotation of its committee chairpersons and

---

[113] See, Exhibits 15 and 16.

membership, the Board of Trustees should aim to balance the benefits derived from continuity and experience against the benefits derived from the diversity of expertise and viewpoints.

### 3. NYTHA Executive Director on NYRA Board of Trustees

On December 16, 2004, Robert F. Flynn ("Flynn"), the executive director of NYTHA, was named to the NYRA Board of Trustees, an appointment which was subsequently approved by the Racing & Wagering Board.[114]  Although Flynn was named to the Board of Trustees in an individual capacity, it is expected that his involvement will enhance communication and cooperation by and between NYRA and the horsemen.  As the Executive Director of NYTHA, Flynn has a tremendous depth of knowledge about issues that are important to the horsemen and his membership will bring an important perspective to the NYRA Board of Trustees.

### 4. Monitor Suggests Rotation Policy for Board of Trustees

In the same manner that the practice of rotating committee chairpersons and members benefits the organization, so might a rotation of Trustees of the Board, including its Executive Committee members.[115]  Rotating Trustees would ensure that new ideas are brought to the table and that problems are viewed with a fresh perspective.  Such a policy could simultaneously emphasize the value of institutional knowledge by allowing former Board members would had rotated off the Board to serve again after a determinate period of time, e.g., two years.

The Monitor believes that NYRA should consider implementing a suitable policy of rotation amongst its Board of Trustees to ensure diversity and a wide range of skill and expertise that will evolve with the changing composition of the Board of Trustees.

---

[114]  See, NYRA Press Release, Flynn Named NYRA Trustee, Dec. 16, 2004 available at http://nyracing.com/aqueduct/news.asp?id=1498&track=A (last visited Aug. 28, 2005), attached hereto as Exhibit 43.  Flynn was approved by the Board on Feb. 16, 2005.  See also, Feb. 16, 2005 Racing & Wagering Board Minutes available at www.racing.state.ny.us/pastminutes/2005/021605.htm (last visited Aug. 28, 2005).
[115]  According to the New York Racing Association, Inc., By-Laws, executive officers of the Board shall hold their office until a successor is named or "until his death, resignation or removal[.]"  See, the Oct.8, 1999 New York Racing Association, Inc., By-Laws, at Section 1, attached hereto as Exhibit 44.

5.      NYRA Code of Ethics

From its establishment in 1955 through and including 2003, NYRA did not have a Code of Ethics.  NYRA has since drafted a robust and meaningful Code of Ethics that was approved by the Board of Trustees on August 10, 2005.[116]  The current Code of Ethics provides a set of ethical guidelines for NYRA trustees, officers and employees in the context of their work at NYRA.

## V.      Current Financial Condition

In August 2005, NYRA released its financial statements for the year ended December 31, 2004.[117]  While the statements showed NYRA to be in a weak financial position – auditor Deloitte & Touche provided a qualified opinion raising substantial doubt about NYRA's ability to continue as a going concern – they were representative of both a company in transition and NYRA's continued commitment to transparency.

A.      The Numbers

On the positive side, as compared to the prior year, NYRA: (1) reduced its net loss; (2) increased its revenues; and (3) decreased its expenses.  That said, however, NYRA reported a net loss of $15.98 million for the year ended 2004.  In summary:

- NYRA reported a net loss of $15.98 million for the year ended 2004 compared to a net loss of $22.13 million for the year ended 2003.

- Total revenues for the year ended 2004 increased by $4 million, from $283.53 million in 2003 to $287.53 million in 2004.

- Net revenues for the year ended 2004 increased by $1.19 million, from $151.75 million in 2003 to $152.94 million in 2004.

---

[116] See, Exhibit 40.
[117] See, Exhibit 34.

- Total expenses for the year ended 2004 decreased by $4.96 million, from $173.89 million in 2003 to $168.93 million in 2004.

- At December 31, 2004, NYRA had a working capital deficit of $35,537,000 and a net capital deficiency of $134,725,000.

Based on NYRA's financial condition, NYRA's independent auditors issued a qualified opinion stating that, "[NYRA's] recurring losses from operations, working capital deficit, net capital deficiency, and limited borrowing capacity raise substantial doubt about its ability to continue as a going concern."[118]

### B.    Cash Flow Concerns and the Purse Cushion

NYRA's most pressing and immediate financial obstacle is its persistent cash flow deficiency.  NYRA management sets forth in the financial statements its belief that, "based on the current operating assumptions and projections, [NYRA] will not be able to satisfy its cash requirements through 2005."[119]  NYRA's inability to generate sufficient cash flow for operations is a significant problem and one that, historically, has led to other problems.[120]

The cyclical nature of NYRA's business provides large swings in cash flow at different points in the year.  During the Saratoga Race Course meet, for instance, NYRA is cash rich.  By contrast, however, during the Belmont Fall and Aqueduct Winter meets, NYRA is in need of cash for operations.  NYRA does not, however, generate sufficient cash flow at any time of the year to enable it to build a reserve sufficient to carry it through the cash-lean periods.

---

[118] See, Deloitte & Touche Independent Auditors' Report, Aug. 2, 2005, attached hereto as Exhibit 45.
[119] See, Exhibit 34 at 8.
[120] For example, prior to the start of the Monitorship, NYRA had spent down approximately $13 million in horsemen's funds that NYRA was holding for the benefit of the horsemen.

It is worthy of note that, if NYRA was able to maintain a funded purse cushion, much of the pressure associated with operational cash demands would be relieved.[121]  NYRA has a daily demand, during every season of the year, to pay purses on the races run at NYRA tracks.  The purses should be paid on the day of the race.[122]  This obligation exists regardless of whether other aspects of NYRA operations make paying purses difficult.  In other words, if a vendor is late in making its payment to NYRA, or handle happens to be down, or a simulcast site refuses to pay its signal fee, that is all part of running a racetrack and NYRA should still pay its purses.  Having a funded purse cushion would allow NYRA to continually fund purses independent of, or largely independent of, cash flow considerations stemming from other aspects of NYRA's business.  This is not to say that having a fully funded purse cushion would solve NYRA's cash flow difficulties; it would, however, make things more manageable and allow for a focused analysis of the issue.

NYRA's cash flow problems are not attributable to current management.   To the contrary, current management inherited the cash flow problem with myriad other problems affecting NYRA's operations.   In fact, being forced to address and resolve other significant issues, like the funding of the Horsemen's Account, prevented NYRA management from using newly-generated revenues to address the cash flow deficiency.[123]  NYRA Management continues to seek and achieve opportunities to increase revenue.

---

[121] According to NYRA's Balance Sheet as of December 31, 2004, there is a liability for Accrued Stakes and Purses (i.e., cushion) in the amount of $15,848,000.  This obligation is unfunded.   As a result, NYRA is without the reserve from which to pay daily purses.  Both NYRA's regulator, the Racing & Wagering Board, and the horsemen's representative, NYTHA, are aware that the cushion is unfunded.  In June 2005, NYRA provided NYTHA with a written acknowledgement of the liability together with a commitment "to fund the purse cushion as soon as it is feasible for NYRA to do so." See, letter from J. William Byrne to Alan Foreman, Esq., of 06/10/05, attached hereto as Exhibit 46.

[122] For races run on a weekend or bank holidays, purses should be paid on the next business day. It should be noted that the payment of purses on race day is not a statutory requirement, but is a sound business practice.

[123] For example, in August 2004, NYRA negotiated a deal with TVG whereby TVG paid to NYRA a substantial up-front lump-sum fee.  While this money would have certainly proved useful in addressing NYRA's cash flow issues,

C.       Pension Benefit Guaranty Corporation Action

NYRA currently has two outstanding issues with its employee pension funds.  The first is that the pension funds are underfunded.[124]  NYRA has stated that this underfunding will not present a significant operational issue, as there are sufficient funds to cover the anticipated pool of potential retirees well into the future.  The second issue is that NYRA has missed a number of required contribution payments.[125]  NYRA is in the process of bringing itself current with respect to these payments.  Earlier this year, the Pension Benefit Guaranty Corporation filed a number of liens against Saratoga Race Course to cover overdue payments.

NYRA should take all steps necessary to fully satisfy its employee pension obligations.

VI.    **New York Racing & Wagering Board**

The Racing & Wagering Board is the state regulator of thoroughbred horse racing and pari-mutuel wagering.[126]  It was established in 1973.

A.       Overview

The Racing & Wagering Board has "general jurisdiction over all horse racing activities and all pari-mutuel betting activities, both on-track and off-track, in the State and over the

---

most of that money was used to repay funds to the Horsemen's Account that had been depleted under prior NYRA regimes.

[124] It has been reported that Gary Pastorius, a spokesman for the Pension Benefit Guaranty Corporation has stated that NYRA's pension fund is underfunded by $44.7 million.  See, James M. Odato, NYRA Faces New Lien Over Pension Funding, The Times Union, August 13, 2005 at B3, attached hereto as Exhibit 47.

[125] See, Vince Calio, A Slight Handicap: NY Racing Falls a Little Behind, Pensions and Investments, Aug. 22, 2005, at 8 ("In the past year, NYRA has missed contributions of $1.1 million and $4.5 million, and will soon owe an additional $1.3 million for the second quarter of this year, according to the PBGC.").

[126] In August 2005, Governor Pataki signed into law legislation creating an Oversight Board with jurisdiction over NYRA.  The Oversight Board is empowered to, among other things, make recommendations for establishing model governance principles; review and approve capital plans; review and approve NYRA's compliance with laws, rules and regulations; and, review and make recommendations concerning NYRA's operating budgets, accounting, revenue and expenditure policies, and internal control systems.  As of the date of this report, this Oversight Board is not yet functional.

NYRA Monitorship

corporations, associations, and persons engaged therein."[127]  In addition to horse racing and pari-mutuel betting, the Racing & Wagering Board is responsible for the oversight of charitable gaming (such as bingo) and Indian gaming in New York State.  The Racing & Wagering Board's stated purpose is "to ensure that New York State's legalized casinos, pari-mutuel, and charitable gambling activities operate with integrity and are in full compliance with New York State statutes and rules."[128]

Pursuant to statute, Racing & Wagering Board shall consist of three members appointed by the Governor and confirmed by the New York Senate for terms of six years.[129]  No more than two of the members shall belong to the same political party.[130]  Two members of the Racing & Wagering Board shall constitute a quorum for the purpose of conducting Racing & Wagering Board business.[131]  The Racing & Wagering Board has the power to: (i) administer oaths and examine witnesses, (ii) issue subpoenas to compel attendance of witnesses, and (iii) issue subpoenas to compel the production of relevant documents and materials.[132]

B.    The Current Racing & Wagering Board

The Racing & Wagering Board is currently comprised of two members: Chairman Michael J. Hoblock, Jr. and Board Member Cheryl Ritchko-Buley.  The third position on the Racing & Wagering Board has remained vacant since the prior third member of the Racing & Wagering Board retired in or around July 2001.[133]  Concerns have been raised in the past concerning Racing & Wagering Board composition.

---

[127]  See, N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 101(1) (McKinney 2005).
[128]  See, New York State Racing and Wagering Board Annual Report and Simulcast Report – Calendar Year 2004, accessed at http://www.racing.state.ny.us/pdf/2004%20Annual%20Report.web.pdf.
[129]  See, N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 101(2)-(3) (McKinney 2005).
[130]  Id.
[131]  See, N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 101(6) (McKinney 2005).
[132]  See, N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 101(9).
[133]  See, Minutes of the New York State Racing & Wagering Board Meeting of July 18, 2001, accessed at http://www.racing.state.ny.us/bmeetings/board.home.htm.

NYRA Monitorship

At the time one of the current members was appointed, questions were raised about whether the Board composition was consistent with provisions of the law requiring that no more than two of the members shall represent the same political party. Both the current Chairman, Michael Hoblock, and the since retired member were registered Republicans. The other current member, Cheryl Ritchko-Buley changed her voter registration from Republican to unaffiliated shortly before her confirmation by the Senate.[134]

The Racing & Wagering Board has seven departments, an Executive Director, a ten-member Executive Staff, and approximately 300 staff members.[135]

C.     Pending NYRA Matters

1.     NYRA's Simulcast License

During the course of the Monitorship, the Racing & Wagering Board has not approved NYRA's simulcast license. As a result, NYRA has been proceeding, for both 2004 and 2005 under a continuing right basis premised on its prior license. The Racing & Wagering Board is aware of this matter.

Given that NYRA continues to simulcast, and that its regulator knows and, at least implicitly approves of that simulcasting activity, it seems logical for the Racing & Wagering Board simply to approve NYRA's simulcast license for the current period.

According to some accounts, the Racing & Wagering Board has taken the position that it is disinclined to approve NYRA's simulcast license while there is an indictment pending against the entity.[136] Should the indictment against NYRA be dismissed, then the Monitor recommends

---

[134] See, Exhibit 1 at pp. 18-19.
[135] The seven departments are: Administration, Audits and Investigations, Charitable Gaming, Casino Gambling, Counsel's Office, Racing Operations and Officials, and the Secretary's Office. The ten member Executive Staff includes, among others, a Director of Racing Officials, a Director of Audits and Investigations, General Counsel, and a Chief of Racing Operations. Of the 300 staff members, approximately half are seasonal per diem employees assigned to the racetracks. See, New York State Racing and Wagering Board Annual Report and Simulcast Report – Calendar Year 2004, accessed at http://www.racing.state.ny.us/pdf/2004%20Annual%20Report.web.pdf.
[136] Tom Precious, Monitor's Comments Indicate NYRA May Be Cleared, Bloodhorse.com, available at http://www.bloodhorse.com/viewstory_plain.asp?id=29323 (last visited 09/11/05), attached hereto as Exhibit 49.

that the Racing & Wagering Board act promptly to formally approve NYRA's simulcast license for the above-stated reasons.

2.      NYRA's Simulcast Agreements

Although NYRA cut off its contractual arrangements and simulcast signal from all identifiable rebate shops, NYRA continues to send its signal to and maintain contractual arrangements with out of state racing entities that have player rewards programs (e.g. the Meadowlands in New Jersey and Philadelphia Park in Pennsylvania).  The Racing & Wagering Board has repeatedly delayed the approval of NYRA's proposed simulcast language to deal with this issue.  If the Racing & Wagering Board were to insist on a strict "no rebate" policy, then NYRA would lose a significant amount of handle that would have an adverse impact on NYRA's contributions to the state.  The Monitor recommends that Racing & Wagering Board act promptly on this matter.  Doing so would help clarify the remaining pending issue, i.e., NYRA's proposed player rewards program.

3.      Rewards Program

NYRA undertook its decision to cut off the offshore and Indian reservation shops knowing that it would likely have a negative financial impact (the terminated rebate shops accounted for approximately $300 million in annual handle on NYRA races).  As a countervailing measure, together with Capital OTB and Nassau OTB, submitted to the Racing & Wagering Board on May 6, 2005, a detailed player reward program proposal.  The proposal set forth the structure of the program and provided a financial analysis of the positive impact of the program on NYRA income, purses, contributions to the Breeding fund, and revenue to the State of New York.  To date, NYRA has not received a response from the Racing & Wagering Board.  Given the importance and urgency of the pending proposal request, the Monitor recommends

that Racing & Wagering Board act as soon as possible on this matter.  As pointed out above, in the current environment NYRA must go head to head in competition with other U.S. tracks that offer such player rewards to their customers.

4.      Remaining Appointee

The legal structure of the Racing & Wagering Board is designed to prevent deadlock and stagnation.  Currently, unless the two members can reach unanimous agreement, nothing can go forward.  A third member, which is what is provided for under law, would alleviate this situation. The Monitor recommends that action be taken promptly to appoint the missing member of the Racing & Wagering Board.

VII.    **The Franchise**

A.      Legislation Establishing the Oversight Board and Ad Hoc Committee

On August 3, 2005 Governor Pataki signed into law Senate Bill No. 5923[137] which, among other things, created an Oversight Board for NYRA tasked with monitoring and reviewing all aspects of NYRA's business practices during the remainder of its franchise, which is due to expire at the end of 2007.  For example, the Oversight Board has the authority to approve NYRA's expenditure plans and operating budget, to recommend internal controls, to examine NYRA's books and records, and to establish model governance principles to improve transparency and accountability.  The Oversight Board consists of 5 members to be appointed by the Governor, one upon recommendation of the temporary president of the Senate and one upon recommendation of the speaker of the Assembly.[138]  Significantly, the Oversight Board takes over the duties and powers of the former State Thoroughbred Racing Capital Investment Fund

---

[137] See, S. 5923, 2005 N.Y. Laws 354.
[138] As of the date of this report, four appointments have been made to the Board, three chosen by the Governor and one upon the recommendation of Senator Joseph Bruno.

("CIF"), and has the authority and power to settle all debts which were owed to the CIF on terms which the Oversight Board deem to be "reasonable and just."  If NYRA's franchise were to be revoked or surrendered prior to its expiration at the end of 2007, then NYRA "shall transfer to the [Oversight Board] at the time of such relinquishment . . . revocation or dissolution all right, title and interest held by [NYRA] in all such facilities, and all capital improvements made to the real property and such facilities. . . ."[139]  Although the power and authority granted to the Oversight Board is, to an extent, duplicative of the responsibilities of the NYSRWB, this statute does not diminish the NYSRWB's authority, and in fact, the Oversight Board will carry out its duties with the assistance of NYSRWB staff.[140]

With respect to the franchise to run Aqueduct, Belmont and Saratoga, the new law accelerates from before July 2006 to before December 1, 2005, the creation of an ad hoc committee which will solicit proposals for the purchase of the franchise.   This committee can, among other things, issue requests for proposals for the franchise, make recommendations with respect to the awarding of the franchise to the Governor and legislature, conduct public hearings, and report its findings to the Governor, the legislature and the RWB, including its recommendations concerning any proposed legislation and responsibilities to be assigned to the RWB or other state agencies in connection with the operation of the franchise.   The committee consists of 9 members to be appointed by the Governor, three upon recommendation of the temporary president of the Senate and three upon recommendation of the speaker of the Assembly.

---

[139] See, S. 5923, 2005 N.Y. Laws 354
[140] See, S. 5923, 2005 N.Y. Laws 354 ("[N]othing in this section shall be deemed to reduce, diminish or impede the authority of the state racing and wagering board to . . . determine and enforce compliance by [NYRA]";  "The [Oversight Board] shall utilize employees of the state racing and wagering board to carry out its duties.").

The portion of the legislation which establishes the Oversight Board will be repealed thirty days following the assumption of the franchise by a successor entity.

B.    Qualifications to Include in the Requests for Proposals for the Awarding of the Franchise to Operate Aqueduct, Belmont and Saratoga in the Future

Senate Bill No. 5923 sets forth as its intended goal improving the integrity of racing and wagering in New York State.   This is a goal that all those who care about the horse breeding and racing industry in New York hope to promote and realize.   As discussed in this final report to the Court, NYRA has implemented significant improvements in its organization and in the manner in which it operates the racetracks.   It has implemented policies and procedures which have increased the public confidence in racing and wagering and which should become industry standards.  We believe that the Oversight Board and the Committee on the Future of Racing (the name given to the nine member ad hoc committee) should consider the positive changes and improvements that NYRA has made during the course of the monitorship and incorporate them as standards and requirements into the franchise request for proposals.   The positive improvements implemented by NYRA at Aqueduct, Belmont and Saratoga should continue in the future for the well being of New York State, regardless of which organization is awarded the franchise.

The following is a list of the most significant improvements implemented by NYRA during the term of the monitorship.   We recommend that the RFP for the New York racing franchise mandate that the following be included as conditions of the franchise:

1.  A safe, healthy and humane environment in which to work and live for the backstretch employees and their families.

_____
NYRA Monitorship

2.  A refusal to send the simulcast signal to rebate shop betting locations that do not provide full and complete information to satisfy New York State that they are operating in a lawful manner.

3.  A strict drug testing program with severe sanctions for violators to guarantee that all races at Aqueduct, Belmont and Saratoga are fairly run and to ensure that bettors are not disadvantaged.

4.  Pre-race monitoring barns at each track.

5.  A fully-funded segregated trust account for the horsemen's funds, together with full access by the horsemen to account records for review and inspection.

6.  A comprehensive Code of Ethics that applies to all track employees, officers and board members, and that is enforced in a meaningful and effective manner.

7.  Audited financial statements filed on a yearly basis that: are transparent; accurately portray the financial condition of the company; are prepared according to generally accepted accounting principles; and, are made available to the appropriate State regulatory agencies for review and inspection.

8.  Registration as a Money Services Business, including all related reporting requirements, the anti-money laundering policies and other financial system protections that have been implemented by NYRA to meet its obligations to those who have entrusted the track with their funds and to prevent the facilitation of criminal activity, e.g., money laundering, tax evasion, etc.

This list sets forth several improvements which have taken place at NYRA during the course of the monitorship which we believe should be continued regardless of which organization is granted the franchise. We are not suggesting that this list is exhaustive, or that

the systems put into place can not be improved upon.  For example, NYRA acknowledges that it needs to improve upon the physical conditions in the backstretch and the monitoring barns.

We recommend that the Oversight Board and the Committee on the Future of Racing address these issues as they carry out their mandate to improve the integrity of racing and wagering in New York, recommend legislation, draft requests for proposals for the award of the franchise, and recommend which organization should operate New York's three premier thoroughbred race tracks in the future.


## VIII.   Operational Issues and Observations

    A.    Mutuel Tellers

        1.    Background

Prior to the inception of the Monitorship, NYRA had been the target of federal and state investigations involving employee misconduct by NYRA Pari-Mutuel Employees ("Mutuel Employees").  From January 1980 through and including 1999, Mutuel Employees collectively deducted approximately $19 million from their federal income tax returns as un-reimbursed employee expenses as part of a massive tax scam.[141]  This activity resulted in the indictment of NYRA and six individuals and led to the DPA in this matter.[142]

In the DPA, NYRA represented that, as a remedial step to address concerns raised by the United States Attorney's Office and other law enforcement and regulatory bodies, it would implement "new policies and procedures for employees in the Pari-Mutuel Department,

---

[141] The scheme provided that the Mutuel Employees would extract money from their cash drawers, falsely report shortages, receive payroll deductions for the same, and declare the deducted wages as un-reimbursed business expenses.  Thus, the Mutuel Employees would pay taxes on an artificially deflated income.  See, Exhibit 3 at ¶¶ 23-27.

[142] All six individuals have plead guilty.

including a daily count-out procedure[.]"[143]   Similarly, NYRA represented that it would implement a "new work rule requiring that any Mutuel Employee who had a history of excessive shortages prior to the new shortage policy that was put into effect in 2000 not be allowed to perform any job in the money room, at any fifty dollar minimum window, at any IRS window, or at any check cashing or cash advance window[.]"[144]   In the time since, NYRA has taken a number of steps, in addition to those mentioned in the DPA, to curtail improper or illegal behavior by Mutuel Employees and to foster a climate of transparency and integrity within the department.

2.   New Pari-Mutuel Department Procedures

In response to the Mutuel Employee issues discussed above and identified in the DPA, NYRA has revised the practices relating to and procedures governing its Mutuel Employees. The Mutuel Employees are now bound by Mutuel Department Rules and Regulations ("Rules and Regulations") with which they are expected to familiarize themselves and comply.[145]   Not only are there Rules and Regulations governing the Mutuel Department, but also the Mutuel Department may issue directives which must be obeyed by all department employees.   NYRA can release modifying policies and revise the Rules and Regulations at its discretion.[146]

Perhaps the most significant component of the Rules and Regulations issued in or about January 2000, was the new shortage policy.[147]   The amount of money held by Mutuel Employees at any given moment should equal their opening balance, plus the money that they received throughout the course of the day, minus the money they have paid out.   If a Mutuel Employee

---

[143] See, Exhibit 2 at ¶ 5(g).
[144] Id.
[145] "All pari-mutuel tellers receive the Mutuel Department Rules and Regulations and are expected to know the rules and abide by them."  See, Exhibit 40.
[146] According to representations by NYRA's Mutuel Department, a new version of the Rules and Regulations is currently being drafted.  The Rules and Regulations presently in use have not been modified since 2000.
[147] See, Exhibit 3 at ¶ 41.

has less than that amount in his or her cash box, it will constitute a shortage.  The most recent Rules and Regulations outline a series of penalties for Mutuel Employees who report a shortage of $25.00 or more at the end of the day.[148]   The penalties range from the receipt of a written warning to termination, depending upon the amount of the shortage and the number of shortages reported by the teller in question.[149]   A record of all reported shortages will be maintained by the Mutuel Department for a period of 12 months. [150]   The Monitor verified that the shortage policy is in place and, in combination with other policies such as the daily count-out, it has virtually eliminated the conduct which gave rise to federal and state investigations involving NYRA Mutuel Employee misconduct.[151]

In addition to the shortage policy, the Rules and Regulations outline a number of other prohibitions.  For example, all NYRA One Accounts held by Mutuel Employees were closed and Mutuel Employees are prohibited from opening new NYRA One accounts.[152]   Mutuel Tellers are also prohibited from soliciting tips, using cell phones while on duty, commingling their personal money with the money in their drawer, permitting persons under 18 years of age to bet or betting themselves on the outcome of any race conducted by NYRA.[153]

---

[148] See, Exhibit 7.

[149] Shortages of $25 to $600 will be considered excessive.  Penalties will range from a written warning for the first occurrence to termination or suspension of 15 or more days for the 7th occurrence.  Shortages of $601 to $1,000 will be considered extraordinary.  The first occurrence will result in a written warning, the second a two week suspension and the third a one month suspension and enrollment in a treatment program or termination.  If the clerk reports an extraordinary shortage four times in a 12 month period, it will result in termination.  If a clerk reports a shortage of over a $1,000 a clerk will be immediately suspended for two weeks.  A second shortage of more than $1,000 in a 12 month period will result in termination or a 30 day suspension and enrollment in a gambling treatment program.  Any shortage of more than $600 after two shortages of over $1,000 in a 12 month period will result in immediate termination.  Id., at 15.

[150] Id.

[151] After the new shortage policy was put into place in 2000, there was a drop of approximately 98% in reported shortages.  See, Exhibit 3 at ¶ 41.

[152] With the exception of those employees who may need a NYRA One Account in the course of performing their authorized job duties (i.e. SAM Demonstrators and Telebet Operator Trainers), all Mutuel Employees are prohibited from having or opening a NYRA One Account.  The existence of procedures precluding Mutuel Employees from opening NYRA One Accounts was verified by NYRA's Internal Audit team on March 2, 2005.

[153] See, Exhibit 7.  NYRA has strictly enforced the "no betting" rule for tellers; a policy which is reinforced in the Code of Ethics.  See, Exhibit 40; see also 9 NYCRR § 4005.4 (which states "[n]o employee of the pari-mutuel

NYRA management has also taken internal steps to boost the security and integrity of the Mutuel Department. For example, NYRA has increased the number of Mutuel bay supervisors, such that there is now a supervisor for every operating bay.[154]   The NYRA Security Department has hired experienced personnel to oversee its Mutuel Department operations and NYRA is currently in the process of having security cameras installed in the mutuel bays at all three NYRA-operated tracks.[155]   Unannounced cash counts are performed by Mutuel management and all of the money entrusted to Mutuel Employees is counted out daily.[156]   These are among the definitive steps that NYRA has taken to eliminate credit betting, money laundering, loan sharking, the co-mingling of company and employee funds, and other forms of improper or criminal activity by Mutuel Employees.   These steps have enhanced the transparency and integrity of the operation of the Mutuel Department.

### 3.   Job Action and Relationship with Local 3

On May 21, 2005, the day of Pimlico Racetrack's Preakness Stakes, a significant number of NYRA Mutuel Employees participated in a job action.  At the time, NYRA was negotiating a new collective bargaining agreement with Local 3, the union representing NYRA's mutuel employees.  The job action came in the form of a "sick out" at Belmont Racetrack which drew the participation of as many as 89 Mutuel Employees.

According to the controlling collective bargaining agreement, the mutuel employees were required to give 15 days notice before taking any Job Action.  Although a Job Action had been rumored leading up to May 21, 2005, the union specifically denied that a Job Action was scheduled to occur.  Despite the lack of notice and the specific denials, the Job Action took

---

department of any licensed association shall, during the period of his said employment, bet upon the outcome of any race conducted by any such licensed association.").
[154] Verified by a BridgeMark Pari-Mutuel Operations Customer Service Audit on October 20, 2004.
[155] Reported to the Monitor by the NYRA Security Department.
[156] Verified by NYRA's Internal Audit team.

place.  Subsequently, NYRA took action against the Mutuel Employees who were absent without notice that day.  Thirty of the 89 Mutuel Employees in question arrived at work by 2:04pm, the post time for the third race, after responding to calls from Union officials.  Those 30 individuals were suspended for five days without pay.  The remaining 59 mutuel employees were fired and subsequently banned from NYRA-operated tracks.

Many of the mutuel employees who lost their positions contacted NYRA and the Monitor about their circumstances.  NYRA chose to have the majority of these claims resolved through arbitration with Local 3.  A new collective bargaining agreement has been entered into by NYRA and Local 3.

B.    NYRA Security Department Improvements[157]

A review of Security Department records and reports, in conjunction with interviews of Security Department Personnel, has led the Monitor to conclude that, historically, the NYRA Security Department was riddled with problems. The department lacked adequate organization, training, and leadership.    Since the inception of the Monitorship, the NYRA Security Department has made significant strides towards improvement by restructuring the organization of the department, instituting new written policies and procedures, enhancing record-keeping procedures, and cooperating with local unions and local, state and federal law enforcement.

1.    Security Department Problems - Historical

The NYRA Security Department was plagued by a lack of supervision and discipline, a problem which was compounded by the fact there was no written security manual, or set of departmental policies or procedures.  As a result, Security Department personnel took advantage of the system and engaged in improper or criminal conduct.  For example, security personnel consistently abused the system by failing to perform their job duties during the scheduled time

---

[157]  For a thorough discussion of past NYRA Security Department problems, see, Exhibit 12 at 56-61.

periods.  Security personnel would sleep during their night shifts, leave their security posts to place bets at mutuel windows, leave work early or arrive late and falsify NYRA business records by signing in and out for the times they were scheduled to work rather than for the time they actually worked.  Sometimes guards would abandon their posts altogether without notifying a supervisor to replace them.

Security personnel were also known to drink alcoholic beverages and take giveaway items such as umbrellas, hats, and T-shirts which were intended for NYRA patrons. Security personnel were regularly caught reading newspapers or reviewing racing material, rather than being attentive to their security post.  At the entrance gates, Security personnel routinely allowed individuals to enter onto NYRA property, including the backstretch area, without the individuals providing proper identification.

Not only did Security personnel behave inappropriately at the track, but they also engaged in inappropriate behavior outside of NYRA grounds.  It was reported to the Monitor that security personnel utilized NYRA vehicles in order to perform car and taxi services. Using NYRA vehicles and NYRA fuel, security personnel transported people to and from hotels, airports, and other locations.  This was possible because there were no logs maintained to account for the use of NYRA vehicles and gas, nor were any records kept to record repairs made to vehicles assigned to the Security Department.  The problem was compounded when it was disclosed that the security personnel were actually accepting gratuities for this service.

The department itself failed in a number of key respects, all of which contributed to the culture of misbehavior.  First and foremost, the Security Department did not provide adequate training to its staff members.  The staff did not receive any written manuals nor did they receive hands-on training about security-related topics such as surveillance or investigative techniques.

As a result, the security personnel were ill-prepared to perform the tasks they were required to do.  For example, the Security Department had the responsibility of transporting large sums of cash from the racetrack money rooms to local banks, despite the fact that none of the officers were properly trained to drive an armored car.  Similarly, a number of the security personnel were authorized to carry arms, even though the weapon sign-out process was done on an ad hoc basis with no real supervision, there were no written policies in place defining the use of deadly physical force, and there were no regularly scheduled training sessions for the armed officers.

The backstretch Security Guards who handle assignments such as controlling traffic at horse crossings and policing the barn areas in the backstretch are members of the Truck Drivers Local Union 807 ("Local 807"), while the front side Security Guards, who handle traffic control on public streets, crowd control, and security in the grand stand area, are represented by Service Employees International Union Local 32 BJ of the AFL-CIO ("Local 32 B&J").  There was little to no communication or cooperation between the NYRA Security Director or Security Department Supervisors and Local 807 or Local 32 B&J.

2.    Investigations Division Problems - Historical

Within the NYRA Security Department is a subdivision known as the Investigations Division.  The Investigations Division, while saddled with many of the same problems facing the Security Department as a whole, suffered from a number of its own unique problems prior to the inception of the monitorship.

The Investigations Division's suffered from poor management and organization.  There was no one with the necessary expertise and training to set priorities or give direction to investigations, short- or long-term.   There was no case management system in place to track

details of an investigation nor was there an ability to track targets of investigations.  There were no clear policies as to which law enforcement agency to contact concerning arrests.

Additionally, the Investigations Division staff was poorly trained.[158]  Because of poor training, investigators were overwhelmed by their assignments.  As a result they prepared deficient reports and improperly handled evidence.  Investigators were also found to be guilty of abusing their authority.  They were searching individuals without sufficient cause, holding individuals against their will for extended periods of time, failing to advise them of their rights, and, in many instances, had to release the individuals because they had no grounds to stop or hold them in the first instance.  Had the investigators been properly trained, these abuses could have been prevented.

3. <u>Security Department Restructuring</u>

On December 3, 2003, three months prior to the appointment of the Monitor, Kenneth Cook ("Cook"), a former Deputy Superintendent and Full Colonel with the New York State Police, was hired as NYRA's Director of Security.  This was the first significant step toward restructuring the NYRA Security Department.

Shortly after Cook's hiring and pursuant to his advice, NYRA hired a number of individuals to improve the operation of the Security Department.  NYRA sought out professionals who had expertise, training, and leadership qualities.  In or about January 2004, Richard Eggelston ("Eggelston") was hired as NYRA's Chief of Investigations.  Eggelston was formerly the Senior Investigator in Charge of the State-wide Technical Surveillance Unit of the New York State Police.  In or about February 2004, Major Bruce McAleavy ("McAleavy") was

---

[158] Some of the Investigators were former Wackenhut employees hired by NYRA after Wackenhut lost its contract with NYRA.  Wackenhut, a security personnel service, had its contract with NYRA terminated in February 2004 as part of the Security Department restructuring.

hired as NYRA's Chief of Patrol.  McAleavy was formerly in charge of the New York State Police Aviation Unit.

Cook created a new rank of security personnel known as Inspectors, all of whom are responsible for conducting both criminal and internal investigations.  In or about May 2004, Sid Anthony ("Anthony") was hired as an Inspector. Anthony was formerly a Zone Sergeant Commander with the New York State Police.  In or about September 2004, John McDonnell ("McDonnell") was also hired as an Inspector.  McDonnell was formerly a New York State Police Criminal Investigator.

In addition to the aforementioned individuals, another person was hired to fill a position which was created to address concerns specific to Saratoga. The Saratoga meet season presents unique problems for the Security Department.  The large number of patrons that frequent the track (including but not limited to celebrities and political figures), demands that the security department perform at its highest level. Due to the nature and length of the Saratoga race meet, it is necessary to hire many part-time Security officers, each of whom have to undergo mandatory training.  Donald Eagan, a retired New York State Police, First Sergeant, has been hired to fill the newly created position of Integrity Officer.  His main responsibilities are to oversee NYRA's giveaway program, provide continuous patrol throughout Saratoga, and supervise Security Department employees.

Lastly, the NYRA Security Department has created the position of Administrative Lieutenant to oversee all administrative affairs of the Security Department.  Gary Mara, a former State Trooper, was hired to fill the position.

In the process of restructuring and in an effort improve the operation of the Security Department, NYRA also terminated a number of officers who were determined to be ineffective

or considered disciplinary risks.  At the time of this report, twenty-one NYRA security officers have been terminated.  In addition, a number of investigators have been transferred back to the uniformed force, or otherwise reassigned, because of their ineffectiveness.

4.      Accomplishments of the NYRA Security Department

In addition to the restructuring of the NYRA Security Department, the Monitor observed a number of improvements in security policies and procedures.  These changes have resulted in an increase in the overall productivity of and a reduction of waste and abuse by the Security Department.  Moreover, these changes have resulted in a decrease in the annual Security Department budget of approximately 25%.[159]   The following list highlights a number of accomplishments that have contributed to this turnaround.

- **Improved Training.**  Proper training of the security officers has been identified as a priority of the Security Department.  At present, each new hire receives a minimum of 40 hours of training.  Additionally, the Security Department has an In-Service Training Program whereby every security guard and Peace Officer receives an annual refresher course.  Furthermore, arrangements have been made with the New York State Police to have NYRA investigators attend the New York State Police Academy's Basic Investigator's Training Course.  As of the writing of this report, four NYRA Investigators have attended the course.  Senior management, supervisors and investigators are required to attend training sessions on integrity, loan sharking, and money laundering.  These training sessions are specific to the Security Department and are separate and apart from any training offered to other NYRA employees.  The measures taken to adequately train

---

[159] According to the NYRA Security Department, in 2004 it reduced its operating budged by approximately $3 million as compared to 2003.

the members of the Security Department have improved morale and increased employees' confidence in and respect for their supervisors and their leadership.

- **Watch Guard License.**  As previously mentioned, NYRA severed its relationship with Wackenhut.  In the time since, NYRA applied for and successfully obtained a Watch Guard License from New York's Department of State.  A Watch Guard License is mandatory in New York State for any company or entity providing security.  The Watch Guard license permits NYRA to run its own Security Department without hiring external contractors, which results in significant cost savings for NYRA.

- **Written Policies and Procedures.**  The Security Department has produced a volume of written policies and procedures for its employees. The voluminous policies and procedures include, but are not limited to, a Mission Statement for the Security Department, Core Values to be adhered to by members of the Security Department, Job Descriptions, and Post Assignments for the three NYRA racetracks. The procedures also articulate how officers should handle various incidents and situations.

- **Increased Supervision.**  Supervision of the Security Department has been increased.  By hiring experienced personnel and restructuring the Security Department to include positions such as Integrity Officer, the Security Department has put an increased value on oversight within the department.

- **Improved Enforcement.**  The Security Department has proactively enforced criminal laws.[160]  For example, underage betting and drug use at NYRA facilities will not be tolerated.  Likewise, the Security Department has taken steps to identify contractor fraud

---

[160] NYRA Investigators working in conjunction with the Thoroughbred Racing Protective Bureau[160] conducted the investigation which led to the dismissal of Manny Alvarez, the Dinning Room Maitre' D, who was under suspicion of taking bribes for providing dining tables at Aqueduct, Belmont and Saratoga. The case was referred to the Saratoga Prosecutor's office for their review.

and abuse.  For example, the Security Department has instituted new measures to inspect vehicles removing hay and manure from NYRA Property to guard against improper billing by the service provider.  Due to an improved vigilance and patrolling of NYRA property, there has been a lower incidence of crime.

- **Improved Record Keeping.**  The NYRA Security Department has revamped its record-keeping practices.  A computerized system for tracking investigative reports and targets of investigations has been developed.  Similarly, a system to track backstretch violations has been designed and implemented.  Detailed time records for Security Department personnel are now kept.  Additionally, the Security Department records the use of NYRA vehicles.  Insofar as weaponry is concerned, the Security Department reduced the number of weapons it has on-site and instituted and implemented new measures to record the issuance and return of the weapons.[161]  All of these steps to improve record keeping ultimately result in increased accountability.

- **Improved Internal Communication.**  In order to enhance internal communication, the Security Department began holding weekly meetings attended by all commissioned security officers.  These meetings result in a generally better-informed and much more effective Security force.

- **Improved Cooperation with Local, State and Federal Law Enforcement.**  Local, state and federal law enforcement agencies work side by side with NYRA Security during major events such as the Travers Stakes, Breeder's Cup and the Belmont Stakes.  Moreover, their roles overlap on a day-to-day basis.  The NYRA Security Department has taken several steps to enhance communication and cooperation with local, state, and

---

[161] Every Peace Officer who is armed is now sent for firearms training at either the New York State Police range or at the New York City Police Department Firearms Unit.

federal law enforcement.  For example, arrangements have been made with local Police to improve policies for handling evidence and processing arrests.[162]  Similarly, there has been a coordinated effort between NYRA's Security Department and local, state and federal law enforcement, including the Department of Homeland Security, to address possible acts of terrorism. Canine searches are conducted during the early morning hours of days on which major racing events are scheduled. Air traffic is restricted over NYRA racetracks on days of major racing events. All temporary employees, including mutuel tellers hired by NYRA for special events or major race days, are screened by the FBI through the federal databases located in Washington DC.

- **Improved Relationship with Relevant Unions.**  The Security Department has also improved its relationship with the two unions who have members employed at NYRA, Local 32B&J and with Local 807.   Cook and his staff have developed working relationships with the Shop Steward of each of these unions. The development of these relationships has helped create a better working relationship between NYRA and the two unions.  As a result, NYRA has been able to communicate with the unions about the changes taking place in NYRA's Security Department.

- **Outsourced Money Delivery.**  The NYRA Security Department is no longer responsible for moving large sums of cash from NYRA's money rooms to local banks. This job has been outsourced to Brinks, a global security transportation and cash logistics company.

- **Installation of Video Surveillance.**  The Security Department recently participated in drafting a Request for Proposal ("RFP") for a video surveillance system.  The contract to

---

[162] NYRA has made arrangements to establish policies for handling evidence and processing arrests with the Saratoga Police Department and the Saratoga and Wilton New York State Police Barracks for the Saratoga racetrack, with the 105 Precinct of the New York City Police Department and the 5th Precinct of the Nassau County Police Department for Belmont racetrack, and with New York City Police Department's 106th Precinct for Aqueduct racetrack.

install a video surveillance system at the three NYRA race tracks was awarded to Adventura Technologies. The new video surveillance system will be integrated with existing cameras, door alarms and access control systems.

- **Monitoring Barn Security.** The Security Department implemented tight security at the newly established NYRA Monitoring Barns. A written manual outlining the duties of the Security Department in connection with the Race Day Monitoring Barns was prepared and disseminated.

Although the Security Department has made significant progress during the course of the Monitorship, good security is a never ending challenge and must be a continuing effort. The re-structured Security Department under Cook's leadership has a solid foundation from which to meet this challenge.

C.     Travel and Entertainment Expense Policy

Over the years, NYRA has received repeated criticism for abusing its expense accounts and for its lack of a meaningful travel and entertainment expense policy.[163]  In its most recent audit of NYRA's travel and entertainment expenses, the Comptroller found there to be a significant shortfall in this area.

1.     The State Comptroller 2005 Audit

In January 2005, the New York State Comptroller issued a travel and entertainment expense audit covering the time period from January 1, 2002 through May 31, 2004. The Comptroller's audit took NYRA to task for the quality of the then-existent policy, the lack of consistent application of the policy provisions, and the failure to heed repeated criticism in the past. The Comptroller drew the direct connection between travel and entertainment expenses and NYRA's statutory mandate.

---

[163] See, e.g., Exhibit 39 at 18; Exhibit 12 at 53-55.

> In the absence of adequate policies that are consistently and competently applied, NYRA has incurred unsupported, inappropriate and excessive travel and entertainment expenses.  These expenses, many of which could have been avoided or reduced, decrease NYRA's franchise fee, and ultimately reduce the revenue NYRA should provide for the support of state government.[164]

The Comptroller recommended that NYRA develop a new comprehensive policy that is in compliance with both the federal tax code and the New York state racing law.[165]

In its response to the Comptroller's audit, NYRA expressed appreciation to the Comptroller for raising the issues identified in the audit and agreed to implement the recommendations made by the Comptroller.[166]  Furthermore, in its response to the audit, NYRA referred to the "constructive exchange" that had taken place between NYRA and the Comptroller's office.  This point, as much as any other, resonates with the Monitor as an indication of a change in NYRA's culture.  For years, NYRA has been perceived by its regulators and others, and in most cases with great justification, as uncooperative, aloof, and arrogant.  This "institutional arrogance," as the new CEO Charles Hayward has described it, was certainly not present in NYRA's interaction with the Comptroller's office in the context of the travel and entertainment audit.  The Monitor observed the entire audit process – from the commencement meeting to the closing conference.  NYRA and the Comptroller's office worked together in a mutually respectful and productive manner.  It was clear to the Monitor that NYRA sought to gain from the insight provided by the Comptroller's office and to lay a strong foundation for a positive working relationship going forward.

2.      NYRA's Travel and Entertainment Expense Policy

Among the Comptroller's recommendations that NYRA sought to implement was the creation of a comprehensive Travel and Entertainment Expense Policy.  NYRA developed this

---

[164] See, Exhibit 39 at 23.
[165] See, Exhibit 39  at 24.
[166] See, Exhibit 39 at  Appendix B.

policy, with the input of both the Monitor and the Comptroller's office, in the Spring of 2005. NYRA's new Travel and Entertainment Expense Policy took effect on May 1, 2005.[167]

The new policy is grounded in NYRA's statutory obligation to produce a reasonable revenue for the support of government[168] and applies to government appointed trustees (other trustees are not eligible for reimbursement of travel and entertainment expenses) and all NYRA employees, including officers, administrative personnel, and union employees.   The policy provides a process for reimbursement and makes clear that NYRA will only reimburse employees for those expenses that are ordinary, reasonable, and necessary expenses directly related to and associated with the active conduct of NYRA's business.  The policy further sets federal per diem spending rules as a guideline for meals and lodging.

The new policy has been designed as a comprehensive reference and guide for NYRA employees.  The policy covers such areas as:

- Meals and entertainment
- Hotel and lodging
- Auto, air, and rail travel
- Professional organizations, memberships, and licenses
- Cash advances
- Saratoga travel and per diem.

In addition, the policy makes clear expense reporting and record keeping requirements, the approval and authorization process, and those expenses that will not be reimbursed.[169]  Finally, with respect to anything that may not be covered in the policy, NYRA has designated its

---

[167] See, Exhibit 50.
[168] See, N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 208 (McKinney 2005).
[169] For example, NYRA will not reimburse employee expenses for parking/traffic tickets, club memberships, alcoholic beverages, and non-employee family related expenses.  See, Exhibit 39 at 12.

Accounts Payable Manager as the person for employees to contact with any travel and entertainment expense policy questions or issues.

D.    Procurement

NYRA has repeatedly been the subject of criticism for its procurement practices.  As an organization, NYRA spends approximately $115 million annually on goods and services.  As such, this is an area worthy of review and worthy of NYRA's reform efforts.  During the course of this monitorship, we have witnessed significant, fundamental improvements in this area.  Although NYRA's procurement procedures and practices are not yet perfect, they are compliant, competitive, and steadily improving.

1.    Statutory Requirements

In discussions of NYRA procurement practices, and NYRA's failures in that regard, the oft-quoted provision of the racing law is section 213.[170]  This provision provides, in relevant part, as follows:

> All contracts entered into by [NYRA] for the procurement of goods and services of a value in excess of two hundred fifty thousand dollars shall be awarded only by a process of competitive bidding approved by the board.
>
> [NYRA] shall be exempt from competitive bid requirements under this section, if the goods or services are necessary on an "emergency" basis . . . or if the required goods are available form a "sole source" . . . .  In the event of an emergency, [NYRA] shall notify the [Racing & Wagering Board], in writing, within fifteen days after such emergency, of the events and circumstances constituting such emergency.  In the event of a "sole source" procurement, [NYRA] shall notify the [Racing & Wagering Board], in writing, at least fifteen days prior to contracting for such goods, of the facts establishing the unique nature of such source.[171]

In addition, this provision provides the Racing & Wagering Board, with respect to any contract in excess of on hundred thousand dollars, with the authority to "review the character and fitness

---

[170] See, N.Y. Rac. Pari-Mut. & Breed. Law. § 213 (McKinney 2005).
[171] See, N.Y. Rac. Pari-Mut. & Breed. Law. § 213(5)(a)-(b) (McKinney 2005).

of the entity or its principals entering into contracts with [NYRA]" including the authority to "require such information as it deems necessary including the power to subpoena such books, records and other pertinent information related to the contracts from the contractor or vendor of any contract."[172]

As per the statutory requirement, NYRA has a process of competitive bidding approved by the Racing and Wagering Board.[173]  This approved process has been in place since 1998.  The approved process has the following requirements, among others:

*Bidders*

- NYRA shall provide notice of bids in excess of $250,000 on its web page and in a newspaper or other publication of general circulation

- NYRA shall maintain a bid list of potential vendors / contractors

- Bidders shall complete a qualification statement prior to consideration

- The qualification statements of the three lowest bidders shall be submitted to Kroll Associates, Inc. for review and analysis

- Bidders shall meet certain qualifications –

    o Duly organized and in good standing

    o Technically qualified to perform the proposed work

    o Able to secure adequate financial resources

    o Able to comply with a delivery / performance schedule

    o Satisfactory past performance record

    o No conflicts of interest

- No less than three contractors / vendors shall be solicited to submit bids

---

[172] See, N.Y. Rac. Pari-Mut. & Breed. Law § 213(5)(c) (McKinney 2005).
[173] See, a copy of the process of competitive bidding approved by the Racing and Wagering Board, attached hereto as Exhibit 51.

### *Bid Request*

- All information concerning the bid solicitation shall be in writing

- The bid request shall specify in detail the form of the bidder's response including the bid acceptance period, conditions under which bids may be modified or with drawn and any bid deposit or bond requirements

- All bids are to be submitted by mail or hand delivery (no faxes)

- All inquiries from bidders and subsequent responses by NYRA will be communicated in writing to all bidders

- Bidders shall be made aware that the Racing & Wagering board may (i) review the character and fitness  of the bidder or its principals, (ii) may require the licensing of on-site workers, and (iii) may exercise the power to subpoena books, records, and other pertinent information

- Bidders shall be directed to return all bids to NYRA's CFO by a specific time on a specific date in a sealed envelope

### *Bid Opening*

- At the announced bid opening time, all bids shall be opened simultaneously by the CFO in the presence of the Director or Purchasing or other authorized representatives of NYRA.

- No alteration or correction of bids is permitted at the bid opening.

### *Bid Evaluation & Award*

- Bids will be evaluated on the basis of quality, service, and price.  Quality and service being equal, the contract will be awarded on the basis of price.

- A contract may be awarded to a bidder who is able to meet NYRA's schedule even though that bidder may not be the lowest bidder.

- If the lowest bidder is not awarded the contract, a memorandum detailing the award shall be prepared and approved by the CFO.

*Exemptions*

- NYRA shall be exempt from competitive bidding if the goods and services are necessary on an emergency basis, which means an urgent and unexpected requirement where health and public safety  or the conservation of its resources is at risk.

  o In the event of an emergency, NYRA shall notify the Racing & Wagering Board, within fifteen days after the emergency, of the events and circumstances constituting such emergency and provide a copy or copies of any executed contracts.

- NYRA shall be exempt from competitive bidding if the required goods are available from a sole source which means a procurement in which only one offerer is capable of supplying the required commodities or services.

  o In the event of a sole source procurement, NYRA shall notify the Racing & Wagering Board in writing, at least fifteen days prior to contracting for such goods, of the facts establishing the unique nature of such source.

As noted, the above process for competitive bidding is only statutorily required for contracts for the procurement of goods and services of a value in excess of two hundred and fifty thousand dollars.  In addition, NYRA has self-imposed purchasing requirements in the form of its internal purchasing policy.

2.      The Professional Services "Exception"

Prior to July 2004, NYRA contended that professional services contracts were exempt from the competitive bidding requirements of section 213(5) of the racing law.  This contention was at odds with the plain language of the statute which, as set forth above, provides for only two exceptions – emergency basis procurements and sole source procurements.  This contention was also at odds with the statutory interpretation of the Office of the State Comptroller and the New York State Racing & Wagering Board.

This issue was a matter of discussion between NYRA and the Monitor during the first weeks of the monitorship.  The Monitor conveyed its view that NYRA was misinterpreting the statute.  At the December 2004 meeting of the Board of Trustees, the Chairman of the Audit Committee reported NYRA's change of position in accepting that professional service contracts are subject to the statutory competitive bidding process.  The Audit Committee Chairman further advised the Board that since July 2004 NYRA has been putting such contracts out to bid.

3.    NYRA's Procurement Policy and Practice

a.    NYRA's Procurement Policy

NYRA is currently in the process of having an outside firm revamp NYRA's entire set of accounting and internal controls.[174]  This project involves internal controls in the following areas: purchasing; information systems; pari-mutuel operations; horsemen bookkeeping; racing; admissions and parking; group sales; customer service; simulcasting, OTB relations, and communications; human resources; payroll; legal; risk management; accounting; security; and facilities.  NYRA awarded the contract in the Spring of 2005 following a competitive bidding

---

[174] BridgeMark, a division of BDO Seidman, LLP, was awarded the contract to develop an accounting and internal controls manual.  BridgeMark also served as NYRA's interim Internal Auditor during the period between the dissolution of NYRA's Internal Audit Department in 2003 and its reconstitution in 2004.

process.  The new accounting and internal controls manual is expected to be finalized during the year 2005.[175]

The need for the internal controls overhaul was a direct result of the poor state of NYRA's prior internal controls, policies, and procedures.  During the first months of the monitorship, there existed significant confusion at NYRA on the issue of what internal controls were being followed, who was made aware of the applicable controls, and whether those controls were the same as those on file with the Racing & Wagering Board.  An excerpt from the Comptroller's recent procurement audit is instructive in this regard as it pertains to NYRA's purchasing policy:

> [D]uring our audit survey, we were informed by NYRA officials that NYRA's Policy, as filed with Racing & Wagering, was not the policy they followed during the audit scope period.  Furthermore, the Policy was not distributed to any Department heads outside Purchasing.  The Purchasing Director told us that, rather than follow the Policy, NYRA Purchasing Department staff followed certain procedures that had become common practice over the years, but were not codified.  During the summer of 2003, the Director compiled these practices into an unofficial "narrative," which NYRA filed with Racing & Wagering a year later in September 2004 as its official Policy.  According to NYRA officials, NYRA followed the practices described in this narrative, rather than the official Policy, for about half the audit scope period [i.e., January 1, 2002 – December 31, 2004].[176]

This purchasing narrative described in the Comptroller's report, which is something distinct from the approved bidding process summarized above, was the controlling policy for the purchasing department for most of the monitorship term.[177]

---

[175]  NYRA has conveyed to the monitor that its goal is to have a fully revised set of accounting and internal controls on file with the Racing & Wagering Board during the year 2005.

[176]  See, State of New York Office of the State Comptroller, New York Racing Association Inc. Contracting and Procurement Operations: 2004-S-61 ("NYSOSC 2005 Procurement Audit"), June 15, 2005, at 19-20, available at http://www.osc.state.ny.us/audits/allaudits/093005/04s61.htm (last visited Sept. 9, 2005), attached hereto at Exhibit 52.

[177]  See, copy of NYRA's 2003 purchasing narrative, submitted to the Racing & Wagering Board in September 2004, attached hereto as Exhibit 53.

On or about June 30, 2005, NYRA issued, and filed with the Racing & Wagering Board, its new Purchasing Policies and Procedures Manual.[178]  This is the first of the new out-sourced policies to be filed with the Racing & Wagering Board.[179]  NYRA has advised the Monitor that is in ongoing discussions with the Racing & Wagering Board concerning certain revisions to that new policy.

b.   <u>NYRA's Procurement Practices</u>

During the course of the monitorship, NYRA's procurement practices have been the subject of significant scrutiny.  NYRA and outside entities have reviewed NYRA's procurement practices.

First, perhaps the most extensive review of NYRA's procurement practices came in the form of the contracting and procurement operations audit conducted by the Office of the State Comptroller.  This audit covered the period from January 1, 2002 through December 31, 2004. The audit found serious deficiencies with NYRA's contracting and procurement operations during the audit period.  Specifically, the audit found: violations of the racing law and of NYRA's procurement policy; a failure to follow NYRA's competitive bidding policies; a lack of written contracts for significant procurements; excessive spending in certain areas (such as trophies and trustee gifts); unnecessary spending in other areas (such as horse transportation); a lack of appropriate documentation in support of vendor payments; and a lack of controls over spending.[180]  Among the recommendations made by the Comptroller was that NYRA devise a comprehensive contracting and procurement policy.

---

[178]  <u>See</u>, The New York Racing Association, Inc., Purchasing Policies and Procedures Manual, June 30, 2005, attached hereto as Exhibit 54.

[179]  In May 2005, NYRA filed with the Racing & Wagering Board its new Travel & Entertainment Expense Policy. <u>See</u>, Exhibit 50  That policy, however, was created in-house by NYRA and was not part of the accounting and internal controls manual contract awarded to BridgeMark.

[180]  <u>See</u>, Exhibit 52.

In response to the Comptroller's audit, NYRA stated that it was appreciative of the Comptroller for raising the issues identified in the report and that NYRA agreed in principle with the Comptroller's assessments and recommendations.   In addition, NYRA stated that the Comptroller's findings were in line with NYRA's own findings in this area.

> NYRA's own assessment during the latter part of 2003 was quite similar and, as a result, NYRA instituted a rigorous program of procurement scrutiny and control. The result was an overall reduction in operating expenses of $7,451,635 in fiscal year 2004. . . . In addition, NYRA has committed to the New York State Racing & Wagering Board to develop a robust set of internal policies and controls during fiscal year 2005.  Included will be a comprehensive contracting and procurement policy.[181]

Furthermore, NYRA stated that it has taken the following steps, among others, to address the contracting and procurement deficiencies identified in the Comptroller's audit (and, presumably, the issues identified by NYRA's outside consultant and the Monitor):

- Installed new co-Chairs of its Board of Trustees and replaced several of its senior management and financial personnel including its President/CEO, Chief Financial Officer, Controller, Internal Audit Director, Assistant Controller, and Accounts Payable Manager;

- Engaged, through a competitive bid process, the services of BridgeMark, a division of BDO Seidman, to provide project management expertise and to deliver a revised accounting and internal controls manual by the 4th Quarter of 2005;

- Implemented cost control measures;

- Committed to revise its Code of Ethics, named an Ethics Compliance Officer, and established and Ethics Committee[182];

---

[181] See, Exhibit 52,  Appendix B.  As set forth above, NYRA did submit its new purchasing policy to the Racing & Wagering Board on or about June 30, 2005.
[182] See, Exhibit 40.

- Committed to conducting formal training of all relevant personnel in connection with the issuance of the new purchasing policy; and

- Added to NYRA's organizational structure the position of a Contracting and Procurement Director.[183]

A second form of review occurred through an outside consultant NYRA hired to perform an evaluation of NYRA's procurement operations and procedures. The consultant issued its first report in this area in March 2004 and issued a second, follow-up report in November 2004. Issues identified by the consultant included: many NYRA departments did not comply with NYRA purchasing procedures; procurements often lacked proper documentation and/or authorization; violations of the statutory competitive bidding requirement for certain contracts, and potential conflict of interest procurement contracts.

Finally, an additional review was provided by the Monitor's day-to-day monitoring of NYRA's procurement activities. These activities included the preparation and issuance of RFPs, on-site "walk-through" assessments, bid-openings, and related meetings. Over the monitorship term, we noted a number of areas of concern that are significant because they relate to NYRA's ability to attract the proper quality and quantity of potential bidders for a given contract – these are matters that, if not properly addressed, will leave NYRA with an RFP process that is all form but no substance. [184]

- Improperly prepared RFPs – Contracts pertaining to technical or specialized areas should be prepared by, or at least with the input of, an outside consultant with expertise in the

---

[183] See, Exhibit 52, Appendix B. It should be noted that NYRA did hire a Contracting and Procurement Director in May 2005.

[184] These areas of concern are in addition to those Monitor findings that are duplicative of, or substantially similar to, the findings of NYRA's outside consultant or the New York State Comptroller. It should be noted, however, that a number of these concerns have been addressed through NYRA's subsequent corrective actions, the hiring of the Contracting and Procurement Director, and the issuance of the new Purchasing Policies and Procedures Manual.

relevant area.   An effort to produce such RFPs in house often proved inefficient or, ultimately, ineffective in attracting qualified bidders.

- Insufficient time between request and response – On numerous occasions we witnessed requests for proposals issued with very short time periods allowed for the submission of proposals.   This was a recurring complaint the Monitor received from actual and potential bidders across a number of contract areas.

- Kroll report fee – During the term of the monitorship, all bidders had to pay an up-front fee of approximately $550 to cover the cost of a Kroll report.   This was a complaint that the monitor consistently received from actual and potential bidders.   The bidders have complained that it is unfair to charge this amount in advance[185] and have suggested that a system be established whereby the Kroll report (and the resulting fee) only be required of the vendor who receives the award.

- $5 million insurance requirement – Many RFPs required a $5 million dollar umbrella policy.   This was simply too great a number in light of the relative size of, and risk associated with, certain contracts.   This requirement deterred vendors from bidding and/or made those vendors ineligible to bid.

- Limited vendor selection list – The Monitor observed RFPs sent to vendors on a vendor selection list generated from prior dealings and responses to NYRA's advertisements.   In many cases, this limited list resulted in a paucity of eligible bidders.

- Term of contract – The Monitor observed a significant number of RFPs with contracts slated to terminate at the end of the year or at the end of the franchise.   With respect to those scheduled to end at the end of the year, it seemed operationally problematic to

---

[185] Under NYRA's then-existing policy, NYRA required a competitive bidding process for contracts of $10,000 or greater.   One can see why a potential bidder may not want to pay 5.5% of the total value of a contract merely for the opportunity to bid.

schedule these contracts to terminate all at once, rather than staggered over time.  With respect to the contracts scheduled to end at the end of the franchise, this limitation proved problematic to potential vendors for large contracts; it was not feasible to make certain capital investments or other allocations of resources for a relatively short-term contract.

- Insufficient memorialization of selection criteria / rationale – All winning bids did not have a memorandum to demonstrate or justify the selection of that bid.  Such an explanatory memorandum would prove helpful both from management and audit points of view.

In all of these ways NYRA has made positive changes in the area of contracting and procurement and has established a structure under which to make further advances in this area.

4.    The Selection of MGM for the VLT Project

NYRA has recently been criticized for its selection of management partner MGM Grand (New York) LLC ("MGM") for the Aqueduct Racetrack video lottery terminal ("VLT") project, or "racino."[186]  It has been alleged that the selection of MGM violated the competitive bidding requirements of the racing law and it has been implied that the selection of MGM was, in fact, the result of something other than a competitive process.  For a period of time, criticism was levied, but no action was taken, by NYRA's regulator, the NYSRWB.[187]  It remained uncertain what the effect, if any, of that criticism would be on the VLT project.

---

[186]  MGM was chosen by NYRA as its management partner for the VLT project in the Spring of 2003.  In or about that time, preliminary demolition work was commenced at Aqueduct and MGM advanced certain funding and materials to NYRA for the project.  In the wake of the NYS Attorney General's report on NYRA and in anticipation of federal prosecutorial action against NYRA, MGM ceased work on the project in or about August 2003.  Since that time, and until recently, the project has been on hold.  In June 2005, NYRA and MGM signed the management agreement for the project and things are once again underway.  The parties have not, however, executed the financing agreements for the project and demolition/construction has not yet resumed.

[187]  See, e.g., James M. Odato, NYRA's Future Is No Sure Bet, Albany Times Union, June 20, 2005 at A1 (quoting Racing & Wagering Board Chairman Michael Hoblock as stating, "[The Racing & Wagering Board] approved a

As discussed above, prior to July 2004, NYRA did not put out for bid professional services contracts.  For those professional services contracts in excess of $250,000, NYRA's failure to do so was in violation of the governing provision of the racing law.  NYRA viewed the VLT management contract as a professional services contract that was not subject to bid pursuant to the bidding process it had filed with the NYSRWB.  As detailed below, however, NYRA did elect to follow a competitive bidding process in connection with the VLT contract.

Ultimately, the question of whether the selection of MGM was in compliance with the racing law became moot.  In August 2005, Governor Pataki signed into law legislation that, according to the press release issued by his office, "facilitates the implementation of VLTs at Aqueduct Racetrack by ratifying the contract entered into by NYRA and MGM Mirage that allows MGM Mirage to develop and manage a $170 million facility at the Aqueduct horse racing track in Queens."[188]  This was accomplished by legislatively transferring to the New York Lottery responsibility for approving contracts related to the "operation, management, or distribution of revenues or design of a video lottery gaming facility at Aqueduct racetrack. . . ."[189]

With respect to the implication that the MGM selection was made as the result of something other than a competitive process, certain points are worthy of note:

---

process [NYRA] did not follow" and "As far as we're concerned, it's a no-bid" contract), attached hereto as Exhibit 55.

[188] See, Press Release, Governor Signs Law Establishing NYRA Oversight Board: Law Accelerates Franchise Bid, Allows Additional VLTs to Move Forward, Aug. 3, 2005, available at http://www.state.ny.us/governor/ (last visited Sept. 4, 2005), attached hereto as Exhibit 56.

[189] The relevant provision of the new legislation provides as follows: "Approval required for certain contracts. Notwithstanding any other law, rule or regulation to the contrary, any contract entered into prior to the effective date of this section by the New York Racing Association, Inc., or amendments thereto, which is directly related to the operation, management, or distribution of revenues or design of a video lottery gaming facility at Aqueduct racetrack which contract or amendment either involves a loan or is substantially completed shall be exclusively subject to approval by the lottery division in all respects including the procedures for procurement based upon the division's determination that such contract or amendment optimizes quality, cost, and efficiency."  See, S. 5923, 2005 N.Y. Laws 354.

- During 2002, NYRA engaged in discussions with a number of potential bidders in connection with the VLT project;

- As a result of those discussions, NYRA issued a request for proposals, in the form of a four page letter, to the following entities: (i) Harrah's Entertainment Corp., (ii) Boyd Gaming Corp., (iii) Wynn Resorts, Limited, (iv) MGM Mirage, and (v) Trump Organization.[190]

- The NYRA RFP letter sought from each of the potential bidders a detailed business plan for the Aqueduct VLT project. As set forth in the letter, "NYRA needs to know more about: how you propose to convert NYRA's vacant space into a VLT casino, what you can do to help NYRA finance the project, what level of participation you anticipate requiring or expecting of NYRA throughout, and what costs and fees will be expected in return for your services." NYRA requested specific information concerning:

  o The financing of the project

  o The term of years of the management agreement

  o The management fee and potential buy-out provisions

  o Design and construction (incorporating, or not, the work already completed by NYRA's architect)

  o Proposals for blending the VLT operation with NYRA's live racing and simulcast operations

  o Timelines and budgets

---

[190] See, NYRA VLT project RFP letter, of 12/17/02, attached hereto as Exhibit 57.

NYRA Monitorship

- o Business plan for VLT operations (including financial projections, a plan of operation, a marketing plan, staffing levels, personnel organizational charts, level of control/accountability between NYRA and management firm)

- o Ancillary operations and amenities (i.e., food and beverage service, retail, entertainment)

- o Corporate presence and branding

- NYRA received detailed proposals from (i) MGM, (ii) Harrah's Entertainment Corp., and (iii) Trump Hotels & Casino Resorts.

- NYRA conducted follow-up interviews to review bid proposals with MGM and Trump Hotels & Casino Resorts prior to selecting its management partner.

The monitor was made aware of the above during the course of the monitorship.  As set forth above, this matter is currently before the New York Lottery for its review and approval.

E.  Improved Relationships

It was obvious to us when we began our Monitorship that the NYRA which existed prior to the Indictment was a NYRA which had alienated many of the governmental and private organizations it interacted with and was close-minded to valid criticism and suggestions for reform and change.   Numerous examples of this have been set forth in the reports of the Comptroller and the Attorney General previously cited in this report.[191]   We have witnessed a 180-degree change in the way NYRA conducts its affairs.  We credit the current leadership of NYRA, i.e., its two Co-Chief Operating Officers C. Steven Duncker and Peter F. Karches, who as of January of 2005  also became Co-Chairman of the Board of Trustees, and President and CEO Charles Hayward, with this change in approach and attitude.  The tone has to be set from the top, and the current leadership of NYRA has shown that it recognizes that NYRA must be

---

[191] See, Exhibits 1 and 12.

NYRA Monitorship

accountable to its regulators and protect the interests of the horsemen, jockeys, and backstretch workers who are the lifeblood of racing.

As the franchise holder operating Aqueduct, Belmont and Saratoga, NYRA interacts with numerous regulators, industry participants, and others. Over the course of this monitorship, we have monitored numerous meetings between NYRA and these groups.

1.      State Comptroller

The Comptroller, pursuant to its statutory mandate, has undertaken several audits of NYRA in the past, including several audits of NYRA's franchise fee payments to New York State.  During the course of the monitorship, the Comptroller conducted audits of NYRA's travel and entertainment policies, its contracting and procurement operations, and the franchise fee.[192] The Comptroller is currently working on an audit of NYRA's backstretch operations.   NYRA has cooperated fully with the Comptroller in connection with each of these audits.  Notably, and contrary to what has occurred in the past, NYRA has been responsive to the findings of the Comptroller set forth in its audit reports and has implemented, or is in the course of doing so, policies and programs to address the problems identified therein.   Examples of this are:  a) the implementation of a new Travel and Entertainment policy, as well as a Code of Ethics for all employees, officers and members of the Board of Trustees, in response to the Comptroller's audit of NYRA's Travel and Entertainment policies; and b) NYRA's ready acceptance of the Comptroller's findings with respect to its contracting and procurement procedures (see section of this report, supra, for a full discussion) and the implementation of new policies and procedures to address the issues identified therein.   We have observed that when NYRA has taken a view which differs from that of the Comptroller (for example, with respect to the computation of its franchise fee), it has done so after consideration of the Comptroller's position and engaging in a

---

[192] See, Exhibits 39 and 52; note that the final Franchise Fee Audit report has not yet been issued.

respectful dialogue concerning the matter.    During the course of the Monitorship NYRA has raised certain matters with the Comptroller to solicit the Comptroller's views in advance of taking action.  NYRA has fully cooperated with and been responsive to the Comptroller during the course of the Monitorship.  This is a very positive change from its previous interactions with New York State's Chief Fiscal Officer.

2.    <u>State Attorney General</u>

The Attorney General's Office set forth in great detail in its report  "An Examination of Employee Misconduct at the New York Racing Association, Inc., and Management's Response" issued in June 2003, numerous and serious problems with NYRA's operation of Aqueduct, Belmont and Saratoga.      In an effort to address these issues, NYRA, through its Special Oversight Committee, has met with the Attorney General's Office in an effort to improve its operations and address the issues set forth in this report.  NYRA hired an outside consultant to assist it in this process.  As an example of NYRA's cooperation with the Attorney General and its desire to ensure the integrity of racing at NYRA-operated tracks, it brought the investigative matter discussed above, <u>supra</u>, to the Attorney General's attention, and has fully cooperated with them in the inquiry into this matter.   In addition, in the Summer of 2004, NYRA, together with NYTHA, approached the Attorney General's Office about the issuance of free admittance passes to the track for the spouses and children of horsemen.  The Attorney General's Office identified and supported a needed change in the law, following which both houses of the State Legislature passed such a bill and the Governor signed it into law.  These examples reflect a radical change in  NYRA's  willingness  to  cooperate  with  New  York  State's  chief  legal  officer,  and  to acknowledge and correct problems, instead of pretending they don't exist.

3.     <u>Racing & Wagering Board</u>

As discussed in detail in this report, <u>supra</u>, during the course of our monitorship we have attended numerous meetings between NYRA and the NYSRWB and its employees.  We have witnessed a marked improvement in the manner in which NYRA interacts and communicates with its regulatory agency, from what has been described as its relationship in the past.[193]  For example, although NYRA was late in filing its financial statements in 2003 and 2004, it communicated the specific reasons for these delays to the NYSRWB and provided regular status reports until they were filed.  Ultimately, when the 2004-2003 audited financial statements were filed with the NYSRWB, they provided the most complete and accurate description of NYRA's financial status and operations that the organization has ever compiled.  The current NYRA leadership has demonstrated that they are committed to fulfilling their statutory obligations to NYRA's regulatory agency.

4.     <u>NYTHA</u>

The relationship between NYTHA and NYRA has undergone tremendous progress, as detailed in this report.  The most significant accomplishment is NYRA's  repayment of the money improperly taken from the Horsemen's Account, and the establishment of a segregated trust fund to protect the horsemen's funds in the future.    Another example is NYRA and NYTHA joining together to request the Attorney General's support of the free pass legislation, and NYRA's responsiveness to NYTHA's concerns about the conditions of the monitoring barns at Saratoga.  Lines of communication between NYRA and NYTHA have been established so that in the future, as issues arise, NYRA and NYTHA together can reach resolutions that are in the best interests of New York State and the horsemen.

F.     <u>The Backstretch</u>

---

[193]  <u>See</u>, Exhibits 1 and 12.

NYRA Monitorship

NYRA has expressed its commitment to good conduct.  Social responsibility is one of what the Monitor has termed the Four Pillars of Good Corporate Conduct and it is therefore subsumed within NYRA's commitment.  Nowhere on the track is the need for social responsibility more visible than on the backstretch.  Comprised largely of Latino immigrant workers, the backstretch community bears the responsibility of caring for the horses.  Working as grooms, stable hands, exercise riders and hotwalkers (employees that walk the thoroughbreds for a post-race cool down), backstretch workers literally make racing in New York possible.

As a whole, members of the backstretch community live and work in substandard conditions. The Monitor strongly believes that the treatment of backstretch workers should reflect the significance of their contribution to racing.  As discussed in the Major Accomplishments section of this report, significant improvements by NYRA have already been made, but those accomplishments must be the building block for improvements in the future.

1.    Knowledge of the Backstretch

Backstretch employees typically live in substandard conditions in a state of relative anonymity.[194]   As a result of several key actions, the Monitor was able to penetrate the backstretch and to develop strong ties to this relatively insular community.  The first and most significant step toward penetrating the backstretch was to have a daily presence by the Monitor on the Saratoga backstretch throughout the 2004 Saratoga meet.   With attorneys and investigators, some of whom were bilingual, frequenting the backstretch as early as 6:00 a.m., and then returning in the evening hours as well, the backstretch workers began to communicate with the Monitor.  Additionally, the Monitor's Integrity Hotline, discussed supra at [CITE SECTION], became a regular outlet for reports from and observations by backstretch workers and residents.  With these lines of communication open, the Monitor was able to discern what the

---

[194] Not all backstretch employees live on NYRA grounds.

primary concerns of backstretch workers were and work to address them accordingly.  In turn, the Monitor was able to work with NYRA and the horsemen to improve conditions in the backstretch.

### 2.  Living Conditions on the Backstretch

A significant percentage of backstretch employees reside, free of charge, on the NYRA racetracks.  The backstretch dormitories are available only to persons who are employed on the backstretch.  No children are allowed and men and women are not permitted to share rooms.

The dormitory buildings are intermingled with the stables and other track facilities. Belmont, the largest of the tracks, offers accommodation to backstretch employees year round. Up to 1,000 backstretch employees occupy the 96 residential cottages available at Belmont.[195] Saratoga, which offers seasonal accommodation, has 108 bunkhouses that are home to as many as 1,000 backstretch employees leading up to and during the Saratoga meet.[196]  Aqueduct has the fewest rooms available with space in 13 barns, lodging a maximum of 175 backstretch employees.[197]

The backstretch living conditions at each of the three NYRA-operated tracks are unsatisfactory.  As witnessed and documented by the Monitor, there is an array of issues concerning housing on the backstretch that needs to be addressed.[198]  The Monitor has fully briefed NYRA concerning these issues so that NYRA can rectify the situation.[199]  To date, NYRA has undertaken a large-scale effort to thoroughly clean, and renovate where necessary, the dormitory rooms and bathrooms at Aqueduct, Belmont and Saratoga.[200]  While this

---

[195] Based upon representations made to the Monitor by NYRA's Facilities Department.
[196] Id.
[197] Id.
[198] See, June 1, 2005, "Living Conditions on the Backstretch; Investigative Findings by the Federal Court-Appointed Monitor of the New York Racing Association, Inc.," PowerPoint presentation, attached hereto as Exhibit 58.
[199] Id.
[200] Id.

amelioration is commendable, it needs to continue. Similarly, there needs to be a long-term, joint commitment by NYRA and the resident backstretch workers to maintain the facilities.

### 3. Working Conditions of Backstretch Employees

The backstretch workers at Aqueduct, Belmont and Saratoga are employed directly by trainers who stable their horses at NYRA-operated tracks. Although the backstretch employees do not work for NYRA, they do work on NYRA grounds. Therefore NYRA has a social responsibility to ensure that the backstretch workers are treated humanely and within the bounds of the law by their employers.

The most significant concern expressed to the Monitor by the backstretch community was that, in order to keep their jobs, many of them feel compelled to work seven days per week. Despite general business practices and guiding labor laws, a seven-day work week is typical on the backstretch. Only a small percentage of trainers give their employees a day or more per week off. It was apparent to the Monitor that a significant number of backstretch employees genuinely fear that they will be fired and replaced by their employer trainers should they take any time off.

A second employment-related concern echoed throughout the backstretch community was that workers are underpaid. Rates of pay on the backstretch vary according to the employer and the position held.[201] According to sources, many workers are paid less than the current New York State minimum wage rate.[202]

---

[201] According to observations by the Monitor, the average weekly salary for a hotwalker hovers about $200 while a groom can make upwards of $400. See also, Dennis Yusko, Race Course Workers' Health Care on Track, The Times Union, July 26, 2005, at A1, attached hereto as Exhibit 59.

[202] The New York State minimum wage was increased to $6.00 per hour as of Jan. 1, 2005, and will be increasing to $6.75 on Jan. 1, 2006. See New York Department of Labor Wage and Hour Law available at http://www.labor.state.ny.us/workerprotection/laborstandards/workprot/lshmpg.shtm (last visited Aug. 28, 2005).

Lastly, the Monitor received numerous reports of employee mistreatment on the backstretch, including sexual harassment, discrimination, and verbal and physical abuse. Although the evidence is largely anecdotal, there seems to be a general concern that these issues are extant but poorly documented because of underreporting. NYRA should encourage NYTHA and/or other appropriate organizations to educate backstretch employees about their rights and to develop a viable reporting mechanism by which employees can lodge complaints of this nature with independent and trained professionals. In no instance should NYRA tolerate this type of behavior on the track when it comes to NYRA's attention and it is substantiated.

4.     Backstretch Dialogue With NYRA, NYTHA, and the Workplace Project

In its effort to be a socially responsible entity, NYRA should explore meaningful and effective ways to ensure that backstretch employees are treated humanely and within the bounds of the law. The first step of that process will be improving communication between all of the affected parties.

On July 20, 2005, leadership from NYRA and NYTHA met with a committee of backstretch employees and representatives from an organization known as the Workplace Project. The Workplace Project is a nonprofit organization that aims to protect low-income Latino immigrants from exploitation and support them in their struggle to ameliorate their living and working conditions. Given that the vast majority of backstretch employees on NYRA-operated tracks are Latino immigrants, the Workplace Project has a vested interest in the operation of the backstretch. To date, the Workplace Project has not only offered on-site Workers' Rights courses to interested backstretch employees but has also facilitated the circulation of a worker-initiated petition. The petition calls for, among other things, one day off the current seven-day work week without a reduction in wages, the payment of overtime for

those workers who work more than 40 hours a week, and a code of conduct guaranteeing just and humane treatment for all backstretch workers.  The petition was well received within the backstretch community.  By the conclusion of the Monitorship, over 2,000 backstretch workers had signed the petition.  The Workplace Project presented the petition to representatives of NYRA and NYTHA at the July 20th meeting.

All parties involved agreed that this meeting was the beginning of a meaningful discourse by and between NYRA, NYTHA, and the backstretch employees and the Workplace Project.[203] The Monitor strongly suggests that these parties continue to keep the lines of communication between them open and cooperate together to identify and resolve the complex issues affecting the backstretch working environment.

5.    Backstretch Reorganization: The Backstretch Employee Services Team

The organization of backstretch healthcare and benevolence programs is in the process of being restructured.  The new backstretch healthcare program (discussed infra) and a selection of other benevolence programs have been consolidated to operate under an umbrella 501(c)(3) organization known as the Backstretch Employees Services Team ("BEST"), which was formerly known as the Backstretch Employees Assistance Team ("BEAT").[204]    This consolidation was meant to improve communication and enhance coordination between the various backstretch entities. Additionally, given that it is a 501(c)(3) not-for-profit organization, all donations to BEST will be considered tax deductible to the extent permissible by law.[205]  This is particularly significant considering that the new health benefits program will be enveloped in

---

[203] Charles Hayward, NYRA President and CEO, recently informed the Monitor that NYRA has arranged for a second meeting to occur on or about September 21, 2005.
[204] While most backstretch benevolence programs have been consolidated to operate under BEST, the Backstretch Education Fund (a 501(c)(3) organization operated by Lisa Ford), the Belmont Childcare Association (which operates the Anna House), the Chaplaincy and the New York Backstretch Employees Pension Plan fall outside of the BEST program.  See, May 2, 2005 Backstretch Benefits Organization Chart, attached hereto as Exhibit 60.
[205] See, NYRA Backstretch Health Benefit Organization Structure summary, attached hereto as Exhibit 61.

131

the new BEST structure, thereby making charitable contributions from NYRA, NYTHA and the Jockey Club to the health benefits program tax deductible.[206]

      6.    Health Care

Through joint funding by NYRA, NYTHA, and the Jockey Club, medical insurance has been and continues to be available to backstretch workers.[207] The previous backstretch health benefits plan was operated by Empire Blue Cross Blue Shield ("EBCBS") from 1999 through and including August 1, 2005. The EBCBS plan had a number of drawbacks, including but not limited to high administration costs,[208] high co-payments and annual deductibles, no pharmacy benefits, and low enrollment.[209]

After receiving external consultation from Empire Health Advisors ("EHA"), on August 1, 2005, NYRA replaced the EBCBS program with a new health benefits program operated by MagnaCare.[210] According to NYRA representatives, the MagnaCare program will address all of the aforementioned deficiencies in the EBCBS program and expand individual coverage available to backstretch employees. Accordingly, it is expected that enrollment by backstretch employees will increase tenfold.[211] Already, enrollment has spiked from 103 enrollees under the

---

[206] In 2003, the following contributions were received by BEST (operating as BEAT at the time): from NYRA ($603,107), NYTHA ($466,000), and from the Jockey Club ($44,600). See, Empire Health Advisors, "NYRA backstretch Workers; Funding for Health Care Services/2003" Summary, Nov. 3, 2004, attached hereto as Exhibit 62.

[207] NYRA committed to make voluntary contributions to BEST in the same amount that it previously provided to the Empire Blue Cross/Blue Shield health benefits program, provided that such contributions are not determined to be unlawful. See, Letter from Charles E. Hayward, President and Chief Executive Officer of the New York Racing Association, Inc., to Nancy Kelly, Chairperson of the Backstretch Employees Services Team of New York, Inc. of 7/22/05, attached hereto as Exhibit 63.

[208] The cost of administering the backstretch healthcare insurance program - the administration of which was conducted by NYRA, NYTHA and a third party administrator – was $433,850 in fiscal year 2003. See, Empire Health Advisors, "NYRA Backstretch Workers; Spending for Health Care Services" Summary, Mar. 14, 2005, attached hereto as Exhibit 64.

[209] Only 15% of the backstretch employee population used EBCBS benefits in 2003. See, Backstretch Workers Healthcare Initiative memorandum, attached hereto as Exhibit 65.

[210] See, MagnaCare Participant Letter of July 2005, attached hereto as Exhibit 66.

[211] EHA projected that roughly 1,000 workers will take advantage of the new MagnaCare program within the first year, whereas only 103 workers were registered to receive benefits under the EBCBS program as of April 2005 (according to a representation made by NYRA at a BEST Board of Directors meeting held on April 14, 2005).

EBCBS program in April 2005 to over 600 persons currently enrolled in the MagnaCare health benefits plan.[212]

In addition to revamping the health benefits coverage, improvements to on-track health care facilities have been made.  In cooperation with BEST, NYTHA and Schenectady Family Health Services, NYRA opened a health clinic in Saratoga on July 27, 2005.[213]  This is the first time that a full-scale medical clinic has been available to address the health needs of the hundreds of Saratoga backstretch workers.[214]  Furthermore, the clinic boasts a bilingual staff that is able to communicate well with the largely Spanish-speaking backstretch population.[215]  The clinic was open every day of the Saratoga meet and is scheduled to be open two days per week during the spring and fall training seasons.[216]  Roughly 10-12 patients have been seen at the clinic each day since its opening.[217]

The new healthcare benefits program has not been established without criticism.  The dominant complaint reported to the Monitor relates to family coverage under the new MagnaCare program.  While the previous EBCBS health benefits program covered spouses and dependents of backstretch workers, the new MagnaCare health benefits program does not.[218]  Prior to the inception of the MagnaCare program, approximately 25% of those persons enrolled in the EBCBS program had family coverage.[219]  Those backstretch employees with families affected by the change have been directed to apply for state insurance plans, such as Family

---

[212] According to a representative of the NYRA Backstretch Insurance office, over 624 persons had been enrolled in the MagnaCare program as of August 26, 2005.
[213] See, Exhibit 32.
[214] Prior to the opening of the clinic, backstretch workers in need of immediate medical attention would have to go to the First Aid station that serviced the entire racetrack.  Id.
[215] Id.
[216] Id.
[217] Reported to the Monitor on August 25, 2005 by a Schenectady Family Health Services employee.
[218] According to a backstretch "Survey on Health Care Access" conducted by EHA and attached hereto as Exhibit 77, 53% of backstretch workers are married and 40% of backstretch workers have children living with them.
[219] On or about August 31, 2005, a representative of the NYRA Human Resources Department told the Monitor that 44 of 175 EBCBS enrollees had family coverage.  Note that the number of enrollees, 175, varies from the number of enrollees (103) mentioned above.

Health Plus and Child Health Plus, at their own expense.[220]  NYRA did not begin the process of contacting previously enrolled employees about the change in coverage until July 20, 2005, just 11 days before the EBCBS coverage terminated.[221]  Therefore, spouses and dependents of EBCBS enrollees had little opportunity to obtain alternate coverage before the termination of their own.   The Monitor has been advised that NYRA is re-evaluating the possibility of family coverage under the MagnaCare program.

Additionally, the Monitor has received complaints relating to provider options under the new MagnaCare system.  First, the provider network under the new MagnaCare program is much more limited than the previous provider network under EBCBS, thereby limiting enrollees' provider choices.   Second, the distance to local providers in Saratoga has raised concerns regarding transportation.  The Saratoga clinic provides a limited number of services on-site; other services, including but not limited to podiatry, dental care, and Planned Parenthood services, are only available through other providers, many of whom are located in Schenectady or further away from the track.  As a result, backstretch workers who do not own cars rely upon the Chaplain or BEST employees to take them to the other provider offices.  It has been reported to the Monitor that this has led to late, missed and cancelled appointments.

7.   The Backstretch Pension Fund

The New York Backstretch Employees Pension Plan ("Pension Plan") is a pension fund organized to benefit backstretch employees in the New York racing community.   The fund is

---

[220] See, NYRA Inter-Office "Loss of Benefits" Memorandum from Vivian Muniz to Frank Franzini, Aug. 20, 2005, attached hereto as Exhibit 68.
[221] Reported to the Monitor by a representative of the NYRA Backstretch Insurance office.

reported to have over $35 million in its coffers.[222]  According to representatives of NYTHA, the administrative costs for operating the fund are near to $400,000 per annum.

The Pension Plan is a separate legal entity from NYRA and, as such, did not fall under the Monitor's Court-ordered mandate.  That said, NYRA does remit purse monies to the Pension Plan on behalf of the horsemen and the benefits offered by the Pension Plan affect the very people that constitute the backbone of New York racing.[223]  Therefore, NYRA has an interest in the proper operation of the Pension Plan.

During the course of the monitorship, the Monitor made certain observations about the Pension Plan that indicate a need for further investigation by an authorized regulatory or investigative body.  First, there is a need to effectively communicate to backstretch employees information concerning the Pension Plan and its benefits.  Furthermore, in interviews with the Monitor, a number of backstretch employees indicated that communication about the Pension Plan was hampered by hostile administrators who are not bilingual.  Many backstretch workers are unable to procure or produce the paperwork required to obtain a pension.  The lack of required documentation can result from illiteracy, poor record keeping, or unrecorded cash payments from their employers.  Also, the backstretch employee community is composed largely of Latino immigrants, many of whom return to their native countries upon retiring from the track.  If the employees who leave have not registered to receive their pension prior to leaving

---

[222] See, Jennifer Koons, NYTHA board member profile: Dan Schmidt, NYTHA Newsletter, Vol. 4, Feb. 2001, available at http://www.nytha.com/2001Newsletters/0102Newsletter/p07.htm (last visited Sept. 4, 2005), attached hereto as Exhibit 69.
[223] "The state racing and wagering board may, as a condition of racing, require all trainers and owners engaged in racing at meetings of any association or corporation subject to its jurisdiction to participate in a pension plan or trust established, or which may be established, by trainers and owners for the benefit of stable employees (backstretch workers) regularly employed at such meetings…. The state racing and wagering board shall, as a condition of racing, require any non-profit racing association and every other corporation or association subject to its jurisdiction to withhold one percent of all purses and, in the case of a non-profit association, to pay such sum to the horsemen's organization or its successor that was first entitled to receive payments pursuant to this section[.]"  See N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 221 (1-2) (McKinney 2005).

and/or they give no forwarding address, they will not receive their rightful pension benefits.   All of these factors contribute to the unfortunate reality that there are countless individuals who, as eligible former backstretch employees, are entitled to receive a pension but are not collecting it.

The Monitor strongly suggests that the structure and operation of the Pension Plan be further examined by an appropriate regulatory or investigative body.  In addition, the Monitor would recommend that NYRA work with representatives of the Workplace Project to better educate and inform backstretch employees about the conditions for receiving a pension and the benefits that would be available thereunder.

8. Conclusion

NYRA's commitment to social responsibility is a commitment to the backstretch.  This commitment can be demonstrated by contributions to BEST, the Backstretch Education Fund, and the Belmont Childcare Association, substantial improvements to and continued maintenance of lodging facilities, and NYRA's participation in a meaningful and on-going discourse with horsemen and backstretch employees alike about the working conditions on the track.  These steps are part of a larger effort to improve the quality of life for the individuals that make racing possible and that effort, if sustained, will further set NYRA aside as a leader in the horse racing industry.

G. Exploration of New Business Models

The current position and perspective of NYRA leadership is that the statutory business model under which NYRA currently operates is so flawed that, while NYRA seeks to continue to be the provider of top-tier thoroughbred racing in New York State, it would not be willing to do so under the current model. [224]

---

[224] NYRA CEO Charles Hayward, NYRA: The Present, The Future, supra.

In recent weeks, with much talk in the industry of the state of New York racing and the impending RFP process, NYRA has remained relatively quiet.  NYRA leadership has informed the Monitor that it does not want to appear presumptuous, discussing the future of the organization while its fate under the pending federal criminal Indictment is unclear.

NYRA has communicated to the Monitor its position that future success in New York racing demands fundamental changes to the business and regulatory environment in which the franchisee operates.  In monitoring NYRA's operations, particularly over the past ten months, the Monitor has been witness to significant and varied efforts by new NYRA leadership to position the company to effectively compete in the upcoming RFP process.  NYRA has advised the Monitor that, in this regard, it is exploring the use of new business models.

H.      Monitor Master List

As we discussed in our first public report to the Court, in the years prior to the monitorship, detailed reviews of NYRA's operations were conducted by various governmental agencies.  These agencies issued comprehensive reports that included recommendations for improvement and change.  In addition, also prior to the monitorship, NYRA hired an outside consultant to further review its operations and to recommend improvements thereto.  Based on our review of the various reports, including those of the State Comptroller and the State Attorney General, the Monitor compiled a comprehensive forty-four page Master List setting forth the issues and recommendations for change identified prior to the commencement of the monitorship.  The Monitor Master List was attached as an exhibit to the sealed portion of our First Report given the sensitive nature of some of the issues reported therein (e.g., security vulnerabilities).

Without making reference to the specific content of the Master List, we note that over the course of the monitorship, NYRA has addressed and successfully resolved virtually every issue on the Monitor Master List.  Both through this report, and through information disclosed by NYRA or the Monitor prior to the date of this report, the vast majority of the issues on the Master List have been publicly reported.

**CONCLUSION**

What is the value of the horse racing industry to New York State?  We submit to you that our horse racing industry is nothing less than a state treasure.

Why did the film Seabiscuit resonate so in America?  We suggest that it is because horse racing, and all that it implies, can be a metaphor for the best in all of us.

When one accepts the privilege to run horse racing in New York State, one accepts a trust for all of its citizens.  And that's where the old NYRA failed.  It lost its way and became arrogant and insensitive and corrupt.  Therein lay the challenge to NYRA's trustees and to this Monitorship.

When people look back on this experience, we hope they say this was the time that NYRA found itself again.  Not just that NYRA perhaps escaped prosecution.  Rather, it was a time when the trustees of racing in New York remembered what their responsibilities entailed.  And they stepped up and reformed NYRA to fulfill its true purpose.

The People of the State of New York deserve nothing less – particularly, the owners, trainers, jockeys, breeders, the backstretch workers, NYRA's employees, and the myriad of individuals whose lives and jobs are tied to this industry.

As of this writing, we do not know who will be entrusted with the future franchise to run New York racing.  But we do know this.  Somewhere between the advent of the DPA and today, NYRA found itself again.  And when all the empirical analyses are over and done, the most important measure will be that NYRA succeeded in making this franchise reflect its true value.

It did so by embracing the Four Pillars of Good Corporate Conduct – integrity, transparency, good governance and social responsibility.  It committed to be measured by the business performance standards of profitability, productivity, effectiveness and efficiency.   It implemented the principle that that good conduct means good business and it acted on that belief.

We believe that Government at every level should support NYRA's integrity-based actions.  Law enforcement must remain vigilant against market driven misconduct.[225]

Of the many recommendations set forth in this report, we most strongly recommend that:

(1)     The Racing and Wagering Board act as soon as possible on the joint NYRA / Capital OTB and Nassau OTB Player Reward Program proposal (pending since May 6, 2005) as a countervailing measure to the cut-off of rebate shops (see, pp. 60-66, 89-90, above); and

(2)     The forthcoming RFP for the franchise to run racing in New York State should include the specific criteria set forth in this report and not take us backwards to lesser practices and standards that continue to exist elsewhere (see, pp. 92-94, above).

[continued on next page]

---

[225] See, Richard M. Cooper, Enforcement Against Market-Drive Misconduct, Business Crimes Bulletin, June 2005, attached hereto as Exhibit 70.

It has been our privilege to undertake this Monitorship.  We hope that the results achieved will be of substantial benefit to the New York thoroughbred horse racing industry, its constituencies, and all New Yorkers.

DATED:  New York, New York                    GETNICK & GETNICK
        September 13, 2005                    Rockefeller Center
                                                   620 Fifth Avenue
                                                 New York, NY 10020-2457
                                                 Tel.: (212) 376-5666
                                                 Fax: (212) 292-3942

                                               by:  /S/ NEIL V. GETNICK____
                                                  Neil V. Getnick (NG-9864)
                                                   Margaret J. Finerty (MF-3771)
                                                   Richard J. Dircks (RD-0530)

                                             Federal Court-Appointed
                                             Independent Monitor of the New
                                           York Racing Association, Inc